UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE
2022 APR 12   AM 11: 05

Michelle Nicole Bonet

_____

Write the full name of each plaintiff.

No. _____
(To be filled out by Clerk's Office)

-against-

New York State Department of Corrections

and Community Supervision

_____

_____

_____

Write the full name of each defendant. If you cannot fit the
names of all of the defendants in the space provided, please
write "see attached" in the space above and attach an
additional sheet of paper with the full list of names. The
names listed above must be identical to those contained in
Section IV.

**COMPLAINT**
(Prisoner)

Do you want a jury trial?
☒ Yes   ☐ No

---

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed
with the court should therefore *not* contain: an individual's full social security number or full
birth date; the full name of a person known to be a minor; or a complete financial account
number. A filing may include *only*: the last four digits of a social security number; the year of
an individual's birth; a minor's initials; and the last four digits of a financial account number.
See Federal Rule of Civil Procedure 5.2.

## I.    LEGAL BASIS FOR CLAIM

State below the federal legal basis for your claim, if known. This form is designed primarily for prisoners challenging the constitutionality of their conditions of confinement; those claims are often brought under 42 U.S.C. § 1983 (against state, county, or municipal defendants) or in a "*Bivens*" action (against federal defendants).

☒  Violation of my federal constitutional rights

☐  Other:  _____

## II.    PLAINTIFF INFORMATION

Each plaintiff must provide the following information. Attach additional pages if necessary.

Michelle    Nicole    Bonet
_____
First Name          Middle Initial          Last Name

_____

State any other names (or different forms of your name) you have ever used, including any name you have used in previously filing a lawsuit.

17G0689
_____
Prisoner ID # (if you have previously been in another agency's custody, please specify each agency and the ID number (such as your DIN or NYSID) under which you were held)

Taconic Correctional Facility
_____
Current Place of Detention

250 Harris Road
_____
Institutional Address

Bedford Hills, New York 10507-2498
_____
County, City                          State                          Zip Code

## III.    PRISONER STATUS

Indicate below whether you are a prisoner or other confined person:

☐  Pretrial detainee

☐  Civilly committed detainee

☐  Immigration detainee

☒  Convicted and sentenced prisoner

☐  Other:  _____

## IV.    DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

Defendant 1:    New York State Department of Corrections and

First Name                    Last Name                    Shield #

Community Supervison

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

Defendant 2:

First Name                    Last Name                    Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

Defendant 3:

First Name                    Last Name                    Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

Defendant 4:

First Name                    Last Name                    Shield #

Current Job Title (or other identifying information)

Current Work Address

County, City                    State                    Zip Code

## V.    STATEMENT OF CLAIM

Place(s) of occurrence:    `Please See Attached`

Date(s) of occurrence:    `Please See Attached`

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

`Please See Attached`

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

Please See Attached

## VI.    RELIEF

State briefly what money damages or other relief you want the court to order.

$4,700,000.00

## VII.   PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

03/29/2022
Dated                                                Plaintiff's Signature

Michelle Nicole Bonet
First Name            Middle Initial        Last Name

250 Harris Road
Prison Address

Bedford Hills, New York 10507-2498
County, City                  State              Zip Code

Date on which I am delivering this complaint to prison authorities for mailing: 4/4/22

**MICHELLE BONET**

v.

**NEW YORK STATE DEPARTMENT OF CORRECTIONS**

FACTS OF THE CASE & STATEMENT OF CLAIM ATTACHMENT

1. The post office address of the claimant (you) is Taconic Correctional Facility 250 Harris Road, Bedford Hills, New York 10507-2498

2. This claim arises from the acts or omissions of the defendant. Details of said acts or omissions are as follows: Claimant is an Incarcerated Individual who at the time of the incident, was housed at Albion Correctional Facility. Claimant applied and was approved for a Department of Correction (herein DOCCS) privilege, Family Reunion Program (herein FRP). Claimant was accused of drug use and removed from the FRP visit and sent to Special Housing Unit (Herein SHU) for prehearing confinement.

3. On January 25, 2019 at approximately 8:30am Claimant reported for a urine test which was a routine full scan in conjunction with her first FRP trailer visit with her husband and 3 children (at the time ages 10,12,14).

4. At approximately 1:30pm on January 26, 2019 while participating in the second day of a 3day/2night visit with her family, Claimant was asked, via intercom, to report to the FRP officer's station without explanation. She informed her family she would be right back. Upon reporting to the officer's station, a Sargent informed Claimant she tested positive for a drug called "AB-Pinaca" and she was not permitted to return to her family as the visit was now terminated. Claimant made it clear that something must be wrong because she did not use drugs, and was well aware the urine test was be expected as part of the FRP visit. Claimant was then cuffed and escorted to SHU without humane departure from her family. Directly following, Claimant's Husband and children were informed they had one hour to evacuate the FRP premises. Claimant's family lives 8 hours away from Albion Correctional Facility.

5. On January 28, 2019, while in SHU, Claimant was served with a Tier III misbehavior report. A hearing was conducted on January 31, 2019 by Hearing Officer (herein HO) Captain Batson. It was adjourned and continued on February 4, 2019, was adjourned and then continued on February 7, 2019; and adjourned again. On this date, a request for extension was requested and allegedly granted by the DOCCS. At said hearings, Claimant stated that she was not a drug user, was in fact a model inmate with no disciplinary history during the 15 months she has been in DOCCS custody. Her FRP application had been denied, and she was required to appeal that decision to earn the program. She completely knew she would be tested in accordance with the directive to participate in FRP, and strongly believed some other unknown factor must be the cause of the positive urinalysis result. Claimant asked for a list of medications known to cause false results, which is commonly generated by urinalysis manufacturers as standard practice. The HO, Captain Batson understood the claimants concerns and committed to "getting to the bottom" of this situation.

6. During a subsequent hearing session, HO Batson provided a list of medications on a document provided by Thermo Scientific labeled, AB-Pinaca Assay. The Assay document lists all medication tested against the AB-Pinaca enzyme, medications known NOT to cause false results (The opposite of what was requested). The medication, Prazosin, which Claimant was prescribed and took as a mental health medication, was not one of the medications tested against the enzyme. Claimant asked what the results of an untested medication would have on the urinalysis. HO Batson responded, "she did not know". Nurse Baker (an Albion Staff Nurse), was contacted as a witness via phone and asked if Claimant was on any medication that would cause a false result on a urinalysis. Baker responded "no". Claimant stated, "the limitations" section on the AB-Pinaca Assay document reports, "any substance not part of the specificity study could cause a false result"". Baker insisted no medication could alter the test regardless of the document provided by the manufacturer of the urinalysis machine. During this hearing it the Claimant discovered that the urinalysis machine had been implemented the 2nd week of

January (1-2 weeks prior) and the facility did not have all the documentation for the product yet so no additional information was available.

7.   On February 6, 2019, Claimant was interviewed by DOCCS Office of Special Investigation.   Special Investigator Ryan indicated that he believed the Claimant's statements and would assign staff to explore what was happening with the new machine.

8.  On February 6, 2019, while confined, Claimant contacted Prisoner Legal Services (herein PLS) to request assistance with challenging a Tier III hearing.  PLS informed that they could not assist until after a disposition was rendered, and then appealed to the Director of Special Housing/Inmate Disciplinary, and she received a response to the appeal.  While awaiting said reply, Claimant signed release forms permitting PLS to obtain hearing records and tapes of the hearings.

9.  After the 3rd hearing date (February 7, 2019), Claimant waited in SHU to proceed with the hearing; then on February 15, 2019, while on rounds, Claimant asked Captain Goodman why her hearing had not continued.  She was told Captain Batson had not returned to work and yet another extension was filed.  On or around February 21, 2019, while **STILL in SHU**, Claimant once again inquired why her hearing had not continued; and was once again told, Captain Batson still had not returned and a subsequent extension was filed. Claimant requested assignment of another hearing officer because she was relegated to solitary confinement in SHU the entire time the hearing was paused.

10.  On February 26, 2019, on the Claimants 31st day of SHU confinement, the hearing was restarted from the beginning with a new hearing officer, P. Barhite.  Claimant once again explained she was not a drug user and proposed the theory that her mental health medication was not tested by the urinalysis manufacturer and could be the cause of the positive results.  Claimant explained that Special Investigator Ryan had spoken to her, and he was requested as a witness.  HO Barhite denied the witness.  Pharmacist M. Dennis was called as a witness by the HO and she testified she had communicated with the urinalysis

manufacturer and, "no medications Claimant was prescribed would cause a positive result".

11. HO Barhite found Claimant guilty of 113.24 Drug Use. The evidence relied upon was the misbehavior report, testimony of D. Mack - the urinalysis operator with 2 weeks experience on the new machine, a memo from Nurse Baker - who still had limited documentation on the new machine, as well as the testimony from Pharmacist M. Dennis. Neither Nurse Baker nor Pharmacist M. Dennis explained how and untested medication could be ruled out as the cause of a positive test result. Claimant was penalized 60 days keeplock, 60 days loss of recreation, 60 days loss of phones, 60 days loss of commissary, with 15 days suspended (1/26/19-3/12/19). This was the maximum penalty despite this being the Claimant's first ever infraction while in DOCCS custody for 15 months; and an infraction Claimant maintained she did not commit.

12. On February 27, 2019, Claimant was transferred from SHU to Keeplock to complete the 32nd to 45th day of confinement sanctions. Once in Keeplock, Claimant encountered Incarcerated Individual Martinez (17G1112) who informed her, that she was removed from the Work Release program due to a positive urinalysis for AB-Pinaca during a routine test after a return from furlough. Martinez informed she was taking the same medication as the Claimant. Claimant immediately wrote to the Superintendent of Albion Correctional Facility, S. Squires to inform her of the finding that another "model inmate" was currently in confinement with the same set of circumstances regarding the medication prescribed and the positive urinalysis for the same drug. The written response from S. Squires was that the Claimant should appeal the decision to Special Housing just like everyone else.

13. On March 7, 2019 at 10:45am, while still in confinement, Claimant was ordered for a random urine test by Albany for "Full Scan" (all potential drugs). On March 8, 2019 Claimant was served with another (2nd) Misbehavior Report for 113.24 Drug Use; despite being in solitary confinement for the entirety of this situation.

14. On March 13, 2019, HO P. Ciulla conducted a hearing, which was adjourned and commenced several times until March 15, 2019. During said hearings, Claimant explained

she was not a drug user, was a model inmate and did not have the motive or opportunity to obtain or use drugs since she had been in confinement for 40 days at the time of providing the urine sample. Once again, the Claimant proposed the theory that her mental health medication could be causing the positive result. Claimant emphasized the fact that the medication, Prazosin, **had not been researched** against the AB-Pinaca enzyme, consequentially the effect of the medication on the test is unknown. Claimant once again questioned Pharmacist M. Dennis on the effect the medicine, Prazosin, could have on the results of the urinalysis. Pharmacist Dennis stated, "She could not say one way or the other" if the medication was responsible for the positive result since the medication had not been researched. The hearing was adjourned.

15.   On the morning of March 15, 2019, the hearing commenced. Claimant continued addressing the fact that the medication had unknown potential to the AB-Pinaca panel. She reiterated that she was a model inmate with no propensity for drug use, lived in preferred housing where she earned a private room, participated in the college program, held two prestigious employment positions; assisting civilian staff as a teacher's assistant; and was trusted to facilitate Inmate Orientation/Phase 1, where she came in contact with every new inmate entering the facility. She further explained her family lived 8 hours away in the New York City area and earning FRP was crucial to maintaining her contact with her family as she had been a stay-at-home mother to her 3 children. Claimant implored HO Ciulla to consider, she had too much at risk to ever use drugs and she had never displayed a problem with drugs during her 15 months incarcerated at the facility. Claimant asked HO to consider that logic dictated the medication was a sound theory to explain the positive results as her medication had not in any way been ruled out. HO, P. Ciulla insisted she was only able to consider the misbehavior report and the positive urinalysis test results. She told the Claimant that her perfect disciplinary record, status as a college student and any other evidence could not be considered and were irrelevant to the disciplinary hearing. Claimant attempted to further explain that another Incarcerated Individual (Martinez 17G1112), was removed from work release for testing positive for AB-Pinaca and, Martinez was also on Prazosin (the untested medication). In addition Claimant requested OSI be contacted regarding their investigation on this matter. The hearing was adjourned.

16. At approximately 12:30pm on March 15, 2019, Claimant was escorted to an office in the keeplock facility and presented to three representatives of DOCCS Office of Special Investigation, Investigators Ransom and Tirado as well as an intern shadowing them for a day. The officers explained that, prompted by Special Investigator Ryan, they had begun an investigation into her claims that her urinalysis results were false positives. They further explained that Claimant should not have been removed from the FRP visit, and at first glance, they immediately identified something wrong with the circumstances surrounding the case; as it made no sense for the Claimant to use drugs. During this interview, an Albion Officer entered to ask one of the investigators to go and speak to a Dep. who requested to see them. Investigator Ransom left the room. Investigator Tirado continued questioning and Claimant told him about Incarcerated Individual Martinez (17G1112) who was in the same situation and on the same medication. Tirado told the Claimant he would continue his probe in an effort to assist her cause. He also pointed out the directive, which recommends humane departure and, explained that Albion staff should have waited until the FRP visit was over (a mere additional 17 hours) for the interest of the Claimants children who were present. Claimant was then escorted back to her cell.

17. That same date March 15, 2019 at approximately 2:00pm, HO Ciulla continued the hearing. Claimant was found guilty of 113.24 Drug Use and penalized with 60 days SHU, 60 days loss of recreation, 60 days loss of packages, 60 days loss of commissary, 60 days loss of phones, 60 days loss of property. The imposed sanction was the maximum penalty for 113.24 Drug Use.

18. During SHU confinement on March 20, 2019, Claimant wrote to Captain Batson to request entering medical observation 24/7 for as long as required to prove she was not taking drugs; In the hope it would prove she would continue to test positive for AB-Pinaca as long as she was still on the mental health medication Prazosin. Her request was verbally denied. On March 31, 2019 Claimant wrote to S. Squires, Superintendent of Albion Correctional Facility to reiterate her desire to go into medical observation. On April 3, 2019 S. Squires replied she was unable to assist. Request denied.

19.  During her 78 days of confinement, Claimant wrote to **many** DOCCS employees requesting assistance on this matter.  On March 9, 2019 Claimant wrote to Albion Pharmacy, as well as DOCCS Office of Special Investigation (Investigator General S. Maher), Albion Office of Mental Health (herein OMH), Albion Superintendent S. Squires. On March 11, 2019 Claimant wrote to Albion Captain Batson.  On March 19, 2019 DOCCS Commissioner A. Annucci.

20.  While confined in SHU, Claimant requested to see her OMH practitioner, Dr. Razzi. Claimant was informed, while in SHU she would only be allowed to see the practitioner assigned to SHU.  On April 10, 2019 Claimant attended an appointment with SHU OMH practitioner Dr. Lerner and Case Manager Ashton.  The doctor informed her that many patients were being victimized by the same circumstances of false positive test results; but there was nothing OMH could do, as they were technically not part of DOCCS.  When the Claimant asked what options were available to prevent future positive results.  She was told the only options were to switch medications, despite the small range of pharmacology approved for DOCCS use, and the fact that Prazosin was in fact an approved medication. There was no other way to ensure the positive results would stop.

21.  On April 14, 2019 after receiving a 7-day time cut, Claimant was released from SHU having served 32 days SHU, 16 days keeplock, 30 days SHU consecutively (Total of 78 days confinement).  Due to further sanctions upon release, Claimant did not speak to her husband or children for 101 days.

22.  On April 15, 2019, Claimant initiated the process, in writing, to switch medications out of fear of future urinalysis testing.  On May 5, 2019, post SHU release, Claimant had an appointment with prescribing Practitioner Dr. Razzi, Claimant expressed the need to switch medications and Dr. Razzi acknowledged the medicine, Prazosin, was most likely the cause of the positive AB-Pinaca results.  Despite being the prescribing practitioner, Dr. Razzi **was never called to testify** at either of Claimants hearings.  The medications were switched as of 5pm May 5, 2019.  During the month of July 2019 (date unknown) after switching

medications, Claimant was selected for a random urinalysis screening. The test was full scan (all drugs). Claimant was negative for the presence of any drugs.

23. On May 2, 2019, Claimant received the decision for her appeal from D. Venettozzi at the Office of Special Housing / Inmate Disciplinary upholding the guilty disposition; no reason was explained in the letter.

24. On May 10, 2019, PLS submitted a Supplemental Appeal / Request for Reconsideration to D. Venettozzi. Said document identified, due process rights violations during hearings, denial of Claimants right to reply to charges and evidence, and hearing disposition not supported by substantial evidence. On May 24, 2019 PLS received a reply from D. Venettozzi at the Office of Special Housing / Inmate Disciplinary, the disposition was upheld.

25. On June 5 2019, PLS wrote an advocacy letter to: A. Annucci, Commissioner of DOCCS, R. Finnegan, and Assistant Commissioner of DOCCS – Office of Inmate Discipline, S. Squires, Superintendent of Albion Correctional Facility, and Dr. J Morley, Chief Medical Officer at DOCCS. Said letter stated, "A large volume of requests for assistance with false positive urinalysis, had been received from Incarcerated Individuals [Text formerly "inmates"] at Albion Correctional Facility since the implementation of the new Indiko DRI-CEDIA testing system". Reported in the letter, four Incarcerated Individual PLS was representing (Claimant included) were the least likely to consume drugs due to their history and model inmate status. Additionally PLS indicated a similar situation in 2010 at Attica Correctional Facility, where the volume of calls to PLS for false positive assistance increased radically and then led to DOCCS identifying a calibration error resulting in false positives. PLS requested investigation into the matter.

26. On July 8, 2019, Claimant retained the services of Cheryl Kates Esq. to represent her interest in challenging both Tier III hearings. On July 9, 2019, C. Kates submitted a Request for Reconsideration pertaining to the January 2019 and March 2019 misbehavior reports. Said request identified further rights violations and additional matters that

established an unfair and biased process, which had determined the Claimant guilty of 113.24 Drug Use. On July 25, 2019, D. Venettozzi of the Office of Special Housing / Inmate Disciplinary replied to the request. The reply stated, "all testing procedures have been confirmed to have been conducted within proper departmental procedures", he would not reconsider the previous decision. The reply did not acknowledge the medication Prazosin; it did however note the Claimant should, "avoid any further disciplinary problems". Due to financial concerns, the Claimant chose to proceed to Article 78 Pro Se.

27. **Communication with Thermo Fisher Scientific Inc.** – On September 13, 2019 Cheryl L Kates, representing Claimant contacted Marc N. Casper, CEO of Thermo Fisher Scientific, the manufacture of the Indiko Plus Analyzer DRI-CEDIA Drug Testing System; to communicate problems associated with the machine as they relate to her client. On October 11, 2019, Marc Casper sent a letter to Cheryl Kates responding to her concerns. The letter indicated that, "Microgenics' drugs of abuse tests are all **preliminary tests**, and because of this the Instructions For Use ("IFU") expressly require a more specific confirmatory test to be run to obtain a confirmed analytical result". In addition, the letter informed that, company complaint logs for since 2017 only contained nine complaints in total and only four related to NYS DOCCS. Of those four only one was registered in 2019. The letter confirmed that there were many untested medications because it is not feasible to test all medications; however, the letter also indicated that during September 2019 DOCCS had made modifications so the assays were "less sensitive". Throughout the letter emphasis is placed on the use of confirmatory testing in the case of unconfirmed positive results.

28. **Grievance Process** - On March 11, 2019, while confined, Claimant filled a grievance regarding the problems with the use of the newly implemented, Thermo Scientific Indiko Plus Analyzer DRI-CEDIA Drug Testing System (Grievance #ALPC-12335-19). On March 28, 2019 the grievance was denied on the basis that the "machine was calibrated **every time** it was used". On March 31, 2019, Claimant appealed Inmate Grievance Review Committee (herein IGRC) decision to Superintendent S. Squires, as per 7NYCRR §701.5, and DOCCS directive 4040. In the appeal, Claimant explained the problem was not the

calibration but an issue of false results due to untested medication. On April 8, 2019, the appeal was denied on the basis that the machine calibrations are done on a **weekly** basis. The denial additionally stated the manufacturer had found no medication that caused a false positive (despite the manufacturer's documentation indicating the opposite). On April 9, 2019, Claimant appealed the Superintendents decision to DOCCS Central Office Review Committee (herein CORC) as per 7NYCRR §701.5, and directive 4040. Since no reply had been received within 4 months administrative options had been exhausted, as per 7NYCRR §701.5(d)(2)(ii). An article 78 proceeding was initiated. Upon questioning Albion Correctional Facility Civilian Grievance Representative Thomas reported, central office is 1.5 years behind in replying to grievances. On December 1, 2020 (21 months later), Central Office replied, "Grievant's Request Unanimously Accepted **In Part**.....Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby accepted in part....CORC notes that neither grievant has a misbehavior report listed in the DOCCS computer system as a result from urinalysis testing.....With respect to the grievant B...'s appeal, CORC finds insufficient evidence of malfeasance by staff"

30. **Grievance Process** - On March 5, 2019 while still confined, Claimant filed a second grievance regarding the Pharmacy Dept. misrepresentation of the medication, Prazosin, not causing false positives when tested against the AB-Pinaca enzyme (ALPC-12369-19). On April 11, 2019 the grievance was denied as the chemical composition was not deemed close enough to warrant consideration for testing against the AB-Pinaca enzyme. Claimant appealed to the Superintendent who denied the grievance on April 19, 2019 on the grounds "Thermo Scientific did not find the chemical composition close enough to warrant further testing". Thermo Scientific refused to test the medication, Prazosin. Claimant appealed to CORC, requesting Thermo Scientific test the medication, Prazosin, against the AB-Pinaca enzyme. Since no reply had been received within 4 months, administrative options had been exhausted, as per 7NYCRR §701.5(d)(2)(ii). An article 78 proceeding was initiated. Upon questioning, Albion Correctional Facility Civilian Grievance Representative Thomas reported, central office is 1.5 years behind in replying to grievances. On August 13, 2020 (17 months later), Central Office replied, "Grievant's Request Unanimously Accepted **In Part**.....Upon full hearing of the facts and circumstances in the instant case, and upon

recommendation of the Division of Health Services, the action requested herein is accepted in part........CORC notes that the grievant's complaint has been reviewed by the Division of Health Services' staff who advise that a complete investigation was conducted and that the grievant is receiving appropriate treatment.  CORC further notes that she is no longer prescribed Prazosin........CORC recommends that the grievant address any further medical concerns to medical staff via established sick call procedures.

31. **Documentation** – During the initial hearings with Capt. Batson (January 31, 2019, February 3, 2019, February 7, 2019); Claimant requested information about a urine test which had been conducted, within FRP directive, one week prior to the January 25, 2019 positive result.  Claimant was informed by HO Batson that the AB-Pinaca levels on January 19, 2019 were 19.6 and the cut off was 20; therefore, Claimant was .4 away from a positive result.  She asked why no one notified her considering a week later she would be tested again, only this time her three children would be there.  HO Batson stated that it was not facility policy.  Claimant requested copies of the January 19, 2019 urinalysis results and was told, "it was unnecessary to provide her with the copy".

32. **Documentation** – During the hearings with HO Ciulla (March 13, 2019 and March 15, 2019), Claimant asked about the January 19, 2019 results, and requested a copy.  HO Ciulla informed the Claimant that the levels were high and she did not need a copy.

33. **Documentation** – On March 24, 2019 while confined in SHU, Claimant filed a Freedom of Information Law (herein FOIL) request for a copy of the January 19, 2019 urinalysis results report.  On May 18, 2019, Claimant again requested a copy of said report.  On May 20, 2019 Offender Rehabilitation Coordinator / FOIL Officer T. Leon replied, she sent a letter requesting funds for the copy.  On May 21, 2019, Claimant replied that she had not received the letter and furnished the finds for the copy.  On May 29, 2019, Claimant received a letter from T. Leon, as well as a copy of a urinalysis results report.  Upon further inspection, Claimant realized the report was for another Incarcerated Individual (17G1112 Martinez), the other person who has also tested false positive for AB-Pinaca.  Claimant immediately informed T. Leon in writing that she had received the wrong report.  On June

4, 2019, Claimant received a set of results dated January 26, 2019; on June 5, 2019 Claimant explained that she had not received the results for the appropriate date, and again requested the January 19, 2019 report.  On June 12, 2019, T. Leon wrote to Claimant explaining, the reports she received were from the disciplinary record labeled "Bonet", indicating the results reported to Claimant during her hearings were in fact the results of Incarcerated Individual Martinez.  On July 12, 2019, Claimant received FOIL request for January 19, 2019.  The FOIL request took almost 4 months to complete.

34. **Hearing Tapes** – On March 12, 2019, Claimant requested copies of her hearing tapes dated:  January 31, 2019, February 4, 2019, February 7, 2019, and February 26, 2019.  On March 20, 2019, Claimant additionally requested copies of her March 13, 2019 and March 15, 2019 hearing tapes.

35. **Hearing Tapes** – On April 5, 2019 T. Leon (ORC / FOIL Officer) responded in writing.  The correspondence confirmed all hearing dates and requested funding for the copies.  When the tapes were provided, the January 31, 2019, February 4, 2019, and February 7, 2019 dates were missing.  Claimant wrote to Capt. Goodman requesting the 3 missing hearing tapes.  When the tapes were finally provided they were not audible (slowed beyond discernibility).  Claimant wrote to Capt. Goodman again, requesting audible copies of the 3 hearing tapes.  Two months later new copies were provided.  When Claimant listened, they were once again not audible, this time speeded up beyond discernibility.

36. **Court Proceedings and Administrative Remedy** – On September 26, 2019 Claimant filed an Article 78 to request judicial intercession on this matter.  The initial court date was scheduled for October 29, 2019.  This date was postponed until November 26, 2019 and then again until January 9, 2020.  On January 3, 2020 DOCCS administratively reversed the dispositions of Claimants disciplinary proceedings of February 26, 2019 and March 15, 2019.  On January 22, 2020 Acting Supreme Court Justice Sanford A. Church dismissed the matter as moot due to the administrative reversal on January 3, 2020, 345 days after the initial incident of FRP visit removal / SHU confinement.

37. **Medication** – With no alternative to ensure subsequent urinalysis would be accurate, Claimant switched medications on May 5, 2019. Over the course of the next calendar year and a half, many medication combinations were prescribed to mimic the effectiveness of the former mixture with little success. After DOCCS reversal of dispositions and administrative remedy, Claimant requested OMH restore her original combinations of effective medications. OMH denied the request despite many other Incarcerated Individuals still using said medications. Claimant was told, "She could only be prescribed the medication under certain circumstances and she did not meet the criteria". Claimant was on these medications upon entry into prison, and that meets one of the criteria however, since she ended use to ensure her tests would not come back positive, she now would not be able to continue the use of the medications.

38. **Access to Personal Legal Material** – After passing a state exam qualifying the Claimant to work as a Paralegal Assistant in the Law Library, she was assigned to the position early months of 2020. During the fall of 2020, (date unknown), Notification of Intent to pursue a legal claim regarding the drug system failure was sent to the Attorney General. The corresponding documentation was in a file at the Claimants desk in the Law Library (return receipt & copies of the intent). Shortly after, the Claimant was unexpectedly reprogrammed. Law Library Officer in Charge, Kephart, informed the Claimant that she cleaned out her desk and indicated she was not welcome to return to the position in the future. No documentation was ever submitted to the Claimants DOCCS record regarding poor performance or rules breach of any kind. On a later date (unknown due to COVID), the Claimant arrived by schedule to the Law Library and requested her legal file. Kephart stated, "It was a long time ago", indicating she was not going to turn over the file. The Claimant spoke with Captain Batson regarding the matter and the other related issues at the Law Library. She was assured that the matter would be reviewed. Days after, the Claimant was drafted to Taconic Correctional Facility and no further communication has been forthcoming. As a result the Claimant has been denied access to crucial material and dates to complete this legal filing.

## CAUSE OF ACTION

DOCCS FAILED IN THEIR OBLIGATION TO SUPERVISE HEARING OFFICERS CONDUCTING TIER III SUPERINTENDENT HEARINGS, INFRINGING ON SUBSTANTIVE DUE PROCESS. AS A RESULT:

- THE HEARING OFFICERS FAILED TO ASSESS THE CLIENT'S MENTAL HEALTH WHICH PREVENTED INFORMATION WHICH SUPPORTS HER DEFENSE OF FALSE POSITIVE DRUG TESTS.

- HEARING OFFICERS INTERFERED WITH PRESENTING A DEFENSE, CALLING WITNESSES AND DEMONSTRATED BIAS, IN VIOLATION OF DUE PROCESS

- HEARING OFFICERS FAILED TO CAPTURE DISCIPLINARY PROCEEDINGS ELECTRONICALLY TO ALLOW FOR INTELLIGENT REVIEW

- HEARING OFFICERS DETERMINATIONS OF GUILT RENDERED WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

- THERE IS EVIDENCE THESE WERE PRE-DETERMINED DECISIONS, IN VIOLATION OF DUE PROCESS

- THE CLAIMANT ENDURED WRONGFUL SOLITARY CONFINEMENT

---

_**Peoples v. Fischer**_, 11CV 2694 (S.D.N.Y., 2015) challenged the use of solitary confinement and DOCCS proposed new guidelines to guide how the administration of solitary confinement as a punishment would be used. Part of this process included methods to ensure the process was fair and unbiased against the inmate.

Fundamental due process rights are required in a disciplinary matter, _Wolff v. McDonnell_, 418 U.S. 539 (1974). The regulations governing these basic rights were established after the Wolff case was decided. Some of the rights established in the regulations go above what was afforded in the Wolff case.

In both hearings, it is acknowledged the defendant is taking OMH medications yet the hearing officers in both proceedings failed to assess the client's mental health. This is a required factor the hearing officer must consider, and in both hearings, they failed to do so. This would have allowed the doctor, who later indicated there is a possibility of a false positive on both tests due to the medication he prescribed, to testify. This information was not available to either hearing officer because they did not call the doctor as a witness. Instead, DOCCS chosen witness (the pharmacist) was not able to adequately answer the inquiries about false positives and mental health medications; and therefore, the hearing record is incomplete and does not meet the standard of due process.

The pharmacist and a nurse were used between the two hearings to try to conclude there would be no incidence of false positive results. However, this was a new test, which began use in January 2019. There is no evidence these staff members have any familiarity or were trained for the use of the Indiko machine. Where an issue cannot be clarified, the appropriate remedy would be to call the prescribing OMH doctor to clarify the issues present. The hearing officers failed to conduct the hearings appropriately, as they failed to investigate and assist in developing the record for the Claimant / Defendant's claim, that she was not using drugs and these were false positive results, Additionally, the OSI investigator who was investigating the claim, of whether there was an issue at Albion with the machine rendering false positives, was denied as a witness. The hearing officer denied allowing this testimony, they mischaracterized it as character testimony. The testimony would be relevant as the OSI investigator could offer evidence he interviewed several inmates making the same claim. On January 4, 2020 New York State Inspector General

Lucy Lang, held a press conference regarding the investigation into the 2019 DOCCS drug-testing program. The findings indicated that the drug-testing program had been a failure and that over 1,500 unjust hearings based on positive test results had been reversed. If the OSI investigator had been contacted, the developments of this investigation may have been shared and the Claimant would not have been exposed to the undeserved punitive sanctions of solitary confinement. This wrongful confinement forced the Claimant to undergo abnormal and substantial suffering, "For purposes of determining whether prison inmate suffered atypical and significant hardship when allegedly wrongfully confined to special housing unit (SHU), as required to show deprivation of liberty interest sufficient to sustain §1983 action, SHU confinement constituted significant hardship when compared to ordinary incidents of prison life; SHU inmate had longer periods of cell confinement and were restricted in many activities open to general population, such as work, visitation, recreation and law library use. *U.S.C.A. Const. Amend. 14; 42 U.S.C.A. §1983*. <u>*Scott v. Coughlin*</u>, 78 F. Supp.2d 299. The Claimant's confinement consisted of isolation 23 out of 24 hours a day – for months. Much has been researched and written about the effects of solitary confinement on the human condition. New York State has recently adopted the Humane Alternatives to Long-Term Solitary Confinement Act (the "HALT" Act) that among other things, adopted the 15-day cap on solitary confinement. The Claimant spent over 70 days in this type of internment due to many failures by DOCCS staff and is entitled to damages, "Victim of violation of procedural due process is guaranteed nominal damages, but victim is not entitled to compensation for the deprivation of liberty or property which follows the procedural due process violation unless the liberty or property deprivation was caused by the violation."

_Burka v. New York City Transit Authority_, 747 F. Supp. 214.  In this case the procedural due process violation directly resulted in the deprivation "Damages for pain and suffering are recoverable for due process violations." _U.S.C.A. Const. Amend. 14_. _Williams v. City of New York_, 728 F. Supp. 1067.  In this case, the Claimant experienced emotional distress, humiliation, harm to her esteem, and reputation.  She was perceived, by both Incarcerated Individuals and Corrections Staff as being a drug user who jeopardized her families wellbeing by using drugs before her families first FRP visit.  Until this incident, the Claimant had a perfect disciplinary record.  While this incident perpetuated for 11 months the Claimant was concerned her tainted disciplinary record would adversely affect her parole board appearance for release.  "The testimony of the plaintiff alone can be sufficient to support recovery for emotional distress in a §1983 claim." _42 U.S.C.A. §1983_. _Miller v. City of East Orange_, 509 F.Supp.2d 452.  "To establish an injury in the form of emotional distress in a §1983 claim, expert medical testimony is not required." _42 U.S.C.A. 1983_. _Miller v. City of East Orange_, 509 F. Supp.2d 452.  "In a §1983 claim, there is no requirement that specific types of evidence be introduced to demonstrate injury in the form of emotional distress." _42 U.S.C.A. §1983_. _Miller v. City of East Orange_, 509 F. Supp.2d 452.  In order to compensate a §1983 plaintiff fully for the injuries he has suffered, he can recover not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation and mental anguish and suffering." _42 U.S.C.A. §1983_. _Miller v. City of East Orange_, 509 F. Supp.2d 452. "Under Civil Rights Act, as amended, successful claimants may recover compensatory damages for future pecuniary loss, emotional pain and suffering, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, inmate's constitutional right to due

process requires prison officials to conduct proper hearing before disciplining inmate based on misbehavior report." U.S.C.A. Const. Amend. 14. *Greaves v. State of New York*, 958 F. Supp. 142.

Incarcerated Individuals have a constitutional and regulatory right to call witnesses at prison disciplinary hearings provided "their testimony is material, is not redundant and doing so does not jeopardize institutional safety or correctional goals" *7N.Y.C.R.R. §253.5(a)* (previously codified as *7 N.Y.C.R.R. § 254.5*). A hearing officer's actual outright denial of a witness without a stated good faith reason, or lack of any effort to obtain a requested witness's testimony constitutes a clear constitutional violation." Matter of *Benito v. Calero*, 120 A.D3d 778 (2d Dep't 2013)

The second hearing officer in March had a duty to review what happened in the first matter, as it was even more suspect when the Claimant tested positive in March 2019, while she was housed in SHU and Keeplock for the past two months that these tests were exhibiting false positives. She would not have access to drugs when in this position, so it should have further supported her claim, that she did not use drugs. The HO erroneously indicated the only evidence they had to consider was the ticket and the positive results. This means they rendered a pre-determined decision Claimant was guilty. Therefore, none of these hearings can be considered held properly nor allowing for due process, as the correctional officials ignored all evidence the Claimant was innocent. It is now known that there were many other Incarcerated Individuals who were also victims of the Indiko machine and not just the Claimant. DOCCS has begun suit against Thermo Fischer and

on January 4, 2022 The New York State Inspector General, Lucy Lang, held a press conference to announce the findings that the drug testing program had been a failure and that over 1,500 unjust hearings [were] based on false positive test results.

*7 N.Y.C.R.R. §253.1(b)* states:

> *"The disciplinary hearing officer shall be responsible for conducting disciplinary hearings in an impartial manner. 7 N.Y.C.R.R. §253.1(b)*

The hearing officers demonstrated bias in many ways as listed above.

In *Harvey v. Prack*, 39 NYS 3d 471 (2d Dept., 2016), when the hearing officer failed to inquire and fails to review information to judge credibility and reliability, this is not a fair hearing and it violates due process. It also prejudiced the inmate's ability to raise a defense she was not guilty of the charges lodged against her.

Specifically, in *Miller v. Fischer*, 2014 WL 4255627 (3rd Dep't., 2014) the court reviewed a case where a CI established threats or intimidation. The HO must review credibility and reliability of the sources cited in the said investigation establishing the offense. They must make an independent assessment of the credibility and reliability. The interview done by the HO must gauge the informant's knowledge and reliability (in this case the witnesses).

The HO must make their own assessment of the truthfulness and cannot rely on an officer's assessment or just think their testimony is credible based on their education or credentials. The information must be given with specificity supporting the issue posed. This is the same with medical testifying about whether meds can cause a false positive. It

was clear the pharmacist was not credible to be the source of information on whether these specific drugs could cause a false positive urinalysis. The HO(s) had an obligation to further investigate the Claimant's defense and they failed to do so. As stated, in this matter, the issue at hand involved mental health medications, and despite the requirement to assess mental health. All hearing officers failed to make this inquiry properly. The forms indicate N/A.

In these hearings, the petitioner denied guilt. An alternate theory was given that her mental health medication caused the false positive. This presents and issue of credibility in which the HO has a duty to resolve, *Fernandez v. Venetozzi*, 164 AD 3d 1557 (3d Dep't., 2018). They had an obligation to interview the mental health-prescribing physician. The second hearing officer had a larger obligation, as the petitioner was pre-hearing confined, where it is not likely she could have gained access to illicit substances.

A HO when relying on testimony must make an independent assessment whether the information is credible, *Quinones v. Ricks*, 288 A.D. 2d 569 (3d Dept., 2001); *Harris v. Coughlin*, 126 Misc. 2d 747 (Ulster Co., 1984); *Wolff v. McDonald* 418 U.S. 539 (1974); *Helms v. Hewitt*, 655 F. 2d 487 (1981); *Gomes v. Travisono* 510 F. 2d 537 (1st Cir., 1974) (testimony of confidential informants). Credibility must be independently assessed by the HO, *Striplin v. Griffin*, 164 AD 3d 1347 (2nd Dep't., 2018); *Cruz v. Annucci*, 152 AD 3d 1100, (3rd Dep't., 2017); *Antrobus v. Lee*, 140 AD 3d 745, (2d Dep't., 2016); *Jackson v. Prack*, 137 AD 3d 1133 (2nd Dep't., 2016). It is a severe violation of due process, if HO(s) rely only on a misbehavior report and a drug test result, ignoring other factors.

*7 N.Y.C.R.R. §254.1* states:

> *"Prior to presiding over a Superintendents Hearing the hearing officer shall receive training on relevant topics, including implicit bias, and procedural due process rights." 7 N.Y.C.R.R. §254.1*

In both hearings DOCCS, Albion's Superintendent, and the HO had an obligation to protect the inmate's due process rights. The HO, should have been properly trained to ensure rights were not violated. An Incarcerated Individual has a right to a determination supported by some reliable evidence. In <u>Sira v. Morton</u>, 380 F3d 57, 81 (2d Cir. 2004), the Court held that at a prison disciplinary hearing the accused individual has a due process right to a determination of guilt that is supported by reliable evidence. In <u>Elder v. McCarthy, et al.</u>, 967 f3d 113 (2d Cir. 2020), when the HO concluded the hand writing in the disbursement forms was similar to the plaintiff's court found, "the entire proceeding rested in the assumption-one unsupported by any direct evidence....". In this case, the Claimant produces a document produced by the manufacturer indicating that her medication had not been tested against the AB Pinaca enzyme. When asked, the DOCCS witness indicates that she cannot say one way or the other if this would cause a false result, and the HO finds the Claimant guilty based on the testimony of the witness.

Throughout this ordeal, the Claimant repeatedly contacted the Superintendent of Albion Correctional Facility, S. Squires. Supt. Squires could have, at any point resolved this matter as per *7N.Y.C.R.R. Chapter V §254.9*:

> *"Discretionary Review by Superintendent, At any time during which a penalty imposed pursuant to a Superintendents hearing is in effect, the Superintendent may reduce the penalty". 7N.Y.C.R.R. Chapter V §254.9*

Superintendent S. Squires repeatedly communicates to the Claimant that she could not do anything to fix the situation, when in fact that was false.  Additionally, *7N.Y.C.R.R Chapter V. (A) §250.2 (c)* explains:

> *"The disciplinary techniques within a correctional facility must be varied to fix such factors as.....the problem and the present atmosphere of the facility consequentially, persons vested with responsibility for disciplinary measures in facilities of the department should not establish rigid structures for disciplinary sanctions but should consider each situation individually." 7N.Y.C.R.R Chapter V. (A) §250.2 (c)*

In both of the Claimants dispositions harsh sanctions are permitted by the Superintendent despite these questionable nature of the charges.  Both HO's refuse to take into account the Claimants spotless history and consider the alternate theory that the OMH medication is causing the positive test results.  Instead they repeatedly impose maximum sanctions.  Against *7N.Y.C.R.R Chapter V. (A) §250.2 (c)* this situation was not treated individually.


*7 N.Y.C.R.R. §253.6 (b)* states:

> *"The entire hearing must be electronically recorded."7 N.Y.C.R.R. §253.6 (b)*

The tapes provided the Claimant were not audible (slowed beyond discernibility). Claimant wrote to Capt. Goodman again, requesting audible copies of the 3 hearing tapes. Two months later, new copies were provided.  When Claimant listened, they were once again not audible, this time speeded up beyond discernibility.  To date no audible electronically recorded copy of the events has been presented in direct contradiction to the agencies own statute. "Agencies have no authority to create rules out of harmony with or inconsistent with the plain meaning of statutory language." *Nekoosa Papers, Inc. v Chu,*

495 N.Y.S.2d 1003.  "Administrative agency may not, in the exercise of its rule-making authority, promulgate a regulation out of harmony with the plain meaning of the statutory language; agency may not, in excess of its lawful delegated authority, promulgate rules and regulations for application to situations not within the intendment of the statute." *Festa v. Leshan*, 537, N.Y.S.2d 147, 145 A.D.2d 49

In this matter, OMH was not contacted as the best source of expertise; biased hearing officers interfered with presenting a defense and calling witnesses.  It is questionable whether documents utilized during proceedings were in fact the Claimant's, improper standards were used to judge guilt, supervisory staff refused to utilize their capabilities to remedy the situation, disciplinary proceedings were not captured electronically for intelligent judicial review, and actions were in direct conflict with established directives and regulations.  Furthermore, the Claimant was subjected to an ineffectual grievance system.  This egregious disregard of due process rights resulted in wrongful solitary confinement.  The proceedings were arbitrary and capricious; they used unlawful measures, and should result in a ruling for the Claimant.

DOCCS FAILED IN THEIR OBLIGATION TO SUPERVISE OPERATIONS OF THE FAMILY REUNION PROGRAM AND AS A RESULT:

- DISREGARDED THE STATED OVERALL MISSION OF THE PROGRAM

- ENDANGERING THE MENTAL HEALTH AND WELLBEING OF PARTICIPANTS TO INCLUDE MINORS

- DISREGARDING WRITTEN DIRECTIVES DESIGNED TO ENSURE THE WELLBEING OF PARTICIPANTS

---

DOCCS *Directive 4500(I)* states, "The Family Reunion Program (FRP) is designed to provide inmates and their families the opportunity to meet for an extended period of time in privacy. The goal of the program is to preserve, enhance and strengthen family ties that have been disrupted as a result of incarceration."

During the FRP visit, Claimant was removed from her family, handcuffed on the FRP site, and escorted to SHU. This process was in direct violation of the law. "An orderly, humane, and dignified procedure for the departure of families and for the return of inmates to the facility is expected at the cessation of **ALL** visits..........closing time for visitation should be clearly understood by inmates and family participants*." 7NYCRR 220.8(a)* Clearly based on the directive this was not what DOCCS intended.

The Claimant had the expectation that her Husband and Children would be treated in a compassionate manner as per the operations of FRP by law. It is clear that the visitors of the program are not incarcerated therefore; operational guidelines are crucial to ensure they will be treated appropriately. The removal of the Claimant was malicious and cruel with only 16-18 hours left on the visit. It was insensitive not to consider the welfare of the Claimants

Children, and the potential harm endured.  The wellbeing of family ties is clearly the intent of DOCCS as stated in the program description.  The decision to remove the Claimant was unnecessary at least, and criminal at most.  "Administrative agency, in exercise of its rule-making authority, cannot extend meaning of statutory language to apply to circumstances not intended to fall within statute." _Perry Thompson Third Co. v. City of New York,_ 718 N.Y.S.2d 306, 279 A.D.2d 108.  "Administrative agencies are without authority to promulgate rules out of harmony with statute." _Jackson v. Blum_, 436 N.Y.S.2d 358, 79 A.D.2d 1076.

DOCCS failed in their responsibility to protect the wellbeing of program participants, ignored their own rules and standards resulting in profound harm the Claimant and her family, mainly her young children.  This was unlawful and should result in a finding for the Claimant.

DOCCS VIOLATED DUE PROCESS IN THEIR USE OF THE MICROGENICS URINALYSIS TESTING MACHINE TO THE POINT OF INDIFFERENCE BY:

- MISREPRESENTING COMMUNICATION WITH THERMO FISCHER DIAGNOSTICS

- FAILING TO REPORT QUESTIONABLE URINALYSIS RESULTS TO THE MANUFACTURER

- UTILIZING THE MACHINE OUTSIDE MANUFACTURER RECOMMENDATIONS

- UTILIZING THE MACHINE IN A MANNER THAT DOES NOT MEET U.S.C.A. DUE PROCESS STANDARDS FOR DISCIPLINARY PROCEEDINGS

During the Claimants attempts at resolving the situation utilizing the DOCCS grievance process, repeatedly conflicting information was provided. On March 28, 2019 the grievance was denied on the basis that the "machine was calibrated **every time** it was used". Then on April 8, 2019, the appeal was denied on the basis that the machine calibrations are done on a **weekly** basis. The denial additionally stated the manufacturer had found no medication that caused a false positive. October 11, 2019, Marc Casper the CEO of Thermo Fisher Scientific, the manufacture of the Indiko Plus Analyzer DRI-CEDIA Drug Testing System, sent a letter to the Claimants attorney, Cheryl Kates, responding to her concerns. The letter indicated that, "Microgenics" drugs of abuse tests are all **preliminary tests**, and because of this the Instructions For Use ("IFU") expressly require a more specific confirmatory test to be run to obtain a confirmed analytical result". In addition, the letter informed that, company complaint logs for since 2017 only contained nine complaints in total and only four related to NYS DOCCS. Of those four only one was registered in 2019.

Microgenics Corporation / Thermo Fischer is a Delaware company that manufactures and markets drug testing machines known as Indiko Plus urinalysis analyzers (herein "IPUA") , and reagents used with those machines to test a subject's urine for illicit substances. One of the illicit substances is AB Pinaca a synthetic marijuana. In June 2018, DOCCS awarded Microgenics a bid to install IPUA at 52 DOCCS facilities. In the contract, Microgenics was required to provide related testimony services at disciplinary hearings arising from an inmate's receipt of a positive IPUA urine screen, including testimony covering questions about the platform of IPUA machines,

products and services including those pertaining to "operation, calibration, maintenance, procedures, reagents and cross-reactivity...". Pursuant to the IPUA standards, "the accuracy of any positive drug test results obtained through IPUA urinalysis is to be verified by a confirmatory test using gas chromatography or some other method". This standard is in place in order to eliminate a urinalysis test risk of false positives due to reagents' cross-reactivity potential, which refers to when reagent reactions are triggered by lawful medications or other non-illicit substances in urine. The IPUA manual contained at least one page pertaining to cross-reactivity issues. IPUA manufacturer standards require that confirmatory testing verify any positive result obtained by their IPUA urinalysis.

DOCCS has known for nearly 40 years that immunoassay manufacturers recommend that positive urinalysis drug-screen results be confirmed by an alternative scientific method *Peranzo v. Coughlin*, 608 F. Supp. 1504, 1514 (S.D.N.Y 1985). Still, DOCCS's inmate urinalysis testing has at all relevant times employed reagent test urinalysis scans alone without confirmatory testing "to verify whether or not an inmate has used drugs" N.Y. Comp Codes R. & Regs. Tit 7§1020.1, *Steele-Warrick v. Microgenics Corporation* 2021 WL 1109050 (E.D.N.Y., 2021)

Urinalysis tests are considered searches for Fourth Amendment purposes. U.S.C.A., Const. Amend. 14 has set the standard for evaluating whether prison disciplinary proceedings use of urinalysis has denied a prisoner due process. The standard of "some evidence" is required to support the disciplinary decision. In *Higgs v. Bland* it was held that the reliability of the enzyme multiplied immunoassay technique (herein "EMIT") for drug abuse was sufficient to satisfy due process standards when used as a basis for prison discipline, relating to drug use. Conversely, a test that produces frequent incorrect results could fail to constitute "some evidence" under the Hill standard. The Thermo Scientific provided CEDIA AB-Pinaca Assay document indicate, "Out of 34 samples positive .... 4 samples were confirmed as negative by LC-MS/MS". Mathematically speaking, 4 out of 34 is 11.8%, that is 11.8 people out every 100 that could suffer a false positive and undeserved discipline in a prison setting. The claimant here is proposing that the Thermo Scientific Indiko Plus Analyzer did not meet the Higgs standard intended by the Judiciary. When DOCCS migrated to a new testing system, they no longer met Due Process standards for urinalysis testing.

Laboratories must meet federal standards in order to be certified to conduct diagnostic tests on human specimens. These standards are embodied in the Clinical Laboratory Improvement Amendments of 1988 (CLIA) "the testing shall be conducted on a quarterly bases, except where the Secretary determines for technical and scientific reasons that a particular examination procedure may be tested less. (But not less often than twice per year). *42 U.S.C.A. §263a (f)(3)(A)*. Certified labs must participate in periodic quality control proficiency testing. This is crucial to assess the competency of the labs independent work. At no point did Albion Correctional Facility participate in this required process.

During the Claimants two disciplinary hearings, she indicated that the AB Pinaca Assay document clearly stated, in the limitations section (#2), "It is possible that substances other than those investigated in the specificity study may interfere with the test and cause false results". Repeatedly, the Claimant informed both hearing officers that her psych medication, "Prazosin" did not appear in the 5-page assay, and its entire table of tested medications. DOCCS was fully aware the test being utilizing was only intended for screening, the documentation provided indicated untested medication could produce false positives, yet the Claimant was still penalized for drug use because of repeated due process rights violations. DOCCS failed to take prompt corrective action after the Claimant informed that the medication was a liability to the accuracy of her tests. Had due process been paramount, the Claimant would not have endured the punitive sanctions of wrongful solitary confinement.

DOCCS's has intentionally elected not to make confirmatory testing a part of its inmate urinalysis program shown by the fact that DOCCS has made a different choice as to other drug testing programs, such as DOCCS's parolee and employee drug testing programs. DOCCS division, Community Supervision does not act against parolees unless the parolee admits to drug use or their preliminary positive test results are confirmed by an outside laboratory using a more specific alternative method.

This situation was a degradation, a blatant disregard for due process or the humanity of Incarcerated Individuals who were charged and punished even though they did not ingest any illicit substances. DOCCS ultimately determined that the test was so unreliable that it reversed every

inmate disciplinary decision that had been based on the IPUA.  The testing failiures ahve also given rise to DOCCS and New York State Inspector General investigations.  This cannot be characterized as neglect due to the many efforts made by the Claimant to resolve the situation within the framework and underpinnings provided by administrative law.  The inconsistencies involve point to patent malfeasance.

## **CONCLUSION**

Claimant was the victim of a false positive urine test by the Thermo Scientific Indiko system that had been installed two weeks prior to her FRP visit.  DOCCS had a duty of care, which they failed to perform, and as a result of these numerous failures the Claimant suffered serious emotional consequences.  The ineffective grievance process created and environment lac

This unnecessarily exposed her and other Incarcerated Individuals to undeserved punitive sanctions.  Claimant received two Tier III misbehavior reports and spent 78 days straight in segregation (32 days in SHU/16 days in keeplock/30 days in SHU – consecutively).  With sanctions, Claimant was not able to speak to her family for 101 days.  Claimant carried two Tier III misbehavior reports on her disciplinary record for 345 days.  All of the above listed sanctions imposed atypical and significant hardship on the Claimant in relation to ordinary incidents of prison life.

Over the period of segregation the Claimants access to phone, property, free movement, meaningful activity, human contact, proper footwear, books, showering and other hygienic activities were limited in comparison to the access of ordinary prison life.  As a result Claimant suffered: hyper-responsivity to external stimuli, perceptual disorders, severe panic attacks, loss of appetite, difficulty with thinking / concentration / memory, overt paranoia, delirium, sleep disturbances, vision loss, and stupor.

Then, during the period of altered disciplinary record (carrying two tier III tickets), this hardship was compounded by an inability to remain in the college program, which delayed the

achievement of the Claimants Associates Degree.  One year of college tuition at the Medaille College is $28-30,000.

Claimant lost privileged job assignments, preferred / honor housing (private room), FRP for future participation; all of which the Claimant was removed from as a result of this incident; and could not reapply for without a clean disciplinary record.  During this period, the Claimant could not apply for close to home transfers and faced potential denial of parole.  All of which, imposed atypical and significant hardship relation to ordinary incidents of prison life

The Claimant's husband and children were traumatized by the manner in which they and the Claimant were removed from the FRP site.  Without any understanding as to the whereabouts of the Claimant and no communication due to SHU confinement, the Claimant's family were extremely distressed.  Claimant did not speak to her daughters during both their birthdays and her wedding anniversary.  Normally the family visited the Claimant every 4-6 weeks for the prior 15 months from the incident.  The children were reluctant to return to the prison for future visitation and did not actually visit for 6 months.

Claimant was further damaged due to the mandatory change of medications to ensure clean urinalysis results.  This change of medication injured the Claimant because she could not find an appropriate replacement for the formulation she had been prescribed.  The regimen formerly approved was designed for the Claimant while she was in rehab for alcohol addiction, and was very specifically formulated to replace benzodiazepines.  Locating a replacement within the limited range of pharmacology approved by DOCCS was not feasible and resulted in many medication shifts over the next calendar year and a half, none of which effectively alleviated her mental health symptoms.

Bonet, Michelle

**Taconic Correctional Facility**
250 Harris Road
Bedford Hills, NY 10507



CERTIFIED MAIL

7016 2070 0000 3101 8008

2.56



United States District Court
Southern District
500 Pearl Street
New York, N.Y. 10007

Att: Pro Se Intake Unit



RECEIVED
APR 12 2022
PRO SE OFFICE



TACONIC          NEOPOST
04/08/2022
US POSTAGE   $002.56⁰
CORRECTIONAL FACILITY          ZIP 10507
041M11467127



04/08/2022
US POSTAGE   $012.80⁰
CORRECTIONAL FACILITY          ZIP 10507
041M11467127

 

Legal mail          legal mail