Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT

for the

Western District of New York



Case No.   22-CV-300 (JLS)

MICHELLE NICOLE BONET

*Plaintiff(s)*

-v-

**A. ANNUCCI,** Former Acting Commissioner of the Department of Corrections and Community Supervision (DOCCS), **D. VENETTOZI,** DOCCS Director of Special/Inmate Disciplinary Program, **S. SQUIRES,** Superintendent of Albion Correctional Facility, **P. CIULLA,** Deputy of Programs, Albion Correctional Facility, **P. BARHITE,** Senior Offender Rehabilitation Coordinator, Albion Correctional Facility. **R. GOODMAN,** Capitan, Albion Correctional Facility, **D. MACK,** Correction Officer, Albion Correctional Facility, **D. BAKER,** Nurse, Albion Correctional Facility, **M. DENNIS,** Pharmacist, Albion Correctional Facility,

*Defendant(s)*

Jury Trial: *(check one)*   ☒ Yes   ☐ No

SECOND AMENDED COMPLAINT
FOR A CIVIL CASE

## SECOND AMENDED COMPLAINT FOR A CIVIL CASE

**I.     The Parties to This Complaint**

    **A.     The Plaintiff(s)**

        Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

        Name        **MICHELLE NICOLE BONET**

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

| | |
|---|---|
| Street Address | 9 STONEWALL CIRCLE |
| City and County | WHITE PLAINS |
| State and Zip Code | NY 10607 |
| Telephone Number | (914)260-4162 |
| E-mail Address | MICHELLEBONET@GMAIL.COM |

**B.**     **The Defendant(s)**

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | **A. ANNUCCI** |
| Job or Title *(if known)* | FORMER ACTING COMMISSIONER OF NYS DOCCS |
| Street Address | 1220 WASHINGTON AVENUE |
| City and County | ALBANY |
| State and Zip Code | NY 12226 |
| Telephone Number | UNKNOWN |
| E-mail Address *(if known)* | UNKNOWN |

Defendant No. 2

| | |
|---|---|
| Name | **D. VENETTOZI** |
| Job or Title *(if known)* | DOCCS - DIRECTOR OF SPECIAL/INMATE DISCIPLINARY |
| Street Address | 1220 WASHINGTON AVENUE |
| City and County | ALBANY |
| State and Zip Code | NY 12226 |
| Telephone Number | UNKNOWN |
| E-mail Address *(if known)* | UNKNOWN |

Defendant No. 3

| | |
|---|---|
| Name | **S. SOUIRES** |
| Job or Title *(if known)* | DOCCS - SUPERINTENDENT OF ALBION C.F. |
| Street Address | 1220 WASHINGTON AVENUE |
| City and County | ALBANY |
| State and Zip Code | NY 12226 |
| Telephone Number | UNKNOWN |
| E-mail Address *(if known)* | UNKNOWN |

Defendant No. 4

| | |
|---|---|
| Name | **P. CIULLA** |

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

| | |
|---|---|
| Job or Title *(if known)* | DOCCS - DEPUTY OF PROGRAMS, ALBION C.F. |
| Street Address | 1220 WASHINGTON AVENUE |
| City and County | ALBANY |
| State and Zip Code | NY 12226 |
| Telephone Number | UNKNOWN |
| E-mail Address *(if known)* | UNKNOWN |

Defendant No. 5

| | |
|---|---|
| Name | **P. BARHITE** |
| Job or Title *(if known)* | DOCCS - SENIOR OFFENDER REHABILITATION COORDINATOR |
| Street Address | 1220 WASHINGTON AVENUE |
| City and County | ALBANY |
| State and Zip Code | NY 12226 |
| Telephone Number | UNKNOWN |
| E-mail Address *(if known)* | UNKNOWN |

Defendant No. 6

| | |
|---|---|
| Name | **R. GOODMAN** |
| Job or Title *(if known)* | DOCCS - CAPITAN, ALBION CORRECTIONAL FACILITY |
| Street Address | 1220 WASHINGTON AVENUE |
| City and County | ALBANY |
| State and Zip Code | NY 12226 |
| Telephone Number | UNKNOWN |
| E-mail Address *(if known)* | UNKNOWN |

Defendant No. 7

| | |
|---|---|
| Name | **D. MACK** |
| Job or Title *(if known)* | DOCCS - CORRECTION OFFICER, ALBION C.F. |
| Street Address | 1220 WASHINGTON AVENUE |
| City and County | ALBANY |
| State and Zip Code | NY 12226 |
| Telephone Number | UNKNOWN |
| E-mail Address *(if known)* | UNKNOWN |

Defendant No. 8

| | |
|---|---|
| Name | **D. BAKER** |
| Job or Title *(if known)* | DOCCS - NURSE. ALBION C.F. |
| Street Address | 1220 WASHINGTON AVENUE |

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

| | |
|---|---|
| City and County | ALBANY |
| State and Zip Code | NY 12226 |
| Telephone Number | UNKNOWN |
| E-mail Address *(if known)* | UNKNOWN |

Defendant No. 9

| | |
|---|---|
| Name | **M. DENNIS** |
| Job or Title *(if known)* | DOCCS - PHARMACIST, ALBION C.f. |
| Street Address | 1220 WASHINGTON AVENUE |
| City and County | ALBANY |
| State and Zip Code | NY 12226 |
| Telephone Number | UNKNOWN |
| E-mail Address *(if known)* | UNKNOWN |

## II.      Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question          ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

**A.      If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

**This civil action seeking relief and/or damages to defend and protect the rights guaranteed by the Constitution of the United States. This action is brought pursuant to 42 U.S.C.§1983. The Court has jurisdiction over the action pursuant to 28 U.S.C.§1331, 1343(3) and (4), and 2201.**

**B.      If the Basis for Jurisdiction Is Diversity of Citizenship**

1.      The Plaintiff(s)

a.      If the plaintiff is an individual

The plaintiff, *(name)* _____, is a citizen of the State of *(name)* _____.

b.    If the plaintiff is a corporation

The plaintiff, *(name)* _____, is incorporated

under the laws of the State of *(name)* _____,

and has its principal place of business in the State of *(name)*

_____.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

a.    If the defendant is an individual

The defendant, *(name)* _____, is a citizen of

the State of *(name)* _____. Or is a citizen of

*(foreign nation)* _____.

b.    If the defendant is a corporation

The defendant, *(name)* _____, is incorporated under

the laws of the State of *(name)* _____, and has its

principal place of business in the State of *(name)* _____.

Or is incorporated under the laws of *(foreign nation)* _____,

and has its principal place of business in *(name)* _____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

## III.    Previous Lawsuits in State and Federal Court

A.  Have you begun any other lawsuits in state or federal court dealing with the same facts involved in this action?

☒    Yes                ☐    No

<u>If Yes, complete the next section</u>. **NOTE** If you have brought more than one lawsuit dealing with the same facts as this action, use this format to describe the other actions on another sheet of paper.

1.  Names of the parties to this other lawsuit:

Plaintiff(s):        Michelle Bonet

Defendant(s):      New York State Department of Corrections and Community Supervision

2.  Court (if federal court, name the district; if state court name the county):

<u>New York State Court of Claims</u>

3.  Docket or Index Number: _____ <u>Motion No. M-98034</u>

4.  Name of Judge to whom case was assigned: _____ <u>Honorable Richard E. Sise</u>

5.  The approximate date of this action was filed: _____ <u>4/28/2022</u>

6.  What was the disposition of this case?

Is it still pending?    ☐    Yes        ☒    No

If not, give the approximate date it was resolved: <u>Unknown.</u>

Disposition.

_____Dismissed (Check the box, which indicates why it was dismissed):

By court *sua sponte* as frivolous, malicious, or failing to state a claim upon which relief can be granted;

_____By court for failure to exhaust administrative remedies;

_____By court or failure to prosecute, pay filing fee, or otherwise response court order;

_____By court due to your voluntary withdrawal of claim;

<u>   X   </u>Untimely, Dismissed

<u>   N/A   </u>Judgment upon motion or after entered for

____ plaintiff

____ defendant.

B.  Have you begun any other lawsuits in federal court which relate to your imprisonment?

☐    Yes        ☒    No

**IV.    Statement of Claim**

PLEASE SEE ATTACHED "**FACTS OF THE CASE & STATEMENT OF CLAIM**" (ATTACHMENT #1)

**V.    Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Plaintiff requests $4,700,000.00 as compensatory damages

**VI.    Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.    For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Declare under penalty of perjury that the foregoing is true and correct.

Date of signing:     05/16/2024

*Michelle Nicole Bonet*

Printed Name of Plaintiff:  Michelle Nicole Bonet

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

9 Stonewall Circle

White Plains, New York 10607

State of Florida
County of Palm Beach

**Notary**

Sworn to before me, by Michelle Nicole Bonet who produced NY DL as identification by way of online notarization.

This 16th day of May, 2024

Notary    Kimberly Chodor

KIMBERLY CHODOR
Notary Public - State of Florida
Commission # HH 396492
Expires on May 9, 2027

This notarial act was an online notarization

B.    **For Attorneys**

Date of signing: _____

Signature of Attorney    _____
Printed Name of Attorney    _____
Bar Number    _____
Name of Law Firm    _____
Street Address    _____
State and Zip Code    _____
Telephone Number    _____
E-mail Address    _____

VII.    **Exhaustion of Administrative Remedies**

**See Attached**:    Multiple dates for exhaustion of various routes of administrative remedies in "Facts of Case".

All administrative exhaustion is evidenced exhibits here within.

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

22-CV-300 (JLS)
ATTACHMENT #1

## <u>FACTS OF THE CASE & STATEMENT OF CLAIM ATTACHMENT</u>

**MICHELLE NICOLE BONET**

v.

**A. ANNUCCI**, FORMER ACTING COMMISSIONER OF THE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION (DOCCS), **D. VENETTOZI**, DOCCS DIRECTOR OF SPECIAL/INMATE DISCIPLINARY PROGRAM, **S. SQUIRES**, SUPERINTENDENT OF ALBION CORRECTIONAL FACILITY, **P. CIULLA**, DEPUTY OF PROGRAMS, ALBION CORRECTIONAL FACILITY, **P. BARHITE**, SENIOR OFFENDER REHABILITATION COORDINATOR, ALBION CORRECTIONAL FACILITY. **R. GOODMAN**, CAPITAN, ALBION CORRECTIONAL FACILITY, **D. MACK**, CORRECTION OFFICER, ALBION CORRECTIONAL FACILITY, **D. BAKER**, NURSE, ALBION CORRECTIONAL FACILITY, **M. DENNIS**, PHARMACIST, ALBION CORRECTIONAL FACILITY,

# FACTS OF THE CASE

1. The post office address of the Plaintiff (you) is 9 Stonewall Circle, White Plains, New York 10607.

2. This claim arises from the acts or omissions of the defendant. Details of said acts or omissions are as follows: Plaintiff was an Incarcerated Individual who at the time of the incident, was housed at Albion Correctional Facility. Plaintiff applied and was approved for a Department of Correction (herein DOCCS) privileged, Family Reunion Program (herein FRP). Plaintiff was accused of drug use and removed from the FRP visit and sent to Special Housing Unit (Herein SHU) for prehearing confinement.

3. **In Fall 2017**, Plaintiff II Bonet was admitted into DOCCS and, within 72 hours of arrival at ROCD at Bedford Correctional Facility, she was placed in emergency observation by OMH due to pharmacological discrepancies between DOCCS approved medications and Bonet's prescription formulated by Arms Acres Drug and Alcohol Rehabilitation Program. After spending 2-3 days in emergency observation, an effective mental health medication regimen was tailored for the Plaintiff. This regimen remained active and effective until the occurrences detailed in this document commenced.

4. **On January 25, 2019**, at approximately 8:30am Plaintiff reported for a urine test which was a routine full scan in conjunction with her first FRP trailer visit with her husband and three children (at the time ages 10,12,14).

5. **At approximately 1:30pm on January 26, 2019**, while participating in the second day of a 3day/2-night visit with her family, Plaintiff was asked, via intercom, to report to the FRP officer's station without explanation. She informed her family she would be right back. Upon reporting to the officer's station, a Sargent informed Plaintiff she tested positive for a drug called "AB-Pinaca" and she was not permitted to return to her family as the visit

was now terminated. Plaintiff made it clear that something must be wrong because she did not use drugs and was well aware the urine test was be expected as part of the FRP visit. The Plaintiff was then cuffed and escorted to SHU without humane departure from her family. Directly following, Plaintiff's Husband and children were informed they had one hour to evacuate the FRP premises. Plaintiff's family lives eight hours away from Albion Correctional Facility.

6. **On January 28, 2019**, while in SHU, Plaintiff was served with a Tier III misbehavior report. A hearing was conducted on January 31, 2019, by Hearing Officer (herein HO) Captain Batson. It was adjourned and continued on February 4, 2019, was adjourned and then continued on February 7, 2019; and adjourned again. On this date, a request for extension was requested and allegedly granted by the DOCCS. At said hearings, Plaintiff stated that she was not a drug user, was in fact a model inmate with no disciplinary history during the 15 months she has been in DOCCS custody. Her FRP application had been denied, and she was required to appeal that decision to earn the program. She completely knew she would be tested in accordance with the directive to participate in FRP, and strongly believed some other unknown factor must be the cause of the positive urinalysis result. **Plaintiff asked for a list of medications known to cause false results, which is commonly generated by urinalysis manufacturers as standard practice**. The HO, Captain Batson understood the Plaintiffs concerns and committed to "getting to the bottom" of this situation.

7. During a subsequent hearing session, HO Batson provided a list of medications on a document provided by Thermo Scientific labeled, AB-Pinaca Assay **(See Exhibit A)**. The Assay document lists all medication tested against the AB-Pinaca enzyme; medications known NOT to cause false results (The opposite of what was requested). The medication, Prazosin, which Plaintiff was prescribed and took as a mental health medication, was not

one of the medications tested against the enzyme. Plaintiff asked what the results of an untested medication would have on the urinalysis (See Exhibit A). HO Batson responded, "she did not know". **Nurse Baker (an Albion Staff Nurse) was contacted as a witness via phone and asked if Plaintiff was on any medication that would cause a false result on a urinalysis. Baker responded "No"**. Plaintiff stated, "the limitations" section on the AB-Pinaca Assay document reports, "any substance not part of the specificity study could cause a false result". **Baker insisted no medication could alter the test regardless of the document provided by the manufacturer of the urinalysis machine**. During this hearing the Plaintiff discovered that the urinalysis machine had been implemented the second week of January (1-2 weeks prior) and the facility did not have all the documentation for the product yet, so no additional information was available.

8. **On February 6, 2019**, Plaintiff was interviewed by DOCCS Office of Special Investigation. Special Investigator Ryan indicated that he believed the Plaintiff's statements and would assign staff to explore what was happening with the new machine.

9. **On February 6, 2019**, while confined, Plaintiff contacted Prisoner Legal Services (herein PLS) to request assistance with challenging a Tier III hearing. PLS informed that they could not assist until after a disposition was rendered, and then appealed to the Director of Special Housing/Inmate Disciplinary, and she received a response to the appeal. While awaiting said reply, Plaintiff signed release forms permitting PLS to obtain hearing records and tapes of the hearings.

10. After the 3rd hearing date **(February 7, 2019)**, Plaintiff waited in SHU to proceed with the hearing; then on **February 15, 2019, while on rounds, Plaintiff asked Captain Goodman why her hearing had not continued**. She was told Captain Batson had not returned to work and yet another extension was filed. On or around February 21, 2019, while STILL in SHU, Plaintiff once again inquired why her hearing had not continued; and was once

again told, Captain Batson still had not returned and a subsequent extension was filed. **Plaintiff requested assignment of another hearing officer because she was relegated to solitary confinement in SHU the entire time the hearing was paused.**

11. **On February 25, 2019,** Plaintiff wrote directly to **S. Squires** desperately proposing that someone might have drugged her but she absolutely did not take any drugs. **(See Exhibit B)**

12. **On February 26, 2019,** on the Plaintiffs 31st day of SHU confinement, the hearing was restarted from the beginning with a new hearing officer, **P. Barhite**. Plaintiff once again explained she was not a drug user and proposed the theory that her mental health medication was not tested by the urinalysis manufacturer and could be the cause of the positive results. Plaintiff explained that Special Investigator Ryan had spoken to her, and he was requested as a witness. **HO Barhite denied the witness. Pharmacist M. Dennis was called as a witness by the HO, and she testified she had communicated with the urinalysis manufacturer and, "No medications [Plaintiff] was prescribed would cause a positive result".**

13. **HO Barhite found Plaintiff guilty of 113.24 Drug Use.** The evidence relied upon was the misbehavior report, testimony of D. Mack the urinalysis operator with 2 weeks experience on the new machine, **a memo from Nurse Baker who still had limited documentation on the new machine, as well as the testimony from Pharmacist M. Dennis. Neither Nurse Baker nor Pharmacist M. Dennis explained how an untested medication could be ruled out as the cause of a positive test result.** Plaintiff was penalized 60 days keeplock, 60 days loss of recreation, 60 days loss of phones, 60 days loss of commissary, with 15 days suspended (1/26/19-3/12/19). **This was the maximum penalty despite this being the Plaintiff's first ever infraction while in DOCCS custody for 15 months; and an infraction Plaintiff maintained she did not commit.**

14. **On February 27, 2019,** Plaintiff was transferred from SHU to Keep-lock to complete the 32nd to 45th day of confinement sanctions. Once in Keep-lock, Plaintiff encountered Incarcerated Individual Martinez (17G1112) who informed her, that she was removed from the Work Release program due to a positive urinalysis for AB-Pinaca during a routine test after a return from furlough. Martinez informed Bonet that she was taking the same medication as the Plaintiff. **Bonet immediately wrote to the Superintendent of Albion Correctional Facility, S. Squires to inform her of the finding that another "model inmate" was currently in confinement with the same set of circumstances regarding the medication prescribed and the positive urinalysis for the same drug. (See Exhibit C)** The written response from S. Squires was that the Plaintiff should appeal the decision to Special Housing just like everyone else.

15. **On March 7, 2019**, at 10:45am, while still in confinement, Plaintiff was ordered for a random urine test by Albany for "Full Scan" (all potential drugs). On March 8, 2019, Plaintiff was served with another (2nd) Misbehavior Report for 113.24 Drug Use: despite being in solitary confinement for the entirety of this situation.

16. **On March 9th, 2019**, Plaintiff wrote to the Inspector General's Office to inform them about this matter. **(See Exhibit D)**

17. **On March 9th, 2019**, Plaintiff wrote to the Albion Correctional Facility Pharmacy to inform them about this matter. In this communication it is made clear that another person on the same medication is similarly situated **(See Exhibit E)**

18. **On March 9th, 2019**, Plaintiff wrote to the S. Squires explaining that she had now tested and was ticketed twice, only this time she had been solitarily confined since the last test. **(See Exhibit F)**

19. **On March 13, 2019**, HO P. Ciulla conducted a hearing, which was adjourned and commenced several times until March 15, 2019. During said hearings, Plaintiff explained

she was not a drug user, was a model inmate and did not have the motive or opportunity to obtain or use drugs since she had been in confinement for 40 days at the time of providing the urine sample. Once again, the Plaintiff proposed the theory that her mental health medication could be causing the positive result. Plaintiff emphasized the fact that the medication, Prazosin, had not been researched against the AB-Pinaca enzyme, consequentially the effect of the medication on the test is unknown. **Plaintiff once again questioned Pharmacist M. Dennis on the effect the medicine, Prazosin, could have on the results of the urinalysis. Pharmacist Dennis stated, "She could not say one way or the other" if the medication was responsible for the positive result since the medication had not been researched.** The hearing was adjourned.

20. **On March 14, 2019,** the Plaintiff **once again** writes directly to S. Squires imploring her to investigate the matter that other people were also being victimized by this testing situation. **(See Exhibit G)**

21. **On the morning of March 15, 2019**, the hearing commenced. Plaintiff continued addressing the fact that the medication had unknown potential to the AB-Pinaca panel. She reiterated that she was a model inmate with no propensity for drug use, lived in preferred housing where she earned a private room, participated in the college program, held two prestigious employment positions; assisting civilian staff as a teacher's assistant; and was trusted to facilitate Inmate Orientation/Phase 1, where she came in contact with every new inmate entering the facility. She further explained her family lived eight hours away in the New York City area and earning FRP was crucial to maintaining her contact with her family as she had been a stay-at-home mother to her three children. Plaintiff implored HO Ciulla to consider, she had too much at risk to ever use drugs and she had never displayed a problem with drugs during her fifteen months incarcerated at the facility. Plaintiff asked HO to consider that logic dictated the medication was a sound theory to explain the positive

results as her medication had not in any way been ruled out. HO, P. Ciulla insisted she was only able to consider the misbehavior report and the positive urinalysis test results. She told the Plaintiff that her perfect disciplinary record, status as a college student and any other evidence could not be considered and were irrelevant to the disciplinary hearing. **Plaintiff attempted to further explain that another Incarcerated Individual (Martinez 17G1112), was removed from work release for testing positive for AB-Pinaca and, Martinez was also on Prazosin (the untested medication).** <u>In addition, Plaintiff requested OSI be contacted regarding their investigation on this matter.</u> The hearing was adjourned.

22. **At approximately 12:30pm on March 15, 2019**, Plaintiff was escorted to an office in the keep-lock facility (B-Block) and presented to three representatives of **DOCCS Office of Special Investigation** (OSI), Investigators Ransom and Tirado as well as an intern shadowing them for a day. The officers explained that, prompted by Special Investigator Ryan, they had begun an investigation into her claims that her urinalysis results were false positives. They further explained that Plaintiff should not have been removed from the FRP visit, and at first glance, they immediately identified something wrong with the circumstances surrounding the case as it made no sense for the Plaintiff to use drugs. During this interview, an Albion Officer entered to ask one of the investigators to go and speak to a Dep, who requested to see them. Investigator Ransom left the room. Investigator Tirado continued questioning and Plaintiff told him about Incarcerated Individual Martinez (17G1112) who was in the same situation and on the same medication. Tirado told the Plaintiff he would continue his probe in an effort to assist her cause. He also pointed out the directive, which recommends humane departure and explained that Albion staff should have waited until the FRP visit was over (a mere additional 17 hours) for the interest of the Plaintiffs children who were present. Plaintiff was then escorted back to her cell.

23. **That same date March 15, 2019, at approximately 2:00pm, HO Ciulla continued the hearing. Plaintiff was found guilty of 113.24 Drug Use** and penalized with 60 days SHU, 60 days loss of recreation, 60 days loss of packages, 60 days loss of commissary, 60 days loss of phones, 60 days loss of property. **The imposed sanction was the maximum penalty for 113.24 Drug Use.**

24. **On March 15, 2019, the Disciplinary Office** sent notification that the hearing disposition **was reviewed by the Captain's Office** (See Exhibit H).

25. **On March 19, 2019, the Plaintiff wrote an extensive, six-page letter to A. Annucci outlining her situation with the false positive urinalysis. (See Exhibit I)** In the letter it is explained that on not one, but two occasions "back-to-back" the Plaintiff has been victimized by these testing failures. **In the letter it is explicitly explained that if Commissioner Annucci did not intervein, the Plaintiff was going to be forced to switch medication as a means of ensuring that going forward she would no longer falsely test positive.** This communication should have served as notification of the severity of the situation. Furthermore, this directly adversely impacted the mental health of the Plaintiff.

26. **During SHU confinement on March 20, 2019,** Plaintiff wrote to Captain Batson to request entering medical observation 24/7 for as long as required to prove she was not taking drugs; In the hope it would prove she would continue to test positive for AB-Pinaca as long as she was still on the mental health medication Prazosin. **Her request was verbally denied.**

27. **On March 31, 2019, Plaintiff wrote to S. Squires,** Superintendent of Albion Correctional Facility to reiterate her desire to go into medical observation. On April 3, 2019, S. Squires replied she was unable to assist. Request denied. **(See Exhibit J)**

28. During her 78 days of confinement, Plaintiff wrote to many DOCCS employees requesting assistance on this matter.

29. While confined in SHU, Plaintiff requested to see her OMH practitioner, Dr. Razzi. Plaintiff was informed, while in SHU she would only be allowed to see the practitioner assigned to SHU. **On April 10, 2019,** Plaintiff attended an appointment with SHU OMH practitioner Dr. Lerner and Case Manager Ashton. **The doctor informed her that many patients were being victimized by the same circumstances of false positive test results; but there was nothing OMH could do, as they were technically not part of DOCCS.** The Plaintiff asked what options were available to prevent future positive results. She was told the only options were to switch medications, despite the small range of pharmacology approved for DOCCS use, and the fact that Prazosin was in fact an approved medication. **There was no other way to ensure the positive results would stop.**

30. **On April 14, 2019,** after receiving a 7-day time cut, Plaintiff was released from SHU having served 32 days SHU, 16 days keep-lock, 30 days SHU consecutively (Total of 78 days confinement). Due to further sanctions upon release, Plaintiff did not speak to her husband or children for 101 days.

31. **On April 15, 2019, Plaintiff initiated the process, in writing, to switch medications out of fear of future urinalysis testing. (See Exhibit K)**

32. **On May 5, 2019,** post SHU release, Plaintiff **FINALLY** had an appointment with prescribing Practitioner Dr. Razzi, Plaintiff expressed the need to switch medications and Dr. Razzi acknowledged the medicine, Prazosin, was most likely the cause of the positive AB-Pinaca results. Despite being the prescribing practitioner, Dr. Razzi was never called to testify at either of Plaintiffs hearings. The medications were switched as of 5pm May 5, 2019. During the month of July 2019 (date unknown) after switching medications, Plaintiff was selected for a random urinalysis screening. The test was full scan (all drugs). Plaintiff was negative for the presence of any drugs. **(See Exhibit L)**

33. **On May 10, 2019**, PLS submitted a Supplemental Appeal / Request for Reconsideration to D. Venettozzi. Said document identified, due process rights violations during hearings, denial of Plaintiffs right to reply to charges and evidence, and hearing disposition not supported by substantial evidence. **On May 24, 2019**, PLS received a reply from D. Venettozzi at the Office of Special Housing / Inmate Disciplinary, the disposition was upheld.

34. **On May 20, 2019**, the Plaintiff requested the facility Urinalysis Quarterly Proficiency Reports as per 7NYCRR 1020.7.

35. **On June 6, 2019**, Defendant Goodman did visit the Plaintiff at her work assignment location in the Chapel. At this time the Defendant informed the Plaintiff that proficiency reports were done annually. Bonet explained that as per federal law the proficiency testing must be done much more frequently or else the practice would be obsolete.

36. **On June 6, 2019**, the Plaintiff received a FOIL response for the proficiency testing. The correspondence indicated, "Per security, this request has been addressed and no further action is needed". **(See Exhibit M)**

37. **On June 5, 2019, PLS wrote an advocacy letter to: A. Annucci, Commissioner of DOCCS, R. Finnegan, and Assistant Commissioner of DOCCS - Office of Inmate Discipline, S. Squires, Superintendent of Albion Correctional Facility, and Dr. J Morley, Chief Medical Officer at DOCCS. (See Exhibits N)** Said letter stated, "A large volume of requests for assistance with false positive urinalysis, had been received from Incarcerated Individuals [Text formerly "inmates"] at Albion Correctional Facility since the implementation of the new Indiko DRI-CEDIA testing system". Reported in the letter, four Incarcerated Individual PLS was representing (Plaintiff included) were the least likely to consume drugs due to their history and model inmate status. Additionally, PLS indicated a similar situation in 2010 at Attica Correctional Facility, where the volume of calls to PLS

for false positive assistance increased radically and then led to DOCCS identifying a calibration error resulting in false positives. PLS request investigation into the matter.

38. **On July 8, 2019,** Plaintiff retained the services of Cheryl Kates Esq. to represent her interest in challenging both Tier III hearings. On July 9, 2019, C. Kates submitted a Request for Reconsideration pertaining to the January 2019 and March 2019 misbehavior reports. Said request identified further rights violations and additional matters that established an unfair and biased process, which had determined the Plaintiff guilty of 113.24 Drug Use. On July 25, 2019, D. Venettozzi of the Office of Special Housing / Inmate Disciplinary replied to the request. The reply stated, "all testing procedures have been confirmed to have been conducted within proper departmental procedures", he would not reconsider the previous decision. The reply did not acknowledge the medication prazosin; it did however note the Plaintiff should, "avoid any further disciplinary problems". Due to financial concerns, the Plaintiff chose to proceed to Article 78 Pro Se.

39. **On or around early September 2019,** The Plaintiff wrote to the Education Supervisor S. Doolan, to request reconsideration in re-admitting Bonet into the Medaille college program considering the issue had been acknowledged by DOCCS.

40. **On September 23, 2019,** the response was not positive, even including, "You are encouraged to maintain a positive program and disciplinary record so that you <u>may be</u> considered. Emphasis on "May Be". **(See Exhibit O)**

41. **Communication with Thermo Fisher Scientific Inc**. - On September 13, 2019, Cheryl L Kates, representing Plaintiff contacted Marc N. Casper, CEO of Thermo Fisher Scientific, the manufacture of the Indiko Plus Analyzer DRI-CEDIA Drug Testing System; to communicate problems associated with the machine as they relate to her client. On October 11, 2019, Marc Casper sent a letter to Cheryl Kates responding to her concerns. The letter indicated that, "Microgenics' drugs of abuse tests are all preliminary tests, and because of

this the Instructions For Use ("IFU") expressly require a more specific confirmatory test to be run to obtain a confirmed analytical result". In addition, the letter informed that, company complaint logs for since 2017 only contained nine complaints in total and only four related to NYS DOCCS. Of those four only one was registered in 2019. The letter confirmed that there were many untested medications because it is not feasible to assess all medications; however, the letter also indicated that during September 2019 DOCCS had made modifications, so the assays were "less sensitive". Throughout the letter emphasis is placed on the use of confirmatory testing in the case of unconfirmed positive results. (**See Exhibit P)**

42. **Grievance Process** - On March 11, 2019, while confined, Plaintiff filled a grievance regarding the problems with the use of the newly implemented, Thermo Scientific Indiko Plus Analyzer DRI-CEDIA Drug Testing System (Grievance #ALPC-12335-19). On March 28, 2019, the grievance was denied on the basis that the "machine was calibrated every time it was used". On March 31, 2019, Plaintiff appealed Inmate Grievance Review Committee (herein IGRC) decision to Superintendent S. Squires, as per 7NYCRR §701.5, and DOCCS directive 4040. In the appeal, Plaintiff explained the problem was not the calibration but an issue of false results due to untested medication. On April 8, 2019, the appeal was denied on the basis that the machine calibrations are done on a weekly basis. The denial additionally stated the manufacturer had found no medication that caused a false positive (despite the manufacturer's documentation indicating the opposite). On April 9, 2019, Plaintiff appealed the Superintendents decision to DOCCS Central Office Review Committee (herein CORC) as per 7NYCRR §701.5, and directive 4040. Since no reply had been received within 4 months administrative options had been exhausted, as per 7NYCRR §701.5(d)(2)(ii). Article 78 proceeding was initiated. Upon questioning Albion Correctional Facility Civilian Grievance Representative Thomas reported, the central

office is 1.5 years behind in replying to grievances. On December 1, 2020 (21 months later), Central Office replied, "Grievant's Request Unanimously Accepted In Part.... Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby accepted in part.... CORC notes that neither grievant has a misbehavior report listed in the DOCCS computer system as a result of urinalysis testing... With respect to grievant B...'s appeal, CORC finds insufficient evidence of malfeasance by staff".

43. **Grievance Process** - On March 5, 2019, while still confined, Plaintiff filed a second grievance regarding the Pharmacy Dept. misrepresentation of the medication, Prazosin, not causing false positives when tested against the AB-Pinaca enzyme (ALPC-12369-19). On April 11, 2019, the grievance was denied as the chemical composition was not deemed close enough to warrant consideration for testing against the AB-Pinaca enzyme. Plaintiff appealed to the Superintendent who denied the grievance on April 19, 2019, on the grounds "Thermo Scientific did not find the chemical composition close enough to warrant further testing". Thermo Scientific refused to test the medication, Prazosin. Plaintiff appealed to CORC, requesting Thermo Scientific test the medication, Prazosin, against the AB-Pinaca enzyme. Since no reply had been received within 4 months, administrative options had been exhausted, as per 7NYCRR §701.5(d)(2)(ii). An article 78 proceeding was initiated. Upon questioning, Albion Correctional Facility Civilian Grievance Representative Thomas reported, central office is 1.5 years behind in replying to grievances. On August 13, 2020 (17 months later), Central Office replied, "Grievant's Request Unanimously Accepted In Part... Upon full hearing of the facts and circumstances in the instant case, and upon recommendation of the Division of Health Services, the action requested herein is accepted in part... CORC notes that the grievant's complaint has been reviewed by the Division of Health Services' staff who advise that a complete investigation was conducted and that the grievant is receiving appropriate treatment. CORC further notes that she is no longer

prescribed Prazosin... ..CORC recommends that the grievant address any further medical concerns to medical staff via established sick call procedures. (**See Exhibits Q**)

44. **Documentation** - During the initial hearings with Capt. Batson (January 31, 2019, February 3, 2019, February 7, 2019); Plaintiff requested information about a urine test which had been conducted, within FRP directive, one week prior to the January 25, 2019, positive result. Plaintiff was informed by HO Batson that the AB-Pinaca levels on January 19, 2019, were 19.6 and the cut off was 20; **therefore, Plaintiff was .4 away from a positive result. She asked why no one notified her considering a week later she would be tested again, only this time her three children would be there. HO Batson stated that it was not facility policy.** Plaintiff requested copies of the January 19, 2019, urinalysis results and was told, "**it was unnecessary to provide her with the copy**".

45. **Documentation** - During the hearings with HO Ciulla (March 13, 2019, and March 15, 2019), Plaintiff asked about the January 19, 2019, results, and requested a copy. **HO Ciulla informed the Plaintiff that the levels were high, and she did not need a copy. When the Plaintiff asked why she was not told the levels were high and Ciulla replied, "that is not how we catch people".**

46. **Documentation** - On March 24, 2019, while confined in SHU, Plaintiff filed a Freedom of Information Law (herein FOIL) request for a copy of the January 19, 2019, urinalysis results report. On May 18, 2019, Plaintiff again requested a copy of said report. On May 20, 2019, Offender Rehabilitation Coordinator / FOIL Officer T. Leon replied, she sent a letter requesting funds for the copy. On May 21, 2019, Plaintiff replied that she had not received the letter and furnished the finds for the copy. On May 29, 2019, Plaintiff received a letter from T. Leon, as well as a copy of a urinalysis results report. Upon further inspection, **Plaintiff realized the report was for another Incarcerated Individual (17G1112 Martinez), the other person who has also tested false positive for AB-Pinaca**.

Plaintiff immediately informed T. Leon in writing that she had received the <u>wrong report</u>. On June 4, 2019, Plaintiff received a set of results dated January 26, 2019; on June 5, 2019, Plaintiff explained that she had not received the results for the appropriate date, and again requested the January 19, 2019 report. On June 12, 2019, T. Leon wrote to Plaintiff explaining, <u>the reports she received were from the disciplinary record labeled "Bonet",</u> <u>indicating the results reported to Plaintiff during her hearings were in fact the results of</u> <u>Incarcerated Individual Martinez.</u> On July 12, 2019, Plaintiff received FOIL request for January 19, 2019. The FOIL request took almost 4 months to complete.

47. **Hearing Tapes** - On March 12, 2019, Plaintiff requested copies of her hearing tapes dated: January 31, 2019, February 4, 2019, February 7, 2019, and February 26, 2019. On March 20, 2019, Plaintiff additionally requested copies of her March 13, 2019, and March 15, 2019 hearing tapes.

48. **Hearing Tapes** - On April 5, 2019, T. Leon (ORC/FOIL Officer) responded in writing. The correspondence confirmed all hearing dates and requested funding for the copies. When the tapes were provided, the January 31, 2019, February 4, 2019, and February 7, 2019, dates were missing. Plaintiff wrote to Capt. Goodman requesting the 3 missing hearing tapes. When the tapes were finally provided, they were not audible (slowed beyond discernibility). Plaintiff wrote to Capt. Goodman again, requesting audible copies of the 3 hearing tapes. Two months later new copies were provided. When Plaintiff listened, they were once again not audible, this time speeded up beyond discernibility.

49. **Court Proceedings and Administrative Remedy** - On September 26, 2019, Plaintiff filed an Article 78 to request judicial intercession on this matter. The initial court date was scheduled for October 29, 2019. This date was postponed until November 26, 2019, and then again until January 9, 2020. **On January 3, 2020**, <u>DOCCS administratively reversed</u> <u>the dispositions of Plaintiffs disciplinary proceedings of February 26, 2019, and March 15,</u>

2019. On January 22, 2020, Acting Supreme Court Justice Sanford A. Church dismissed the matter as moot due to the administrative reversal on January 3, 2020, 345 days after the initial incident of FRP visit removal/SHU confinement.

50. **Medication** - With no alternative to ensure subsequent urinalysis would be accurate, Plaintiff switched medications on May 5, 2019. Over the course of the next calendar year and a half, many medication combinations were prescribed to mimic the effectiveness of the former mixture with little success. After DOCCS reversal of dispositions and administrative remedy, Plaintiff requested OMH restore her original combinations of effective medications. OMH denied the request despite many other Incarcerated Individuals still using said medications. Plaintiff was told, "She could only be prescribed the medication under certain circumstances, and she did not meet the criteria". Plaintiff was on these medications upon entry into prison, and that meets one of the criteria however, since she ended use to ensure her tests would not come back positive, she now would not be able to continue the use of the medications.

51. **Access to Personal Legal Material** - After passing a state exam qualifying the Plaintiff to work as a Paralegal Assistant in the Law Library, she was assigned to the position early months of 2020. During the fall of 2020, (date unknown), Notification of Intent to pursue a legal claim regarding the drug system failure was sent to the Attorney General. The corresponding documentation was in a file at the Plaintiffs desk in the Law Library (return receipt & copies of the intent). Shortly after, the Plaintiff was unexpectedly reprogrammed. The Law Library Officer in Charge, Kephart, informed the Plaintiff that she cleaned out her desk and indicated she was not welcome to return to the position in the future. No documentation was ever submitted to the Plaintiffs DOCCS record regarding deficient performance or rules breach of any kind. On a later date (unknown due to COVID), the Plaintiff arrived by schedule at the Law Library and requested her legal file. Kephart stated,

"It was a long time ago", indicating she was not going to turn over the file. The Plaintiff spoke with Captain Batson regarding the matter and the other related issues at the Law Library. She was assured that the matter would be reviewed. Days after, the Plaintiff was drafted to Taconic Correctional Facility and no further communication has been forthcoming. As a result, the Plaintiff has been denied access to crucial material and dates to complete this legal filing.

# CAUSE OF ACTION #1

DOCCS FAILED IN THEIR OBLIGATION TO SUPERVISE HEARING OFFICERS CONDUCTING TIER III SUPERINTENDENT HEARINGS, INFRINGING ON SUBSTANTIVE DUE PROCESS. AS A RESULT:

- THE HEARING OFFICERS FAILED TO ASSESS THE CLIENT'S MENTAL HEALTH WHICH PREVENTED INFORMATION WHICH SUPPORTS HER DEFENSE OF FALSE POSITIVE DRUG TESTS.

- HEARING OFFICERS INTERFERED WITH PRESENTING A DEFENSE, CALLING WITNESSES AND DEMONSTRATED BIAS, IN VIOLATION OF DUE PROCESS

- HEARING OFFICERS FAILED TO CAPTURE DISCIPLINARY PROCEEDINGS ELECTRONICALLY TO ALLOW FOR INTELLIGENT REVIEW.

- HEARING OFFICERS DETERMINATIONS OF GUILT RENDERED WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

- THERE IS EVIDENCE THESE WERE PRE-DETERMINED DECISIONS, IN VIOLATION OF DUE PROCESS

- THE PLAINTIFF ENDURED WRONGFUL SOLITARY CONFINEMENT

---

***Peoples v. Fischer***, 11CV 2694 (S.D.N.Y., 2015) challenged the use of solitary confinement and DOCCS proposed new guidelines to guide how the administration of solitary confinement as a punishment would be used. Part of this process included methods to ensure the process was fair and unbiased against the inmate.

Fundamental due process rights are required in a disciplinary matter, *Wolff v McDonnell*, 418 U.S. 539 (1974). The regulations governing these basic rights were established after the Wolff case was decided. Some of the rights established in the regulations go above what was afforded in the Wolff case.

In both hearings, it is acknowledged the defendant is taking OMH medications, yet the hearing officers in both proceedings failed to assess the client's mental health. This is a required factor the hearing officer must consider, and in both hearings, they failed to do so. This would have

allowed the doctor, who later indicated there is a possibility of a false positive on both tests due to the medication he prescribed, to testify. This information was not available to either hearing officer because they did not call the doctor as a witness. Instead, DOCCS chosen witness (the pharmacist) was not able to adequately answer the inquiries about false positives and mental health medications; and therefore, the hearing record is incomplete and does not meet the standard of due process.

The pharmacist and a nurse were used between the two hearings to try to conclude there would be no incidence of false positive results. However, this was a new test, which began use in January 2019. There is no evidence these staff members have any familiarity with or were trained for the use of the Indiko machine. Where an issue cannot be clarified, the appropriate remedy would be to call the prescribing OMH doctor to clarify the issues present. The hearing officers failed to conduct the hearings appropriately, as they failed to investigate and assist in developing the record for the Plaintiff / Defendant's claim, that she was not using drugs and these were false positive results, Additionally, the OSI investigator who was investigating the claim, of whether there was an issue at Albion with the machine rendering false positives, was denied as a witness. The hearing officer denied allowing this testimony, they mischaracterized it as character testimony. The testimony would be relevant as the OSI investigator could offer evidence he interviewed several inmates making the same claim. On January 4, 2020, New York State Inspector General Lucy Lang, held a press conference regarding the investigation into the 2019 DOCCS drug-testing program. The findings indicated that the drug-testing program had been a failure and that over 1,500 unjust hearings based on positive test results had been reversed. If the OSI investigator had been contacted, the developments of this investigation may have been shared and the Plaintiff would not have been exposed to the undeserved punitive sanctions of solitary confinement. This wrongful confinement forced the Plaintiff to undergo abnormal and substantial suffering, "For

purposes of determining whether prison inmate suffered atypical and significant hardship when allegedly wrongfully confined to special housing unit (SHU), as required to show deprivation of liberty interest sufficient to sustain §1983 action, SHU confinement constituted significant hardship when compared to ordinary incidents of prison life; SHU inmate had longer periods of cell confinement and were restricted in many activities open to general population, such as work, visitation, recreation and law library use. *U.S.C.A. Const. Amend. 14; 42 U.S.C.A. §1983*. *Scott v. Coughlin*, 78 F. Supp.2d 299. The Plaintiff's confinement consisted of isolation 23 out of 24 hours a day - for months. Much has been researched and written about the effects of solitary confinement on the human condition. New York State has recently adopted the Humane Alternatives to Long-Term Solitary Confinement Act (the "HALT" Act) that among other things, adopted the 15-day cap on solitary confinement. The Plaintiff spent over 70 days in this type of internment due to many failures by DOCCS staff and is entitled to damages, "Victim of violation of procedural due process is guaranteed nominal damages, but victim is not entitled to compensation for the deprivation of liberty or property which follows the procedural due process violation unless the liberty or property deprivation was caused by the violation." *Burka v. New York City Transit Authority*, 747 F. Supp. 214. In this case the procedural due process violation directly resulted in the deprivation "Damages for pain and suffering are recoverable for due process violations." *U.S.C.A. Const. Amend. 14. Williams v. City of New York*, 728 F. Supp. 1067. In this case, the Plaintiff experienced emotional distress, humiliation, harm to her esteem, and reputation. She was perceived, by both Incarcerated Individuals and Corrections Staff as being a drug user who jeopardized her family's wellbeing by using drugs before her families first FRP visit. Until this incident, the Plaintiff had a perfect disciplinary record. While this incident perpetuated for 11 months the Plaintiff was concerned her tainted disciplinary record would adversely affect her parole board appearance for release. "The testimony of the plaintiff alone can be sufficient to support recovery for emotional distress in a §1983 claim." *42 U.S.C.A. §1983. Miller v. City of East Orange*, 509 F.Supp.2d 452. "To establish

an injury in the form of emotional distress in a §1983 claim, expert medical testimony is not required." *42 U.S.C.A. 1983. Miller v. City of East Orange*, 509 F. Supp.2d 452. "In a §1983 claim, there is no requirement that specific types of evidence be introduced to demonstrate injury in the form of emotional distress." *42 U.S.C.A. §1983. Miller v. City of East Orange*, 509 F. Supp. 2d 452. In order to compensate a §1983 plaintiff fully for the injuries he has suffered, he can recover not only out-of-pocket loss and other monetary harms, but also such injuries as impairment of reputation, personal humiliation and mental anguish and suffering." *42 U.S.C.A. §1983. Miller v. City of East Orange*, 509 F. Supp.2d 452. "Under Civil Rights Act, as amended, successful Plaintiffs may recover compensatory damages for future pecuniary loss, emotional pain and suffering, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, inmate's constitutional right to due process requires prison officials to conduct proper hearing before disciplining inmate based on misbehavior report." *U.S.C.A. Const. Amend. 14. Greaves v. State of New York*, 958 F. Supp. 142.

Incarcerated Individuals have a constitutional and regulatory right to call witnesses at prison disciplinary hearings provided "their testimony is material, is not redundant and doing so does not jeopardize institutional safety or correctional goals" *7N.Y.C.R.R. §253.5(a)* (previously codified as *7 N. Y.C.R.R. § 254.5*). A hearing officer's actual outright denial of a witness without a stated good faith reason, or lack of any effort to obtain a requested witness's testimony constitutes a clear constitutional violation." Matter of *Benito v. Calero*, 120 A.D3d 778 (2d Dep't 2013)

The second hearing officer in March had a duty to review what happened in the first matter, as it was even more suspect when the Plaintiff tested positive in March 2019, while she was housed in SHU and Keep-lock for the past two months that these tests were exhibiting false positives. She would not have access to drugs when in this position, so it should have further supported her claim, that she did not use drugs. The HO erroneously indicated the only evidence they had to consider

was the ticket and the positive results. This means they rendered a pre-determined decision Plaintiff was guilty. Therefore, none of these hearings can be considered held properly nor allowing for due process, as the correctional officials ignored all evidence the Plaintiff was innocent. It is now known that there were many other Incarcerated Individuals who were also victims of the Indiko machine and not just the Plaintiff. DOCCS has begun suit against Thermo Fischer and on January 4, 2022, The New York State Inspector General, Lucy Lang, held a press conference to announce the findings that the drug testing program had been a failure and that over 1,500 unjust hearings [were] based on false positive test results. *7 N.Y.C.R.R. §253.1(b)* states:

> *The disciplinary hearing officer shall be responsible for conducting disciplinary hearings in an impartial manner.*
>
> *7 N.Y.C.R.R. §253.1(b).*

The hearing officers demonstrated bias in many ways as listed above.

In *Harvey v. Prack*, 39 NYS 3d 471 (2d Dept., 2016), when the hearing officer failed to inquire and fails to review information to judge credibility and reliability, this is not a fair hearing, and it violates due process. It also prejudiced the inmate's ability to raise a defense that she was not guilty of the charges lodged against her.

Specifically, in *Miller v. Fischer*, 2014 WL 4255627 (3rd Dep't., 2014) the court reviewed a case where a CI established threats or intimidation. The HO must review credibility and reliability of the sources cited in the said investigation establishing the offense. They must make an independent assessment of their credibility and reliability. The interview done by the HO must gauge the informant's knowledge and reliability (in this case the witnesses).

The HO must make their own assessment of the truthfulness and cannot rely on an officer's assessment or just think their testimony is credible based on their education or credentials. The information must be given with specificity supporting the issue posed. This is the same with

medical testifying about whether meds can cause a false positive. It was clear the pharmacist was not credible to be the source of information on whether these specific drugs could cause a false positive urinalysis. The HO(s) had an obligation to further investigate the Plaintiff's defense and they failed to do so. As stated, in this matter, the issue at hand involved mental health medications, and despite the requirement to assess mental health. All hearing officers failed to make this inquiry properly. The forms indicate N/A.

In these hearings, the petitioner denied guilt. An alternate theory was given that her mental health medication caused the false positive. This presents and issue of credibility in which the HO has a duty to resolve, *Fernandez v. Venetozzi*, 164 AD 3d 1557 (3d Dep't., 2018). They had an obligation to interview the mental health-prescribing physician. The second hearing officer had a larger obligation, as the petitioner was pre- hearing confined, where it is not likely she could have gained access to illicit substances.

A HO when relying on testimony must make an independent assessment whether the information is credible, *Quinones v. Ricks*, 288 A.D. 2d 569 (3d Dept., 2001); *Harris v. Coughlin*, 126 Misc. 2d 747 (Ulster Co., 1984); *Wolff v. McDonald* 418 U.S. 539 (1974); Helms v. Hewitt, 655 F. 2d 487 (1981); *Gomes v. Travisono* 510 F. 2d 537 (1st Cir., 1974) (testimony of confidential informants). Credibility must be independently assessed by the HO, *Striplin v. Griffin*, 164 AD 3d 1347 (2nd Dep't., 2018); *Cruz v. Annucci*, 152 AD 3d 1100, (3rd Dep't., 2017); Antrobus v. Lee, 140 AD 3d 745, (2d Dep't., 2016); *Jackson v. Prack*, 137 AD 3d 1133 (2nd Dep't., 2016). It is a severe violation of due process, if HO(s) rely only on a misbehavior report and a drug test result, ignoring other factors. *7 N.Y.C.R.R. §254.1* states:

> *Prior to presiding over a Superintendents Hearing the hearing officer shall receive training on relevant topics, including implicit bias, and procedural due process rights.*

*7 N.Y.C.R.R. §254.1*

In both hearings DOCCS, Albion's Superintendent, and the HO had an obligation to protect the inmate's due process rights. The HO should have been properly trained to ensure rights were not violated. An Incarcerated Individual has a right to a determination supported by some reliable evidence. In <u>*Sira v. Morton*</u>, 380 F3d 57, 81 (2d Cir. 2004), the Court held that at a prison disciplinary hearing the accused individual has a due process right to a determination of guilt that is supported by reliable evidence. In *Elder v. McCarthy*, et al., 967 f3d 113 (2d Cir. 2020), when the HO concluded the handwriting in the disbursement forms was similar to the plaintiff's the court found, "the entire proceeding rested in the assumption-one unsupported by any direct evidence....". In this case, the Plaintiff has presented a document produced by the drug manufacturer which states that her prescribed medication had not been tested against the AB Pinaca enzyme. Despite this evidence suggesting a potential failure in the testing process, the DOCCS (Department of Corrections and Community Supervision) witness, when questioned, ambiguously claimed that she could not definitively say whether this unverified interaction could result in a false positive test result. Troublingly, based on this non-conclusive testimony, the HO found the Plaintiff guilty, seemingly disregarding the evidence of potential testing inaccuracies and the witness's uncertain response. This decision calls into question the fair application and adherence to the principles of due process, which dictate that conclusions of guilt should be reached on the standard of "substantial evidence" not speculative or uncertain testimonies. For these reasons findings should favor the Plaintiff

# CAUSE OF ACTION #2

A. ANNUCCI, S. SQUIRES, AND GOODMAN FAILED IN THEIR OBLIGATION TO SUPERVISE OPERATIONS OF THE FAMILY REUNION PROGRAM AND AS A RESULT PROMULGATED A POLICY CONSTITUTING CRUEL AND UNUSUAL PUNISHMENT:

- DELIBERATE INDIFFERENCE TO THE MENTAL HEALTH AND WELLBEING OF PARTICIPANTS TO INCLUDE MINORS

- DELIBERATE INDIFFERENCE TO THE STATED OVERALL MISSION OF THE PROGRAM

---

The dereliction of duty exhibited by A. Annucci, S. Squires, and Goodman in their responsibilities to supervise the operations of the Family Reunion Program resulted in the implementation of policies that can be interpreted as cruel and unusual punishment, a breach of the Eighth Amendment of the US Constitution. These defendants cast aside the stated overarching aim of the program, promoting an agenda that significantly harmed the mental health and wellbeing of participants, including minors whose safety and welfare should have been paramount.

DOCCS *Directive 4500(1)* states, "The Family Reunion Program (FRP) is designed to provide inmates and their families the opportunity to meet for an extended period of time in privacy. The goal of the program is to preserve, enhance and strengthen family ties that have been disrupted as a result of incarceration." During the FRP visit, Plaintiff was removed from her family, handcuffed on the FRP site, and escorted to SHU. This process was in direct violation of the law. "An orderly, humane, and dignified procedure for the departure of families and for the return of inmates to the facility is expected at the cessation of ALL visits... .... closing time for visitation should be clearly understood by inmates and family participants." 7NYCRR 220.8(a) Clearly based on the directive this was not what DOCCS intended.

The Plaintiff had the expectation that her Husband and Children would be treated in a compassionate manner as per the operations of FRP by law. It is clear that the visitors of the

program are not incarcerated; therefore, operational guidelines are crucial to ensure they will be treated appropriately. The removal of the Plaintiff was malicious, cruel, and unusual, with only 16 - 18 hours left on the visit. It was insensitive not to consider the welfare of the Plaintiffs Children, and the potential harm endured. The wellbeing of family ties is clearly the intent of DOCCS as stated in the program description. The decision to remove the Plaintiff was unnecessary at least, and criminal at most. "Administrative agency, in exercise of its rule- making authority, cannot extend meaning of statutory language to apply to circumstances not intended to fall within statute." Perry Thompson Third Co. v. City of New York, 718 N.Y.S.2d 306, 279 A.D.2d 108. "Administrative agencies are without authority to promulgate rules out of harmony with statute." Jackson v. Blum, 436 N.Y.S.2d 358, 79 A.D.2d 1076.

These DOCCS Defendants failed in their responsibility to protect the wellbeing of program participants, ignored their own rules and standards resulting in profound harm to the Plaintiff and her family, mainly her young children. This was unlawful and should result in a finding for the Plaintiff. Notably, these defendants were aware of the elevated levels of AB Pinaca present, as revealed during the disciplinary hearings, regarding the initial drug test taken one week prior. Despite acknowledging this issue, which required immediate and thorough investigation, they instead chose to lure the Plaintiff's family into the program. This strategy appears intentionally designed to entrap the Plaintiff and her family, displaying an alarming disregard for their welfare, and explicitly endangering three minors involved. This is exemplified by the material presented in 'Facts" section (#34), **"therefore, Plaintiff was .4 away from a positive result. She asked why no one notified her considering a week later she would be tested again, only this time her three children would be there. HO Batson stated that it was not facility policy".** This behavior, illustrating a calculated lack of concern for the health and safety of participants in the Family Reunion Program, especially minors, and the deliberate strategy to lead families into entrapment,

constitutes a fundamental disregard for human rights and principles of decency. As a consequence, the Plaintiff and her family have suffered significant emotional distress and harm demanding legal resolution.

The failure of A. Annucci, S. Squires, and Goodman in their roles to adequately supervise the operations of the Family Reunion Program resulted in the promulgation of policies that can be considered as constituting cruel and unusual punishment, a direct violation of the Eighth Amendment to the Constitution of the United States. These defendants utterly disregarded the stated overall mission of the program, putting in place policies and procedures that did not prioritize or safeguard the mental health and wellbeing of the program's participants. This negligence was even more concerning as it involved minors, whose welfare should have been of paramount importance. The oversight displayed by these defendants resulted in the wellbeing of program participants being secondary, if not outright inconsequential.

# CAUSE OF ACTION #3

FORMER ACTING COMMISSIONER ANNUCCI, AND DEFENDANT GOODMAN DISPLAYED DELIBERATE INDIFFERENCE TO THEIR OBLIGATION TO SUPERVISE HEARING OFFICERS CONDUCTING TIER III SUPERINTENDENT HEARINGS, THE PROPER IMPLIMANTATION OF NEW DRUG TESTING MACHINERY, THE REMEDY OF INCONSISTENCIES WITH THE INDIKO DRUG TEST SYSTEM, INFRINGING ON THE SUBSTANTIVE DUE PROCESS RIGHT OF THE PLAINTIFF.

- HEARING OFFICER FAILED TO EVALUATE THE CLIENT'S MENTAL HEALTH, THEREBY HINDERING THE CLIENT'S DEFENSE AGAINST FALSE POSITIVE DRUG TESTS

- HEARING OFFICERS INTERFERED WITH PRESENTING A DEFENSE, CALLING WITNESSES AND DEMONSTRATED BIAS, IN VIOLATION OF DUE PROCESS

- HEARING OFFICERS FAILED TO CAPTURE DISCIPLINARY PROCEEDINGS ELECTRONICALLY TO ALLOW FOR INTELLIGENT REVIEW

- HEARING OFFICERS DETERMINATIONS OF GUILT RENDERED WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

- ALLOWANCE OF UNREASONABLE AND ARBITRARY DISCIPLINARY MEASURES

- THERE IS EVIDENCE THESE WERE PRE-DETERMINED DECISIONS, IN VIOLATION OF DUE PROCESS

- THE DEFENDANTS WRONGFULLY SUBJECTED THE PLAINTIFF TO SOLITARY CONFINEMENT

---

In relation to Defendant **A. Annucci**, this Plaintiff does propose that there was a personal contribution to the denial of due process. This submission seeks to respectfully clarify the extent of Annucci's personal involvement regarding the denial of due process. The need to make a plain distinction is essential for clarity. The June 5, 2019, Prisoners' Legal Services

(PLS) issued an advocacy letter to Defendants A. Annucci, R. Finnegan, S. Squires, and non-defendant Dr. J. Morley. The letter communicated a surge in requests for assistance concerning false positive urinalysis results from incarcerated individuals at Albion Correctional Facility, following the introduction of the new Indiko DRI-CEDIA testing system. This letter stemmed **directly from PLS addressed to Annucci, Finnegan, Squires, and Morley.** This letter to Annucci is one of many direct and personal communications informing this defendant of the serious matter involving faulty drug test results and by extension the potential violation of due process rights within internal disciplinary proceedings. The following is an example of known communication conveyed to Defendant Annucci:

- **On March 19, 2019**, the Plaintiff wrote an extensive, six-page letter to A. Annucci outlining her situation with the false positive urinalysis. In the letter it is explained that on not one, but two occasions "back-to-back" the Plaintiff has been victimized by these testing failures. **In the letter it is explicitly explained that if Commissioner Annucci did not intervein, the Plaintiff was going to be forced to switch medication as a means of ensuring that going forward she would no longer falsely test positive.** This communication should have served as notification of the severity of the situation. Furthermore, this directly adversely impacted the mental health of the Plaintiff.

- **On June 5th, 2019,** PLS wrote an advocacy letter to: A. Annucci, R Finnegan, S. Squires, and J. Morley, indicating the large volume of requests for assistance with false positive, urinalysis results.

- **On August 29, 2019**, the Plaintiff filed an Article 78 petition to the Orleans County Supreme Court. The court's clerk duly served the said petition to Defendant A. Annucci. This petition meticulously detailed the plight and injustices arising from the faulty drug testing system and subsequent failures

within the disciplinary process and hearings. It was fully within the purview of the Acting Commissioner to investigate and remediate the matter as expeditiously as possible in light of the valuable interests of the affected parties. This inaction raises concerns that A. Annucci was more focused on mitigating risk than interest in the genuine human suffering and potential due process violations being imposed on the population of incarcerated individuals within NYS DOCCS custody. Most predominantly of these offenses is the lack of substantial evidence being treated as fact in DOCCS disciplinary hearings during this period of time.

- **On September 13, 2019**, Attorney Cheryl Kates writes to Marc N. Casper, the CEO of Thermo Fischer Scientific Inc. to inform the company of Plaintiff's faulty results and the enormous harm it was afflicting on incarcerated individuals in NYS DOCCS. Former Acting Commissioner Annucci is carbon copied (cc'd) in this communication. Two matters are worth noting (1) this communication indicates, "People's lives are being adversely affected by the unreliability of your machine, far beyond being found guilty of disciplinary matters and being subjected to being placed in solitary confinement". This letter that was carbon copied (cc'd) to defendant Annucci should have served as notice that the potential for due process rights violations existed. The second issue when compiled with the first should arouse concern by court (2) the early victims of these false positive test results were primarily those who willingly participated in urine screenings for esteemed programs, not the usual pool of individuals selected for random urinalysis. This unusual trend again should have prompted alarm and elicited a thoughtful response among the staff, most prominently Acting Commissioner Annucci.

- **On November 5, 2019**, Inspector General's investigation found additional deficiencies in DOCCS' Incarcerated Individual Drug Testing Program for other prohibited substances, the Inspector General formally advised DOCCS that it immediately cease taking adverse action against incarcerated individuals based on positive drug test results using Microgenics systems for **all illegal** drugs without first confirming those results by a more specific alternative method. DOCCS immediately accepted this recommendation and in December 2019, began using an outside laboratory to confirm all positive results of drug screening tests **prior to taking administrative action.** This information is sourced from a later released report from the NYS Investigator General.

This complaint, prepared on a *Pro Se* basis, brings forward concerns of the utmost gravity related to the disciplinary process within the NYS Department of Corrections as it relates to Defendant A. Annucci, particularly the impact of inaccurate test results from the Indiko Plus Analyzer. Given the severity of the situation and its direct influence on incarcerated individuals' liberty interests, one would reasonably expect the Acting Commissioner to have thoroughly considered potential ramifications. Despite this expectation, it appears there was a considerable disregard for these extenuating effects on New York State's incarcerated population, namely the Plaintiff. This characterization is especially poignant when examining the choices, decisions, and attitudes of Former Acting Commissioner A. Annucci.

Further substantiating these concerns is the case of Steele-Warrick v. Microgenics Corp., 2021 U.S. Dist. LEXIS 54068, 2021 WL 1109052 (United States District Court for the Eastern District of New York, March 22, 2021). The rulings and legal rationale in Steele-Warrick particularly validate the persuasiveness of these arguments for the present case. The universality and direct relevance of the legal principles reinforce their compelling nature for

the court's considerations. This correlation holds true, even though the Plaintiff, given their Pro

Se status, lacks the benefit of depositions and extensive case law. The following is directly

from the Steele-Warrick case:

> *In August of 2019, Kelly learned that five of six such samples were false*
> *positives. He informed O'Gorman and Annucci but did not personally pause*
> *testing or attempt to reverse any discipline that had been imposed based on*
> *the five false positives. Ten days later, however, O'Gorman— with Annucci's*
> *approval—ordered all DOCCS facilities to stop using Indiko Plus tests for*
> *buprenorphine.* ***Indiko Plus testing for other substances continued****.*

> -Steele-Warrick v. Microgenics Corp., 671 F. Supp. 3d 229, 243 (E.D.N.Y. 2023)

> *According to the Complaint, Annucci first learned of potential issues with*
> *the Indiko Plus tests when two inmates complained to him about false*
> *positives in January and February of 2019. By May, he had received over*
> *twenty-four letters from inmates who had lost privileges due to alleged false*
> *positives. Annucci also received reports of "faulty testing" from DOCCS*
> *personnel beginning in January 2019, as well as complaints from attorneys*
> *beginning in June 2019. In June 2019, Annucci assigned Kelly to investigate*
> *the complaints. In August, he intervened directly and ordered some positive*
> *samples to be sent for confirmatory testing. Ten days after learning that five*
> *of the six samples were false positives, he approved O'Gorman's order to*
> *stop using Indiko Plus to test for buprenorphine but took no action to*
> *reverse existing discipline until September. Once prompted by the Inspector*
> *General, Annucci stopped all Indiko Plus testing in November and began*
> *reversing discipline based on non-buprenorphine tests in December. To be*
> *sure, bureaucracies as large as DOCCS take time to act, and the alleged*
> *concealment of problems by the Microgenics Defendants undoubtedly*
> *contributed to the delay.* ***Nevertheless, the Court cannot conclude, as a***
> ***matter of law, that the Complaint does not plausibly allege that Annucci***
> ***was deliberately indifferent to problems with the Indiko Plus tests to an***
> ***extent that would shock the conscience.***

> -Steele-Warrick v. Microgenics Corp., 671 F. Supp. 3d 229, 243 (E.D.N.Y. 2023)

In light of the material excerpted from the Third Amended Complaint within Steele-Warrick v.

Microgenics Corp., which was accepted as fact for the purposes of the DOCCS Defendants' Rule

12(b)(6) motion to dismiss in that case, it is pertinent to scrutinize the role and involvement of Defendant A. Annucci.

Combining the elements detailed above, the Steele-Warrick complaint notes, "Annucci was first alerted to potential issues with the Indiko Plus tests when he received complaints about false positives from two inmates in January and February of 2019" *Steele-Warrick v. Microgenics Corp.*, 671 F. Supp. 3d 229, 243 E.D.N.Y. 2023. It seems reasonable to conjecture that the Plaintiff may be one of these two individuals, as she is also identified as a 'blind' individual in the Investigator General's Report on this incident.

The initial incident took place in January 2019. By March, the Plaintiff had written letters; by June, the Prisoners' Legal Services (PLS) had also written; and, by August, Article 78 was served on Mr. Annucci. Nonetheless, supported by the Steele-Warrick material, only when prompted by the Inspector General did Annucci halt all Indiko Plus testing in November and commence reversing discipline...". However, as late as October 28, 2019, the Assistant Attorney General still signaled an intention to uphold the Department of Corrections' stance in the Article 78 proceedings, as evidenced by their letter to the presiding Judge requesting an adjournment until November 26, 2019. This is substantiated by a series of correspondence exchanged between the Plaintiff and the Office of the Attorney General of the State of New York. On December 3, the plaintiff wrote to the Orleans County Supreme Court, with a carbon copy sent to the Attorney General's Office. At the time, there was neither opposition to her motion nor requests for adjournment. Consequently, she requested her motion to be ruled upon unopposed. However, on December 11, 2019, she was informed by the Attorney General that an adjournment had been granted until January 9, 2020. **Then on January 8, 2020, the Plaintiff was notified by the court that DOCCS had moved for dismissal as the matter was moot.** At this time Bonet's disciplinary record was expunged. <u>This was four months after expungement for buprenorphine results began.</u>

An unaddressed issue pertains to the fact that the Department of Corrections and Community Supervision (DOCCS) began expunging disciplinary records for positive buprenorphine results as early as August 2019. Despite the plaintiff enduring harm and facing adverse consequences from these oversights before several others did, her pleas for correction were largely ignored until the threat of court action loomed. This reflects a gross negligence for the plaintiff's anguish, deteriorating mental health, and denial of appropriate mental health medications brought about by this scenario. The following is from PLS publication "Pro Se" which issued a call for people impacted by this matter,

> Prisoners' Legal Services of New York (PLS) and Emery Celli Brinckerhoff & Abady LLP (ECBA) have filed a class action lawsuit on behalf of hundreds of incarcerated New Yorkers who were punished for false positive drug test results in 2019. The lawsuit is filed in the Eastern District of New York. The complaint alleges that the false positives were the result of a systemic problem with new urinalysis analyzers (Indiko Plus machines) installed in New York prisons at the end of 2018 pursuant to a contract with Defendant Microgenics Corporation... If DOCCS reversed a determination that you used Suboxone/buprenorphine between December 1, 2018 and August 31, 2019 and you would like to know more about the lawsuit, please contact...

> Since that time, we have learned that it is more than likely that the Indiko Plus drug testing device has produced false positive results for at least one other substance, AB-Pinaca, a form of synthetic marijuana. ABPinaca is sometimes called K3. It is our understanding that, like the Suboxone/buprenorphine cases, DOCCS is reversing any disciplinary dispositions of guilt for AB-Pinaca that occurred after January 1, 2019 and that DOCCS is also working to restore any individual to the status he/she held prior to being found guilty of ABPinaca drug use. It is also our understanding that, going forward, no one in DOCCS custody will be disciplined for any drug charge unless the sample that tested positive is sent to an outside laboratory for a confirmatory test.

It is now stressed that the Defendant did not change this devastating course of actions till "prompted" by a court date scheduled to hear the Plaintiff's case in the Article 78 proceedings..

Certainly, despite the Plaintiff being one of the first people in NYS DOCCS custody to be victimized by this machine, her disciplinary record was not resolved till January 3, 2020. Therefore, Annucci, with the professional knowledge and expertise permitting him to rise to the rank of acting commissioner certainly had to know the implications of his decisions. These facts independently may seem somewhat benign but viewed collectively, these actualities suggest deliberate indifference to jurisprudence within the DOCCS disciplinary process, bordering on malfeasance.

All of the documented information that was provided to Defendant clearly displays, at de minimus deliberate indifference. Annucci's complete lack of regard or concern for the suffering of individuals, confined in a solitary environment, **prior to the implementation of The Humane Alternatives to Long-Term Solitary Confinement (HALT)** Act which is based on the principle that no one should be subjected to inhumane or degrading treatment. Commissioner Annucci's display of deliberate indifference in his supervision of this matter constitutes a violation of the Plaintiff's substantive due process rights. Despite being informed of potential issues with the drug testing process and known inaccuracies, Commissioner Annucci failed to take adequate action to ensure the integrity of these proceedings. The absence of immediate and meaningful action to rectify the identified inaccuracies or inconsistencies in the process, despite being presented with evidence highlighting the same, reflects a gross negligence and an alarming disregard of fundamental rights. The Plaintiff was found guilty based on evidence that was far from substantial evidence, leading to doubts about the reliability of the verdicts handed down in these hearings under his supervision. Furthermore, the Plaintiff was subjected to the maximum penalty for these unfounded allegations as evidenced in the "Facts" section (#13), **"This was the maximum penalty despite this being the Plaintiff's first ever infraction while in DOCCS custody for 15 months"**. Such indifference has directly resulted in harmful effects for the Plaintiff, including reputational damage. This failure to ensure accountability and justice within the prison administration has

prompted serious concerns about the fair treatment and due process upheld within the system, leading to damages that require proper remedy.

# CAUSE OF ACTION #4

SUPERINTENDENT SQUIRES'S DELIBERATE INDIFFERENCE TO THE. SUPERVISORY HANDLING OF TIER III SUPERINTENDENT HEARINGS RESULTED IN A SEVERE BREACH OF PLAINTIFF'S RIGHT TO DUE PROCESS

- BY FUNCTIONING OUTSIDE DOCUMENTED PRACTICES FOR THE EVEN AND METED DISCIPLINARY PROCESS AS STANDARD OPERATING PROCEDURE THE SUPERINDENT PREVENTED DUE PROCESS

- FAILURE TO OVERSEE DESIGNEE HEARING OFFICERS WHO COMPROMISED PLAINTIFF'S MENTAL HEALTH AND WITHHELD CRUCIAL DEFENSE INFORMATION REGARDING 'FALSE POSITIVE' DRUG TESTS.

- THE DEFENDANT ALLOWED HEARING OFFICERS TO OBSTRUCTED DEFENSE PRESENTATION, WITNESS TESTIMONY, AND DISPLAY PARTIALITY, VIOLATING DUE PROCESS.

- THE DEFENDANT FAILED TO ADDRESS AND RECTIFY THE ISSUE THAT THE HEARING OFFICER DID NOT ALLOW FULL ELECTRONIC RECORDING OF ONE OF THE DISCIPLINARY PROCEEDINGS, THUS HINDERING AN INTELLIGENT AND THOROUGH REVIEW.

- THE DEFENDANT ALLOWED GUILTY VERDICTS THAT WERE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

- THE DEFENDANT ALLOWED FOREJUDGED RULINGS INFRINGING UPON THE PLAINTIFF'S RIGHT TO DUE PROCESS.

- THE PLAINTIFF UNJUSTLY UNDERWENT SOLITARY CONFINEMENT WITHIN THE PURVIEW OF THE DEFENDANT.

---

Throughout this ordeal, the Plaintiff repeatedly contacted the Superintendent of Albion Correctional Facility, S. Squires who could have, at any point resolved this matter as per 7N.Y.C.R.R. Chapter V §254.9: "Discretionary Review by Superintendent, At any time during which a penalty imposed pursuant to a Superintendents hearing is in effect, the Superintendent may reduce the penalty". 7N.Y.C.R.R. Chapter V. §254.9. Presumably the purpose of this discretion is a stop gap measure to ensure jurisprudence within internal disciplinary matters.

Superintendent S. Squires repeatedly communicates to the Plaintiff that she could not do anything to fix the situation, when in fact that was false. In essence this emphasized the reason for having discretion in internal disciplinary matters. It suggests that the discretion serves as a temporary solution to maintain legal principles or rulings within the internal disciplinary processes. Defendant S. Squires displays deliberate indifference to the Plaintiff's suffering due process rights violations under her purview. This lacuna in due diligence becomes even more critical when considering emerging inconsistencies with other incarcerated individuals that recorded positive results, directly and concurrently following the Plaintiff's situation.

The Defendant permitted arbitrary decision-making, devoid of precise fact-finding or relevant law application. This leads to an infringement of the Plaintiff's Fourteenth Amendment rights - the fundamental right to fair process and due process. The ripple effects of this failure caused harm to the Plaintiff, for which she seeks remedy. Indeed, the Defendant, S. Squires did have personal interaction and communication with many parties to this situation, to include the Plaintiff, Bonet:

- **On February 25th, 2019**, The plaintiff. writes to S. Squires. Regarding the entire situation. And. Requesting an investigation into the matter.

- **On February 27th, 2019, t**he plaintiff writes to S. Squires with a plea for assistance. She indicates. That another incarcerated individual named Martinez is also testing positive and is on the same combination of medications as the Plaintiff.

- **On March 9, 2019,** the Plaintiff writes directly to Defendant S. Squires conveying a reminder of a prior communication and a plea for her intervention. At this juncture, the Plaintiff had a positive test result after a considerable solitary confinement period, thereby casting doubts on the system's reliability.

Further, the Plaintiff reasserted the argument that her medication could be causing these false positives.

- **On March 14th, 2019,** The plaintiff reached out to S. Squires once more, seeking help. She notified the Superintendent that another prisoner, on the same medication, had also tested positive. This other individual was in the same keep-lock unit as the plaintiff. At this time the plaintiff emphasized the drastic disparities between her punishment and that of other individuals found positive for drugs, in her correspondence.

- **On March 28th, 2019,** The plaintiff receives a memorandum from. Defendant, S. Squires indicating that she had reviewed the hearing packet and the hearing itself and **found no procedural issues with the hearing**.

- **(#23) On March 31st, 2019,** Plaintiff writes to Superintendent S Squires once again asking for assistance on this matter. Once again explaining that something has gone wrong, and at this time informing the Defendant of inconsistencies between the manner in which this was handled out of harmony with directive #4937 regarding urinalysis testing. At this time, it <u>is FULLY conveyed</u> that the Plaintiff is **being forced to switch the medicine** she uses to manage her mental health in avoidance of continued positive results and extending sanctions.

- **On April 3rd, 2019,** S. Squires responds to the plaintiff via memo, indicating that there is nothing at the facility level that can be done until the responses are provided from special housing.

- **On April 18th, 2019,** Plaintiff once again writes to S. Squires informing that she can reduce the penalty as per 7NYCRR Chapter V. Standards, Behaviors and Allowance Part 252.7.

- **On April 24th, 2019**, S Squires responds to the Plaintiff that she had been found guilty on two instances of drug use and have appeals pending on both and will get a response from the Director of Special Housing Venetozzi regarding my appeal. <u>No acknowledgement regarding her capabilities to reduce the sanctions was evident</u>.

- **On April 26th, 2019,** Defendant D. Venetozzi, Director of Special Housing reviews and affirms the disposition on one of the two disciplinary matters. S. **Squires is Carbon Copied (CC'd)** on this piece of correspondence.

- **On May 14th, 2019,** Defendant D. Venetozzi, Director of Special Housing reviews and affirms the disposition on one of the two disciplinary matters. S. Squires is Carbon Copied (CC'd) on this piece of correspondence.

- **On May 21st, 2019,** Defendant D. Venetozzi, Director of Special Housing writes to Mr. David Bentivegna, Staff Attorney at Prisoners Legal Service of New York indicating that there were not sufficient grounds to reconsider the previous decision on the hearing. This piece of correspondence is Carbon Copied (CC'd) to S. Squires.

- **On September 15th, 2019,** Plaintiff writes to the Superintendent imploring her to provide some meaningful programming while awaiting resolution of these rights violations.

- **On August 27th, 2019,** Defendant D. Venetozzi, Director of Special Housing again reviews and affirms the disposition on one of the two disciplinary matters. S. Squires is Carbon Copied (CC'd) on this piece of correspondence.

Superintendent Squires failed to provide a thorough and critical evaluation of the evidence at hand, in particular, the documentation from the drug manufacturer and the uncertain testimony of

a DOCCS witness. Such negligence led to a verdict based on inconclusive and quite possibly, false evidence. Cognitive errors attributed to Squires's supervisory role resulted in inequities in the disciplinary process, as stated in the "Facts" section #17, "That same date March 15, 2019, at approximately 2:00pm, HO Ciulla continued the hearing. Plaintiff was found guilty of 113.24 Drug Use and penalized with <u>60 days SHU, 60 days loss of recreation, 60 days loss of packages, 60 days loss of commissary, 60 days loss of phones, 60 days loss of property</u>. **The imposed sanction was the maximum penalty** for 113.24 Drug Use". In both of the Plaintiffs' dispositions, harsh sanctions are permitted by the Superintendent - despite the questionable nature of the charges and extensive communication over the entire period of sanctions. Both HO's refuse to consider the Plaintiffs spotless history and consider the alternate theory that the OMH medication is causing the positive test results. Upon review the Defendant does not question the harsh sanction or suspect circumstances, **Instead, she permits the repeated imposition of maximum sanctions. This is in direct contradiction to** 7N.Y.C.R.R Chapter V. (A) §250.2 (c) this situation was not treated individually. Additionally, 7N.Y.C.R.R Chapter V. (A) §250.2 (c) explains: "The disciplinary techniques within a correctional facility must be varied to fix such factors as... the problem and the present atmosphere of the facility **consequentially, persons vested with responsibility for disciplinary measures in facilities of the department should not establish rigid structures for disciplinary sanctions but should consider each situation individually**." 7N.Y.C.R.R Chapter V. (A) §250.2 (c) Essentially, it implies that allowing some flexibility in decision-making helps uphold consistent legal practices within the organization's internal affairs.

At every chance, each of the Defendants subvert the intention of measures established to ensure incarcerated individuals are provided their fundamental right to fair treatment and due process. Consequently, this negligence and deliberate indifference culminated in a violation of the

Plaintiff's rights. This failure has had direct and adverse impacts on the Plaintiff, leading to damages which need proper compensation.

As per 7 N.Y.C.R.R. §253.6 (b) states: "The entire hearing must be electronically recorded. "7 N.Y.C.R.R. §253.6 (b) The tapes provided to the Plaintiff were not audible (slowed beyond discernibility). Plaintiff wrote to Capt. Goodman again, requesting audible copies of the 3 hearing tapes. Two months later, new copies were provided. When Plaintiff listened, they were once again not audible, this time speeded up beyond discernibility. To date no audible electronically recorded copy of the events has been presented in direct contradiction to the agency's own statute. "Agencies have no authority to create rules out of harmony with or inconsistent with the plain meaning of statutory language." Nekoosa Papers, Inc. v Chu. 495 N.Y.S.2d 1003. "Administrative agency may not, in the exercise of its rule-making authority, promulgate a regulation out of harmony with the plain meaning of the statutory language; agency may not, in excess of its lawful delegated authority, promulgate rules and regulations for application to situations not within the intendment of the statute." Festa v. Leshan, 537, N.Y.S.2d 147, 145 A.D.2d 49 In this matter, OMH was not contacted as the best source of expertise; biased hearing officers interfered with presenting a defense and calling witnesses. It is questionable whether documents utilized during proceedings were in fact the Plaintiff's, improper standards were used to judge guilt, supervisory staff refused to utilize their capabilities to remedy the situation, disciplinary proceedings were not captured electronically for intelligent judicial review, and actions were in direct conflict with established directives and regulations. Furthermore, the Plaintiff was subjected to an ineffectual grievance system. This egregious disregard of due process rights resulted in wrongful solitary confinement. The proceedings were arbitrary and capricious; they used unlawful measures and should result in a ruling for the Plaintiff.

# CAUSE OF ACTION #5

DEFENDANTS S. SQUIRES, R. GOODMAN, D. MACK, D. BAKER, AND M. DENNIS ALL EXHIBITED DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS IN VIOLATION OF THE EIGHTH AMENDMENT'S PROHIBITION ON CRUEL AND UNUSUAL PUNISHMENT.

- THESE PRISON OFFICIALS KNOWINGLY DISREGARDED A SUBSTANTIAL RISK OF HARM TO THE PLAINTIFF'S HEALTH OR SAFETY - IN THIS CASE, IGNORING THE POTENTIAL ADVERSE EFFECTS OF CHANGING MENTAL HEALTH MEDICATIONS.

- SPECIFICALLY, THESE DEFENDANTS DEMONSTRATED BLATANT DISREGARD FOR THE MENTAL HEALTH CONCERNS THAT AROSE AS A CONSEQUENCE OF THE PLAINTIFF'S CONFINEMENT WITHIN THE SECURE HOUSING UNIT (SHU). THESE PRISON OFFICIALS WERE AWARE OF THE SIGNIFICANT RISK OF HARM TO THE PLAINTIFF'S HEALTH AND SAFETY. MORE PRECISELY, THEY CHOSE TO OVERLOOK THE POTENTIAL ADVERSE EFFECTS OF THE PLAINTIFF ALTERING HER MENTAL HEALTH MEDICATIONS TO AVOID FALSE POSITIVE DETECTION, AND BY EXTENSION FURTHER SANCTIONS.

- DEFENDANT NEVER INVESTIGATED OR RESPOND TO INFORMATION REGARDING THE FAULTY INSTRUMENT BEING UTILIZED IN HEARING SETTING.

The Plaintiff respectfully requests the court to evaluate the seriousness of Bonet's medical needs, the subsequent harm caused due to the following correlation of items from the "Facts" section of this filing:

- **(# 6)** During a subsequent hearing session, HO Batson provided a list of medications on a document provided by Thermo Scientific labeled, AB-Pinaca Assay. The Assay document lists all medication tested against the AB-Pinaca enzyme; medications known NOT to cause false results (The opposite of what was requested). The medication, Prazosin, which Plaintiff was prescribed and took as a mental health medication, was not one of the medications tested against the enzyme. Plaintiff asked what the results of an untested medication would have on the urinalysis. HO Batson responded, "she did not know". **Nurse Baker (an Albion Staff Nurse) was contacted as a witness via phone and asked if Plaintiff was on any medication that would cause a false result on a urinalysis. Baker responded "no".** Plaintiff stated, "the limitations" section on the AB-Pinaca Assay document reports, "any substance not part of the specificity study could cause a false result". **Baker insisted no medication could alter the test regardless of the document provided by the manufacturer of the urinalysis machine.** During this hearing the Plaintiff discovered that the urinalysis machine had been implemented the second week of January (1-2 weeks prior) and the facility did not have all the documentation for the product yet, so no additional information was available.

- **(#10) On February 26, 2019,** on the Plaintiffs 31st day of SHU confinement, the hearing was restarted from the beginning with a new hearing officer, P. Barhite. Plaintiff once again explained she was not a drug user and proposed the theory that her mental health medication was not tested by the urinalysis manufacturer and could be the cause of the positive results. Plaintiff explained that Special Investigator Ryan had spoken to her, and he was requested as a witness. HO Barhite denied the witness. **Pharmacist M. Dennis was called as a witness by the HO and she testified she had communicated with the urinalysis manufacturer and, "no medications Plaintiff was prescribed would cause a positive result".**

- **(#14) On March 13, 2019**, HO P. Ciulla conducted a hearing, which was adjourned and commenced several times until March 15, 2019. During said hearings, Plaintiff explained she was not a drug user, was a model inmate and did not have the motive or opportunity to obtain or use drugs since she had been in confinement for 40 days at the time of providing the urine sample. Once again, the Plaintiff proposed the theory that her mental health medication could be causing the positive result. Plaintiff emphasized the fact that the medication, Prazosin, had not been researched against the AB-Pinaca enzyme, consequentially the effect of the medication on the test is unknown. Plaintiff once again

questioned Pharmacist M. Dennis on the effect the medicine, Prazosin, could have on the results of the urinalysis. **Pharmacist Dennis stated, "She could not say one way or the other" if the medication was responsible for the positive result since the medication had not been researched.** The hearing was adjourned.

- (#18) On March 19, 2019, the Plaintiff wrote an extensive, six-page letter to A. Annucci outlining her situation with the false positive urinalysis. In the letter it is explained that on not one, but two occasions "back-to-back" the Plaintiff has been victimized by these testing failures. **In the letter it is explicitly explained that if Commissioner Annucci did not intervein, the Plaintiff was going to be forced to switch medication as a means of ensuring that going forward she would no longer falsely test positive.** This communication should have served as notification of the severity of the situation. Furthermore, this directly adversely impacted the mental health of the Plaintiff.

- **On March 31st, 2019**, Plaintiff writes to Superintendent S Squires once again asking for assistance on this matter. Once again explaining that something has gone wrong, and at this time informing the Defendant of inconsistencies between the manner in which this was handled out of harmony with directive #4937 regarding urinalysis testing. **At this time, it is FULLY conveyed that the Plaintiff is being forced to switch the medicine she uses to manage her mental health in avoidance of continued positive results and extending sanctions.**

- **On May 3rd, 2019, Plaintiff has appointment with mental health professional doctor RAZI. At this time. The doctor indicates. That her mood is not stable. She is constricted. Her insight is fair, and her judgment is fair. All resulting from. This failure in due process. And medical indifference. Despite this. Characterization. Plaintiff is still forced to change her medical mental health medication.**

- **As stated in "facts" section (#48) -** Medication With no alternative to ensure subsequent urinalysis would be accurate, Plaintiff switched medications on May 5, 2019. Over the course of the next calendar year and a half, many medication combinations were prescribed to mimic the effectiveness of the former mixture with little success. After DOCCS reversal of dispositions and administrative remedy, Plaintiff requested OMH restore her original combinations of effective medications. OMH denied the request despite many other Incarcerated Individuals still using said medications. Plaintiff was told, "She could only be prescribed the medication under certain circumstances, and she did not meet the criteria". Plaintiff was on these medications upon entry into prison, and that meets one of the criteria

however, since she ended use to ensure her tests would not come back positive, she now would not be able to continue the use of the medications.

From the onset, the plaintiff's serious medical needs and the subsequent harm caused due to disregarding these needs were apparent and repeatedly voiced. This can be evidenced through a series of events. During a hearing session with HO Batson, the plaintiff questioned the validity of the urinalysis results and the potential impact of her prescribed medication, Prazosin, which was not tested against the enzyme involved in the urinalysis. HO Batson admitted to not knowing how an untested medication might affect the results. During this hearing, it was discovered that the urinalysis machine had been recently implemented and full documentation was not available.

In late February 2019, after the plaintiff had spent a month in SHU confinement, the hearing was restarted with a new officer, P. Barhite. The plaintiff reiterated her innocence and put forth the theory that her mental health medication could be causing the positive results. Pharmacist M. Dennis testified that she had communicated with the urinalysis manufacturer, and the plaintiff's medications would not cause a positive result, a claim directly contradicted by the manufacturer's stated lack of interaction.

Throughout several hearing sessions, the Plaintiff consistently professed her innocence, asserting that her mental health medication, Prazosin, could potentially cause false positives on the urinalysis. When queried about this possibility, Pharmacist M. Dennis confessed she could not conclusively declare if Prazosin, given its untested status against the enzyme involved in the urinalysis test, could lead to a positive result. Notably, despite Defendants Dennis and Baker repeated affirmations during the hearings, it's indicated by the urinalysis machine manufacturer's representatives that Pharmacist M. Dennis, and others involved in the hearings, never actually contacted them for clarity regarding these concerns.

Despite her persistent attempts to rectify the situation, the plaintiff received no assistance. She was forced to switch her mental health medication to avoid continued false positive results, directly impacting her mental health. This forced change was despite the identification of inconsistencies in the handling of urinalysis tests and the plaintiff's indication of her intention to switch medication. On May 3rd, 2019, a mental health professional noted the plaintiff's unstable mood and fair judgment. Still, despite these concerns, the plaintiff was forced to change her medication.

Finally, the plaintiff switched her medication on May 5, 2019. Despite DOCCS reversing the dispositions and providing administrative remedy subsequently, the plaintiff could not revert to her original effective combination of medications. Her repeated pleas for returning to her original medication were dismissed with the claim that she did not meet the criteria, despite her having been on these medications while in prison.

## CONCLUSION

Plaintiff was the victim of a false positive urine test by the Thermo Scientific Indiko system that had been installed two weeks prior to her FRP visit. DOCCS had a duty of care, which they failed to perform, and as a result of these numerous failures the Plaintiff suffered serious emotional consequences. The ineffective grievance process created and environment that unnecessarily exposed her and other Incarcerated Individuals to undeserved punitive sanctions. Plaintiff received two Tier III misbehavior reports and spent 78 days straight in segregation (32 days in SHU/16 days in keep-lock/30 days in SHU consecutively). With -sanctions, the Plaintiff was not able to speak to her family for 101 days. Plaintiff carried two Tier III misbehavior reports on her disciplinary record for 345 days. All of the above listed sanctions imposed atypical and significant hardship on the Plaintiff in relation to ordinary incidents of prison life. Over the period of segregation, the Plaintiffs access to phone, property, free movement, meaningful activity, human contact, proper footwear, books, showering and other hygienic activities were limited in comparison to the access of ordinary prison life. As a result, Plaintiff suffered: hyper-responsivity to external stimuli, perceptual disorders, severe panic attacks, loss of appetite, difficulty with thinking / concentration / memory, overt paranoia, delirium, sleep disturbances, vision loss, and stupor. Then, during the period of altered disciplinary record (carrying two tier III tickets), this hardship was compounded by an inability to remain in the college program, which delayed the achievement of the Plaintiffs associate degree. One year of college tuition at Medaille College is $20 30,000.00. Plaintiff lost privileged job assignments, preferred/honor housing (private room), FRP for future participation; all of which the Plaintiff was removed from as a result of this incident; and could not reapply for without a clean disciplinary record. During this period, the Plaintiff could not apply for close to

home transfers and faced potential denial of parole. All of which imposed atypical and significant hardship relation to ordinary incidents of prison life.

The Plaintiff's husband and children were traumatized by the manner in which they and the Plaintiff were removed from the FRP site. Without any understanding as to the whereabouts of the Plaintiff and no communication due to SHU confinement, the Plaintiff's family were extremely distressed. Plaintiff did not speak to her daughters during both their birthdays and her wedding anniversary. Normally the family visited the Plaintiff every 4-6 weeks for the prior 15 months from the incident. The children were reluctant to return to the prison for future visitation and did not actually visit for 6 months.

Plaintiff was further damaged due to the mandatory change of medications to ensure clean urinalysis results. This change of medication injured the Plaintiff because she could not find an appropriate replacement for the formulation she had been prescribed. The regimen formerly approved was designed for the Plaintiff while she was in rehab for alcohol addiction and was very specifically formulated to replace benzodiazepines. Locating a replacement within the limited range of pharmacology approved by DOCCS was not feasible and resulted in many medication shifts over the next calendar year and a half, none of which effectively alleviated her mental health symptoms.

# Exhibit

# A

# CEDIA® AB-PINACA Assay

**For Criminal Justice and Forensic Use Only**

[REF] 10022971 (3 x 17 mL Kit)
10022977 (65 mL Kit)

**Thermo** SCIENTIFIC

## Intended Use
The CEDIA® AB-PINACA assay is intended for the [...]
and estimation of the parent compound and metab[...]
AB-FUBINACA in human urine at a cutoff of 20 n[...]
laboratories and provides a simple and rapid anal[...]
synthetic cannabinoids compounds and metaboli[...]

*The assay provides only a preliminary analytic[...]
chemical method must be used in order to confir[...]
mass spectrometry (GC/MS) and Liquid Ch[...]
(LC-MS/MS) are the preferred confirmatory meth[...]*

The semi-quantitative mode is for detection and for the purpose [...]
determine an appropriate dilution of the specimen for confirmation by a confirmatory method
such as Liquid chromatography/tandem mass spectrometry (LC-MS/MS) or permitting
laboratories to establish quality control procedures.

Clinical and professional judgment should be applied to any drug of abuse test result,
particularly when preliminary positive results are used. For Criminal Justice and Forensic Use
Only.

## Summary and Explanation of the Test
Synthetic cannabinoid is a mixture of herbs, spices or shredded plant material that is typically
sprayed with a synthetic compound chemically similar to THC, the psychoactive ingredient in
marijuana. It is sold in small, silvary plastic bags of dried leaves and marketed as incense that
can be smoked. It is said to resemble potpourri. It is also sold as Bliss, Black Mamba, Bombay
Blue, Blaze, Genie, Spice, Zohai, JWH-018, JWH-073, JWH-250, Yucatan Fire, Skunk and Moon
Rocks. K2 products are usually smoked in joints or pipes, but some users make it into a tea.
Short term effects include loss of control, lack of pain response, increased agitation, pale skin,
seizures, vomiting, profuse sweating, uncontrolled / spastic body movements, elevated blood
pressure, heart rate and palpitations.[3] The onset of this drug is 3-5 minutes, and the duration
of the high is 1-8 hours. In addition to physical signs of use, users may experience: dysphoria,
severe paranoia, delusions, hallucinations and increased agitation. On March 1, 2011, DEA
published a final order in the Federal Register temporarily placing five synthetic cannabinoids
into Schedule I of the Controlled Substance Act CSA. Thus, there is an urgent need to develop
an immunoassay for detection of synthetic cannabinoids using automated clinical analyzers.[2]

The CEDIA AB-PINACA Assay uses recombinant DNA technology to produce a unique
homogeneous enzyme immunoassay.[2] The assay is based on bacterial (*Escherichia
coli*) enzyme β-galactosidase, which has been genetically engineered into two inactive
fragments (enzyme donor and enzyme acceptor). These fragments spontaneously re-associate
to form fully active enzyme that, in assay format, cleave a substrate, generating a color change
that can be measured spectro-photometrically.

In the assay, drug in the specimen competes with the drug conjugated to enzyme donor (ED)
for antibody binding sites. If the sample is present in the sample, it binds to the antibody,
leaving the ED conjugate free to form active enzyme with the enzyme acceptor (EA). If drug
is not present in the sample, the antibody binds to drug conjugated to ED, inhibiting the re-
association of ED to EA, and no active enzyme is formed. The amount of active enzyme formed
and resultant absorbance change are directly proportional to the amount of drug present in
the sample.

## Reagents
**1   EA Reconstitution Buffer**
Contains buffer salts, mouse monoclonal anti-AB-PINACA antibody, stabilizer, and
preservative.
**1a  EA Reagent**
Contains 0.171 g/L enzyme acceptor, buffer salts, and preservative.
**2   ED Reconstitution Buffer**
Contains buffer salts, stabilizer, and preservative.
**2a  ED Reagent**
Contains 0.215 mg/L enzyme donor conjugated with the AB-PINACA derivative,
1.87 g/L chlorophenol red-β-D-galactopyranoside, stabilizers, detergent and
preservative.

### Additional Materials (sold separately):

| REF | Kit Description |
|---|---|
| 10022930 | CEDIA Negative Calibrator III (1 x 10 mL) |
| 10022931 | CEDIA AB-PINACA 5 ng/mL Calibrator (1 x 5 mL) |
| 10022932 | CEDIA AB-PINACA 20 ng/mL Calibrator (1 x 5 mL) |
| 10022933 | CEDIA AB-PINACA 50 ng/mL Calibrator (1 x 5 mL) |
| 10022934 | CEDIA AB-PINACA 100 ng/mL Calibrator (1 x 5 mL) |
| 10022935 | CEDIA AB-PINACA Control set (10 ng/mL and 30 ng/mL, 2 x 5 mL each) |

rum albumin (BSA) fragme[...]
azide and <0.1% drug-spec[...]

[...]ficulties if inhaled.

[...]should not be allowed out o[...]
[...]ntection. In case of inadequa[...]
[...] with plenty of soap and wa[...]
[...]air and keep at rest in a pos[...]
IF INHALED: If breathing [...]
comfortable for breathing. If skin irritation or rash occurs: Get medical advice/atten[...]
If experiencing respiratory symptoms: Call a POISON CENTER or doctor/physician. [...]
contaminated clothing before reuse. Dispose of contents/container to location in accorda[...]
with local/regional/national/international regulations.

In a case of accidental spill, clean and dispose of material according to your laboratory'[...]
local and state regulations.

In a case of damaged packaging on arrival, contact your technical support representati[...]
(refer to back page of this package insert).

## Reagent Preparation and Storage
For preparation of the solutions, refer to the section below. Remove the kit from refrigera[...]
storage (2-8°C) immediately prior to preparation of the solutions. Do not use the reagen[...]
beyond the expiration dates.

Prepare the solutions in the following order to minimize possible contamination.

### R2 Enzyme Donor Solution
Connect Bottle 2a (ED reagent) to Bottle 2 (ED Reconstitution Buffer) using one of the enc[...]
adapters. Mix by gentle inversion, ensuring that all the lyophilized material from Bott[...]
is transferred into Bottle 2. Avoid the formation of foam. Detach Bottle 2a and adapter [...]
Bottle 2 and discard. Cap Bottle 2 and let stand approximately 5 minutes at room tempera[...]
(21-25°C). Mix again. Record the reconstitution date on the bottle label. Place the bott[...]
directly into the reagent compartment of the analyzer or into refrigerated storage (2-8°C) [...]
let stand 30 minutes before use.

### R1 Enzyme Acceptor Solution
Connect Bottle 1a (EA reagent) to Bottle 1 (EA Reconstitution Buffer) using one of the [...]
adapters. Mix by gentle inversion, ensuring that all the lyophilized material from Bott[...]
is transferred into Bottle 1. Avoid the formation of foam. Detach Bottle 1a and adapter [...]
Bottle 1 and discard. Cap Bottle 1 and let stand approximately 5 minutes at room temperat[...]
(21-25°C). Mix again. Record the reconstitution date on the bottle label. Place the [...]
directly into the reagent compartment of the analyzer or into refrigerated storage (2-8°C) [...]
let stand 30 minutes before use.

⚠ NOTE 1: The components supplied in this kit are intended for use as an integral un[...]
not mix components from different lots.

⚠ NOTE 1: Avoid cross-contamination of reagents by matching reagent caps to the p[...]
reagent bottle. The R2 solution (Enzyme Donor) should be yellow-orange in color. A red [...]
purple color indicates that the reagent has been contaminated and must be discarded. D[...]
reagent 1 and/or 2 if turbidity or precipitates are observed.

⚠ NOTE 1: The R1 and R2 solutions must be at the reagent compartment storage temper[...]
of the analyzer before performing the assay. Refer to the analyzer specific applicatio[...]
for additional information.

Store reagents at 2-8°C. DO NOT FREEZE.

For shelf life of the unopened components, refer to the box or bottle labels for the expir[...]
date.

R1 Solution: 60 days refrigerated or at 2-8°C.
R2 Solution: 60 days refrigerated or at 2-8°C.

## Specimen Collection and Handling

Collect urine specimens in plastic or glass containers. Care should be taken to preserve the chemical integrity of the urine sample from the time it is collected until the time it is assayed.

Specimens kept at room temperature that do not receive initial test within 7 days of arrival at the laboratory should be placed into a secure refrigeration unit at 2 to 8°C for up to 12 weeks.[4,5] For longer storage prior to analysis or for sample retention after analysis, urine specimens may be stored at -20°C.[5]

Laboratories following the SAMHSA mandatory guidelines should refer to SAMHSA "Short-Term Refrigerated Storage" and "Long-Term Storage" requirements.[6]

To protect the integrity of the sample, do not induce foaming and avoid repeated freezing and thawing. An effort should be made to keep pipetted samples free of gross debris. It is recommended that grossly turbid specimens be centrifuged before analysis. Frozen samples should be thawed and mixed prior to analysis. Adulteration of the urine sample may cause erroneous results. If adulteration is suspected, obtain another sample and forward both specimens to the laboratory for testing.

Handle all urine specimens as if they were potentially infectious.

## Assay Procedure

The CEDIA AB-PINACA assay is intended for use on automated clinical analyzers capable of maintaining a constant temperature, pipetting samples, mixing reagents, measuring enzymatic rates at 570 nm and timing the reaction accurately can be used to perform this immunoassay.

Refer to specific application instructions for each analyzer for chemistry parameters before performing the assay.

### Qualitative Analysis
For qualitative analysis, use the CEDIA AB-PINACA 20 ng/mL Calibrator as the cutoff level.

### Semi-quantitative Analysis
For semi-quantitative analysis, use all five calibrators.

## Quality Control and Calibration

Good laboratory practice requires the use of control specimens to ensure proper assay performance. Ensure that control results are within the established ranges, as determined by laboratory procedures and guidelines. If results fall outside of the established ranges, assay results are invalid. All quality control requirements should be performed in conformance with local, state and/or federal regulations or accreditation requirements. Each laboratory should establish its own quality control testing frequency.

## Results and Expected Values

### Qualitative
The 20 ng/mL calibrator is used as a cutoff reference for distinguishing the 'positive' from the 'negative' samples. A sample that exhibits a change in absorbance values (ΔA) equal to or greater than that obtained from the cutoff calibrator is considered as positive. A sample that exhibits a change in absorbance value (ΔA) lower than that obtained from the cutoff calibrator is considered as negative.

### Semi-quantitative
An estimate of drug concentrations in the samples can be obtained by running a standard curve with all calibrators and estimating sample concentrations off the standard curve. Sample results above the high calibrator should be diluted with the negative urine calibrator and be retested.

## Limitations

1. A positive result from this assay indicates the presence of AB-PINACA, AB-CHMINACA, AB-FUBINACA and/or other structurally related compounds, and does not necessarily correlate with the extent of physiological and psychological effects. This is a test for primary screening. All positive results must be confirmed via GC/MS or LC-MS/MS.
2. It is possible that substances other than those investigated in the specificity study may interfere with the test and cause false results.
3. Care should be taken when reporting concentration results since there are many factors e.g. fluid intake and other biologic factors that may influence a urine test result.
4. Performance characteristics for the CEDIA AB-PINACA assay performance have not been established with body fluids other than human urine.

## Specific Performance Characteristics

Typical performance results obtained on Beckman Coulter AU680 analyzer are shown below. The results obtained in your laboratory may differ from these data.

### Precision
The analyte of the assay calibrators and controls was spiked into pooled negative human urine to the levels of 10 ng/mL (50%, Low-control level), 15 ng/mL (75% level), 20 ng/mL (100%, cutoff level), 25 ng/mL (125% level), and 30 ng/mL (150%, High-control level). The spiked urine samples were tested using a modified Clinical Laboratory and Standards Institute (CLSI) protocol to obtain both qualitative and semi-quantitative data. Results presented below were generated by testing the samples in replicates of 8, twice per day for 5 days, total n=80.

### Qualitative

| Conc (ng/mL) | % of Cutoff (20 ng/mL) | Number of Determinations | Total Precision (n=80) Immunoassay (Neg) (Negative/Positive) |
|---|---|---|---|
| 10 | -50% | 80 | 80/0 |
| 15 | -25% | 80 | 80/0 |
| 25 | +25% | 80 | 0/80 |
| 30 | +50% | 80 | 0/80 |

### Semi-quantitative (ng/mL)

| Conc (ng/mL) | Mean (n=80) | % Recovery | Within-Run Precision SD | Within-Run Precision % CV | Total Precision SD | Total Precision % CV |
|---|---|---|---|---|---|---|
| 10 ng/mL (-50%) | 10.1 | 101% | 0.68 | 6.74% | 0.95 | 9.35% |
| 15 ng/mL (-25%) | 51.3 | 102% | 0.53 | 3.50% | 0.62 | 4.0% |
| 20 ng/mL (100%) | 20.0 | 100% | 0.68 | 3.45% | 0.81 | 2.0% |
| 25 ng/mL (+25%) | 25.2 | 101% | 0.93 | 3.58% | 1.08 | 4.2% |
| 30 ng/mL (+50%) | 30.6 | 102% | 0.95 | 3.10% | 1.22 | 3.9% |

### Accuracy
A total of 90 urine specimens were tested. Out of the 34 samples positive by immuno 4 samples were confirmed as negative by LC-MS/MS.

|  | LC-MS/MS + | LC-MS/MS − |
|---|---|---|
| CEDIA AB-PINACA Assay (cutoff 20 ng/mL) + | 30 | 4** |
| CEDIA AB-PINACA Assay (cutoff 20 ng/mL) − | 6* | 50 |

* Semi-quantitative results were between 10 and 20 ng/mL.
** Samples were detected as greater than 20 ng/mL, but were not confirmed by LC-MS/MS the metabolites.

### Specificity
The cross-reactivity of the AB-PINACA assay to synthetic cannabinoids compounds determined by adding known amounts of each analyte into drug-free human urine.

The following table lists cross-reactivity of compounds structurally related to AB-PI (including AB-PINACA metabolites, derivatives, additional synthetic cannabinoids compo and natural cannabinoids) using the cutoff at 20 ng/mL.

| Synthetic Cannabinoids Compounds | Tested Concentration (ng/mL) | Observed Concentration (SQ Conc) (ng/mL) | % Cross-reactivity |
|---|---|---|---|
| AB CHMINACA M1A | 14 | 25 | 179% |
| 5F-AB-PINACA | 14 | 20.8 | 149% |
| AB-CHMINACA M1B | 18 | 22.2 | 123% |
| AB-PINACA 5OH pentyl | 20 | 23.7 | 119% |
| AB-PINACA 4OH | 20 | 23.7 | 119% |
| AB-PINACA N-(4-fluoropentyl) isomer | 20 | 21.8 | 108% |
| AB-PINACA pentanoic acid | 20 | 20 | 100% |
| AB-FUBINACA | 25 | 23.4 | 94% |
| 5F-AB-PINACA N-(4-hydroxypentyl) metabolite | 28 | 24.2 | 88% |
| AB-PINACA | 25 | 20.1 | 80% |
| AB-PINACA N-(3-fluoropentyl) isomer | 32 | 22.7 | 71% |
| AB-FUBINACA 3-fluorobenzyl isomer | 40 | 21.5 | 54% |
| AB-CHMINACA | 66 | 25.9 | 39% |
| AB-PINACA | 120 | 35 | 29% |
| AB-PINACA N-(2-fluoropentyl) isomer | 85 | 23 | 27% |
| AB-FUBINACA isomer 1 | 150 | 23.1 | 15% |
| 5-chloro AB-PINACA | 140 | 21.4 | 15% |
| 5F-ABICA | 200 | 24.8 | 12% |
| ADB-FUBINACA | 310 | 21.2 | 6.8% |

Table continued

| Synthetic Cannabinoids Compounds | Tested Concentration (ng/mL) | Observed Concentration (SQ Conc) (ng/mL) | % Cross-reactivity |
|---|---|---|---|
| ADB-PINACA pentanoic acid | 450 | 21 | 4.7% |
| APP-CHMINACA | 475 | 21 | 4.4% |
| 5F-AMB | 510 | 21 | 4.1% |
| AMB | 730 | 21.4 | 2.9% |
| AB-FUBINACA 2-fluorobenzyl isomer | 800 | 20.4 | 2.6% |
| ADB-PINACA RM | 2,500 | 32.1 | 1.3% |
| ADBICA | 2,500 | 24.6 | 1% |
| APP-FUBINACA | 2,500 | 22.2 | 0.9% |
| EMB-FUBINACA | 2,500 | 20.0 | 0.8% |
| AB-FUBINACA 2-fluorobenzyl isomer | 5,000 | 31.9 | 0.6% |
| MAB-CHMINACA RM (ADB-CHMINACA) | 5,000 | 33.7 | 0.7% |
| JWH-250 N-(5-carboxypentyl) metabolite | 5,000 | 26.5 | 0.5% |
| ADBICA pentanoic acid | 10,000 | 35.0 | 0.4% |
| JWH-250 N-(4-hydroxypentyl) metabolite | 10,000 | 34.1 | 0.3% |
| MDMB-CHMINACA | 10,000 | 26.3 | 0.3% |
| MA-CHMINACA | 10,000 | 19.5 | 0.2% |
| AB CHMINACA M2 | 10,000 | 15.9 | 0.16% |
| AB-FUBINACA isomer 5 | 10,000 | 17.7 | 0.18% |
| AB-CHMINACA M3A | 10,000 | 16.5 | 0.17% |
| AB-PINACA cabonyl metabolite | 10,000 | 15.1 | 0.15% |
| STS-135 | 10,000 | 10.3 | 0.1% |
| JWH-018 adamantyl carboxyamide | 10,000 | 9.6 | 0.1% |
| AB-FUBINACA 2A metabolite | 10,000 | 9.3 | 0.09% |
| AB-CHMINACA M6 | 10,000 | 8.8 | 0.09% |
| JWH-073 N-(4-hydroxybutyl) metabolite | 10,000 | 8.7 | 0.09% |
| JWH-250 N-(5-hydroxypentyl) metabolite | 10,000 | 6.7 | 0.07% |
| AB-FUBINACA isomer 2 | 10,000 | 4.9 | 0.05% |
| MDMB-FUBINACA | 10,000 | 4.7 | 0.05% |
| AB-FUBINACA 2B metabolite | 10,000 | 4.6 | 0.05% |
| 5F-AKB-48 4OH pentyl | 10,000 | 0.1 | 0.001% |
| 5F-JWH-018 adamantyl analog | 10,000 | 1.1 | 0.01% |
| A-796260 | 10,000 | 1.6 | 0.02% |
| A-836339 | 10,000 | 0.1 | 0.001% |
| AB-CHMINACA 2'-indazole isomer RM | 10,000 | 1.1 | 0.001% |
| AB-CHMINACA M4 | 10,000 | 0.7 | 0.011% |
| AB-CHMINACA M5A | 10,000 | 1.2 | 0.007% |
| AB-CHMINACA M7 | 10,000 | 0.5 | 0.012% |
| AKB-48 N-(4-hydroxypentyl) metabolite | 10,000 | 0.7 | 0.005% |
| AKB-48 4OH pentyl | 10,000 | 0.7 | 0.007% |
| AKB-48 pentanoic acid | 10,000 | 0.2 | 0.002% |
| AM1220 | 10,000 | 0.8 | 0.008% |
| AM2201 6-hydroxyindole metabolite | 10,000 | 1.3 | 0.013% |
| AM2201 N-(4-fluorobenzyl) isomer | 10,000 | 1.1 | 0.011% |
| AM2201 N-(4-hydroxypentyl) metabolite | 10,000 | 0.7 | 0.007% |
| AM2233 | 10,000 | 1.1 | 0.011% |
| AM694 | 10,000 | 0.8 | 0.008% |

Table continued

| Synthetic Cannabinoids Compounds | Tested Concentration (ng/mL) | Observed Concentration (SQ Conc) (ng/mL) | % Cross-reactivity |
|---|---|---|---|
| FUB-AMB | 10,000 | 0.5 | 0.005% |
| JWH-018 5-hydroxyindole metabolite | 10,000 | 0.8 | 0.008% |
| JWH-018 7-hydroxyindole metabolite | 10,000 | 0.8 | 0.008% |
| JWH-018 adamantyl analog | 10,000 | 0.9 | 0.009% |
| JWH-018 N-(3-methylbutyl) isomer | 10,000 | 0.3 | 0.003% |
| JWH-018 N-(4-hydroxypentyl) metabolite | 10,000 | 1.1 | 0.011% |
| JWH-018 N-(5-hydroxypentyl) metabolite | 10,000 | 1.2 | 0.012% |
| JWH-018 N-(5-hydroxypentyl) beta-D-glucuronide | 10,000 | 1.3 | 0.013% |
| JWH-018 N-pentanoic acid | 10,000 | 0.9 | 0.009% |
| JWH-019 (exempt group) | 10,000 | 0.8 | 0.008% |
| JWH-020 | 10,000 | 0.8 | 0.008% |
| JWH-073 5-hydroxyindole metabolite | 10,000 | 0.8 | 0.008% |
| JWH-073 N-(2-methyl propyl) isomer | 10,000 | 1.9 | 0.019% |
| JWH-073 N-(3-hydroxybutyl) metabolite | 10,000 | 1.4 | 0.015% |
| JWH-200 (exempt prep) | 10,000 | 0.7 | 0.007% |
| JWH-200 5-hydroxyindole metabolite | 10,000 | 1.1 | 0.012% |
| JWH-200 8-hydroxyindole metabolite | 10,000 | 0.7 | 0.007% |
| JWH-398 (exempt prep) | 10,000 | 1.2 | 0.012% |
| JWH-399 N-(5-hydroxypentyl) metabolite | 10,000 | 0.3 | 0.003% |
| MDMB-CHMICA | 10,000 | 0.8 | 0.038 |
| MDMB-FUBINACA | 10,000 | 4.7 | 0.047 |
| PB-22 3 carboxyindole metabolite | 10,000 | 2.1 | 0.021 |
| PB-22 N-(4-hydroxypentyl)-3-carboxyindole metabolite | 10,000 | 1.4 | 0.014 |
| PB-22 N-(5-hydroxypentyl)-3-carboxyindole metabolite | 10,000 | 1.3 | 0.013 |
| PB-22 N-pentanoic acid-3-carboxyindole | 10,000 | 0.5 | 0.005 |
| UR-144 N-pentanoic acid | 10,000 | 1.4 | 0.014 |
| UR-144 N-(5-bromopentyl) analog | 10,000 | 0.7 | 0.007 |
| UR-144 N-(5-hydroxypentyl) beta-D-glucuronide | 10,000 | 1.8 | 0.018 |
| UR144 N-(5-hydroxypentyl) metabolite | 10,000 | 1.5 | 0.015 |
| UR-144 N-5-chloropentyl analog | 10,000 | 1.1 | 0.011 |
| UR-144 N-heptyl analog | 10,000 | 1.4 | 0.014 |
| XLR11-N(4-hydroxypentyl) | 10,000 | 0.5 | 0.005 |

The following table lists cross-reactivity of Synthetic Cannabinoids compounds that negative results at the concentrations tested using the cutoff at 20 ng/mL.

| Synthetic Cannabinoids Compounds | Tested Concentration (ng/mL) |
|---|---|
| A-790269 | 10,000 |
| A-834735 | 10,000 |
| AB-005 | 10,000 |
| AB-005 | 10,000 |
| AKB-48 5OH pentyl | 10,000 |
| FUB-144 | 10,000 |
| JWH-019 N-(6-hydroxyhexyl) | 10,000 |
| JWH-022 | 10,000 |
| JWH-073 8-hydroxyindole metabolite | 10,000 |

Table continued

| Synthetic Cannabinoids Compounds | Tested Concentration (ng/mL) |
|---|---|
| JWH-073 N-(2-hydroxybutyl) | 10,000 |
| JWH-122-N-(4-hydroxypentyl) | 10,000 |
| MO-CHMINACA | 10,000 |
| UR-144 degradant | 10,000 |
| UR-144 N-(2-hydroxypentyl) metabolite | 10,000 |
| UR144-N-(4-hydroxypentyl) | 10,000 |
| UR144-N-(4-hydroxypentyl) | 10,000 |
| UR-144 N-5-chloropentyl analog | 10,000 |
| XLR11 N-(2-fluoropentyl) isomer | 10,000 |
| XLR11 N-(4-pentanyl) analog | 10,000 |

The potential cross-reactivity posed by drugs commonly co-administered was evaluated by adding each substance to drug free urine at the concentration indicated. A drug was considered to cross-react if the observed A6-PINACA concentrations result exceeded 20 ng/mL. As shown in the tables below, all the pharmacologic compounds evaluated, including a number of opiate compounds, exhibited no cross reactivity at the concentrations tested.

*Opiates compounds produced a negative result at the concentration listed below*

| Opiate Compounds | Tested Concentration (ng/mL) |
|---|---|
| 6-Acetylmorphine | 100,000 |
| Buprenorphine | 100,000 |
| Codeine | 100,000 |
| Codeine glucuronide | 100,000 |
| Dextromethorphan | 100,000 |
| Dihydrocodeine | 100,000 |
| Heroin | 100,000 |
| Hydrocodone | 100,000 |
| Hydromorphone | 100,000 |
| Levorphanol | 100,000 |
| Morphine | 100,000 |
| Morphine-3-β-D-glucuronide | 100,000 |
| Morphine-6-β-D-glucuronide | 100,000 |
| Nalbuphine | 100,000 |
| Nalorphine | 100,000 |
| Naloxone | 100,000 |
| Naltrexone | 100,000 |
| Norbupranorphine | 100,000 |
| Norcodeine | 100,000 |
| Normorphine | 100,000 |
| Noroxycodone | 100,000 |
| Noroxymorphone | 100,000 |
| Oxycodone | 100,000 |
| Oxymorphone | 100,000 |
| Oxymorphone-β-D-glucuronide | 100,000 |
| Thebaine | 100,000 |

*Structurally unrelated compounds and other concomitantly used drugs produced a negative result at the concentrations listed below.*

| Compounds | Tested Concentration (ng/mL) |
|---|---|
| 1,3-dimethyluric acid | 100,000 |
| 2-Hydroxyethylflurazepam | 100,000 |
| 3'-methyl-alpha-Pyrrolidinopropiophenone | 100,000 |
| 3-methyl Xanthine | 100,000 |
| 4-methoxy PV8 | 100,000 |

Table continued

| Compounds | Tested Concentration (ng/mL) |
|---|---|
| 4-methyl-alpha-Pyrrolidinobutiophenone | 100,000 |
| 4'-methyl-alpha-Pyrrolidinohexanophenone | 100,000 |
| 4'-methyl-alpha-Pyrrolidinopropiophenone | 100,000 |
| 7-Aminoclonazepam | 100,000 |
| 7-Aminoflunitrazepam | 100,000 |
| 7-Aminonitrazepam | 100,000 |
| 11-hydroxytetrahydrocannabinol | 100,000 |
| 11-nor-9-Carboxy-tetrahydrocannabinol | 10,000 |
| Acetaminophen | 100,000 |
| alpha-Hydroxyalprazolam | 100,000 |
| alpha-Hydroxytriazolam | 100,000 |
| alpha-PVP | 100,000 |
| Amitryptyline | 100,000 |
| Amoxicillin | 100,000 |
| (+/-)Amphetamine | 100,000 |
| S-(+)Amphetamine | 100,000 |
| Ampicillin | 100,000 |
| Aripiprazole | 100,000 |
| Benzoylecgonine | 100,000 |
| Bromazepam | 100,000 |
| Cannabidiol | 100,000 |
| Carbamazepine | 100,000 |
| Carbamazepine epoxide | 100,000 |
| Ceftriaxone | 100,000 |
| Cephalexin | 100,000 |
| Chlordiazepoxide | 100,000 |
| Chlorpromazine | 50,000 |
| Cimetidine | 100,000 |
| Clobazam | 100,000 |
| Clomipramine | 100,000 |
| Clorazepate | 100,000 |
| Cocaine | 100,000 |
| Delorazepam | 100,000 |
| delta-9-Tetrahydrocannabinol | 10,000 |
| Desalkylflurazepam | 100,000 |
| Desipramine | 100,000 |
| Digoxin | 100,000 |
| Dihydrocodeine | 100,000 |
| DL-Kavain | 100,000 |
| EDDP (2-Ethylidene-1,5-dimethyl-3,3-diphenylpyrrolidine) | 100,000 |
| EMDP (2-Ethyl-5-methyl-3,3-diphenylpyrroline) | 100,000 |
| Ephedrine | 100,000 |
| Estazolam | 100,000 |
| Ethacrynic acid | 100,000 |
| Ethylone | 100,000 |
| Fentanyl | 100,000 |
| Flunitrazepam | 100,000 |
| Fluoxetine | 100,000 |
| Fluphenazine | 9,000 |
| Flurazepam | 100,000 |
| Furosemide | 100,000 |
| Gabapentin | 100,000 |

4

Table continued

| Compounds | Tested Concentration (ng/mL) |
|---|---|
| Hydrochlorothiazide | 100,000 |
| Hydroxychloroquine | 100,000 |
| Imipramine | 100,000 |
| Lamotrigine | 100,000 |
| Lorazepam | 100,000 |
| Lormetazepam | 100,000 |
| m-CPP (meta-Chlorophenylpiperazine) | 100,000 |
| MDA (3,4-Methylenedioxyamphetamine) | 100,000 |
| (+/-)MDEA-D6 (3,4-Methylenedioxy-N-ethylamphetamine) | 100,000 |
| MDMA (3,4-methylenedioxy-methamphetamine) | 100,000 |
| MDPV | 100,000 |
| Medazepam | 100,000 |
| Metoprolol Tartrate | 100,000 |
| Meperidine | 100,000 |
| Mephedrone | 100,000 |
| S-(+)Methamphetamine | 100,000 |
| Methiopropamine | 100,000 |
| Methadone | 100,000 |
| Methylone | 100,000 |
| Metolazone | 100,000 |
| Metoprolol Tartrate | 100,000 |
| Midazolam | 100,000 |
| Mitragynine (Kratom) | 40,000 |
| Nitrazepam | 100,000 |
| N,N-Dimethylcathinone | 100,000 |
| N,N-DMA | 100,000 |
| Norchlordiazepoxide | 100,000 |
| (+/-)Norketamine HCl | 100,000 |
| Normeperidine | 100,000 |
| Norpropoxyphene | 100,000 |
| Norpropoxyphene (Maleate) | 100,000 |
| Nortryptiline | 100,000 |
| Oxaprozin | 100,000 |
| Oxazepam | 100,000 |
| Pentobarbital | 100,000 |
| phencyclidine | 100,000 |
| Phenobarbital | 100,000 |
| Prazepam | 100,000 |
| Promazine | 100,000 |
| Promethazine | 100,000 |
| Propranolol | 100,000 |
| Protripyline | 100,000 |
| Ranitidine | 100,000 |
| (R,R)Pseudo-ephidrine | 100,000 |
| (S,S)Pseudo-ephidrine | 100,000 |
| Quetiapine | 100,000 |
| Ranitidine | 100,000 |
| Reperidone | 100,000 |
| Secobarbital | 100,000 |
| Sertraline HCl | 100,000 |
| Temazepam | 100,000 |
| Tetracycline | 100,000 |

Table continued

| Compounds | Tested Concentration (ng/mL) |
|---|---|
| Theophylline | 100,000 |
| Thioridazine | 100,000 |
| Topiramate | 100,000 |
| Thrombin | 100,000 |
| Trazadone | 80,000 |
| Triazolam | 100,000 |
| Trimipramine | 100,000 |
| u47700 (trans-3,4-dichloro-N-[2-(dimethylamino)cyclohexyl]-N-methyl-benzamide) | 100,000 |
| Venlafaxine | 100,000 |
| W-15 (4-chloro-N-[1-(2-phenylethyl)-2-piperidinylidene]-benzenesulfonamide) | 100,000 |

## Interference

The potential interference of pH and endogenous physiologic substances on ***** the AB-PINACA immunoassay Controls was assessed by spiking the l* compounds of potentially interfering substances into the Low (10 ng/mL) and the High (20 mL) Controls for testing against 20 ng/mL cutoff. No interference was observed for compo* listed below at the tested concentrations.

| Compounds | Tested Concentration (mg/dL) | Spiked calibrator analyte level | |
|---|---|---|---|
| | | Low Control | High Contr* |
| Acetaminophen | 10 | NEG | POS |
| Acetone | 500 | NEG | POS |
| Acetyl Salicylic Acid | 10 | NEG | POS |
| Ascorbic Acid | 150 | NEG | POS |
| Caffeine | 10 | NEG | POS |
| Creatinine | 400 | NEG | POS |
| Ethanol | 10 | NEG | POS |
| Galactose | 5 | NEG | POS |
| Glucose | 1000 | NEG | POS |
| Hemoglobin | 150 | NEG | POS |
| Human Serum Albumin | 200 | NEG | POS |
| Ibuprophan | 10 | NEG | POS |
| Oxalic acid | 50 | NEG | POS |
| Riboflavin | 3 | NEG | POS |
| Sodium Chloride | 1000 | NEG | POS |
| Urea | 1000 | NEG | POS |
| pH 5 to 9 | N/A | NEG | POS |

# Exhibit

# B

2/25/19

Dear Superintendent Squires,

My name is Michelle Boret (17G0689) and I am currently housed in SHU. I am charged with drug usage as a result of a failed urinalysis. From the begining of this saga [ordeal] I have adamently [emphatically] denied any drug usage. I have currently been held in SHU for 30 days without the completion of my hearing and without a disposition. Please be advised that I believe, regardless of the extensions submitted on behalf of my hearing, that I am being denied my right to a timely hearing. Furthermore as the evidence suggest the testing was not at fault, I now believe I have been the victim of a drugging. I can

not emphisise enough that at no time have I taken illegal / unauthorized medication while incarcerated. I have been a grateful recovering alcoholic since the day that I caused the death of two people. That is 2 years and 3 months ago. other than this positive urinalysis there is nothing in my record to indicate that I am anything but a credible, model inmate. I have written to the Dep of Security requesting an investigation be launched into the possibility that someone on my former dorm (A1S) had drugged my food or beverage. To date I have heard nothing from the dep. I was visited & interviewed by an investigator from OSI, who to date is the only one who believes me. With my background, character and integrity I'm stunned no one will

# Exhibit

# C

Dear Superintendent Squires,                           2/27/19

My name is Michelle Boret 17G0689 and I am writing to appeal my guilty disposition which was determined yesterday. I have been moved ~~to~~ to keeplock from SHU.

From the beginning of this situation I have emphatically stated that I did not take any drugs. Upon arrival in keeplock today I encountered inmate Martinez (17G1112) who is being held in keeplock for a dirty/Positive urinalysis. I am writing to let you know that Martinez (model inmate participating in work release program) and I both take Seraquil & Protosin. Inmate Martinez has a relative who is a nurse that has told her these two medications especially Seraquil is commonly the culprit for positive urine tests for Pinaca AB. I am writing you in the hopes that you will hear our calls for justice and rectify the situation.

**ALBION CORRECTIONAL FACILITY**
**RECEIVED**

FEB 28 2019

**DISCIPLINARY**

Thank you,
Michelle Boret
17G0689    Keeplock  B-1-W #13

# Exhibit

# D

Copy

March 9, 2019
Stephen Maher
Inspector General
New York State Department of Corrections
1220 Washington Ave
Albany NY. 12226

Dear Mr. Maher,

My name is Michelle Bonet and I am an inmate at Albion C.F.. I am currently housed in Keeplock (B1W) as the result of a positive urinalysis for AB-Pinaca. I have explained from the beginning that I never used illegal/unauthorized medications or Drugs. Upon my hearing I found proof that the OMH medications Seroquel and Protasin are substances not investigated in the test for AB-Pinaca. I am not the only person being held in SHU or keeplock as a result of this problem. This situation began when Albion put in place a new urinalysis testing mechanism called the Thermo Fisher Scientific Inditek Plus Analyzer (use Began circa 1/19). The facility is hiding this situation because so many people have fell victim to this situation that Administration is embarrassed and attempting to cover up their failure. I am a model inmate with a perfect disciplinary record up to this incident, however despite the fact that I have been locked in SHU or keeplock for the past 42 days, on Thursday

3/7/19 — I was pulled from keeplock for another urinalysis which was Positive, instead of owning up to the reality that as long as I'm on this prozosin & Seroquel I will continue to test positive, they served me with another misbehavior report. I am seeking legal counsel to preserve my interests but I would like an investigation into the fact that they are knowingly locking inmates in SHU & keeplock without addressing the issue as a cover-up. Please contact me regarding this matter.

Thank You,

Michelle Bonet
17G0689      B1W #13 — keeplock.

# Exhibit E

Copy

3/9/19

To: Pharmacy

From: Michelle Boret 17G0689

RE: AB-Pinaca

Please be advised Seroquel & Prazosin are NOT part of the substances studied in the AB-Pinaca Assay. On pg. 2 of the Assay provided by Thermo Scientific, the manufacturer of the Thermo Fisher Scientific Indiko Plus Analyzer, reads "Limitations" "#2 It is possible that substances other than those investigated in the specificity study may interfere with the test and cause false results". The Assay goes on to list all investigated substances. Seroquel and Prazosin are NOT listed as investigated substances.

I have been served 2 tickets for "drug use" as a result of this situation. Inmate Martinez 17G1112 and quite a few others have been held in keeplock or SHU since Albion Correctional Facility began using the new Indiko Plus Analyzer in January of 2019. Pharmacy testified at my hearing that there was no way my Meds caused the positive result. Given the above excerpt from the Assay I believe

It is clear that the results can and are the result of ~~DMH~~ DMH medications. Please advise what action Pharmacy is prepared to take to rectify this situation for the population.

# Exhibit F

COPY

Dear Superintendent Squires,                                    3/9/19

My name is Michelle Boret and as you are aware from my previous letters I am being held in keeplock for "Drug Use". As I'm certain you will recall I have stated from the beginning of this process that I did not take any illegal/unauthorized drug or medication. While I was mounting my appeal to the Guilty disposition, I was once again taken on (3/7/19) to admin for urine testing; on In 3/8/19 I was served with another misbehavior report for testing positive for AB-Pinaca. Having been in SHU and keeplock for the ENTIRE time since my last ticket I am imploring you to consider that the OMH medication Seroquel or Prazosin is causing these results. I have explained that the assay provided by the manufacturer, Thermo Scientific indicates the AB-Pinaca test is not researched on these two drugs. I am not the only inmate which has been victimized by this situation. I am seeking legal counsel to protect my interests in this matter. I am desperately requesting you rectify this situation before it progresses any further.

Thank you,
Michelle Boret   17G0689  B111-13

# Exhibit

# G

Dear Superintendent Squires,                COPY                3/14/19

My name is Michelle Bonet and as you know I am still in keeplock as a result of testing positive for AB-Nnara. As I have said from the beginning I have not taken any medication other than that which is prescribed. It is my understanding that Inmate Martinez 17GXXX2 who also takes the same medication as me (Prazosin & Seroquel), however she got 15 days where I got 45. When she was tested again she did not get locked where I got an additional ticket. I am tired of this situation being handled so poorly. I know Inmate Martinez has scene legal counsel. Am I being treated differently because I don't have a lawyer yet? I have tried to be patient throughout this process but my children have not spoken to me on the phone for 47 days.

I am asking you to please put an end to this situation once and for all. Right is right and wrong is wrong.

— Michelle Bonet
17GØ689

# Exhibit H

NEW
YORK
STATE

## Corrections and
## Community Supervision

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

TO:       BONET, MICHELLE                17G0689                SH-0A0-005

FROM:   Disciplinary Office

DATE:    3/15/2019

RE:       Hearing Disposition Revised

HEARING OFFICER:              DSP CIULLA
HEARING COMPLETED:       3/15/2019
INCIDENT DATE:                 3/7/2019          11:35:00 AM

NOTE:       YOUR HEARING DISPOSITION HAS BEEN REVIEWD AND REVISED BY THE
              CAPTAIN'S OFFICE.  THE CORRECTED DATA IS LISTED BELOW:

        SHU SANCTION
          ▪ Start Date
              • 3/7/19

          ▪ Release Date
              • 4/21/19

## ALL OTHER SANCTIONS REMAIN UNCHANGED

c:
      Original - Inmate
      Yellow - Hearing Packet
      Pink - Housing Unit

# Exhibit

# I

March 19, 2019

Commissioner
Department of Correctional Services
State office Building #2
Albany, N.Y. 12226

Copy

Dear Commissioner,

My name is Michelle Buret (17G0689) and I am Currently serving my sentence at Albion Correctional Facility. I have written to you before regarding this matter but have not heard back. I am a model inmate who has served my sentence here since 9/2007. I got my High School diploma, was accepted into the Medaille College Program. Completed ART, AVP1, AVP2, AVP3 and IPA training. I was assigned to facilitate orientation/Phase 1, in addition to being a teachers assistant (60th LTCA Positions). Finally after 15 months of effort, I was approved for FRP trailer visits. I lived in preferred housing and enjoyed the benefits of a private room. I have been Singularly focussed maintaining my sobriety, I have been sober for 2 years and 5 months. I not only participated in AA weekly but back-up facilitated the Saturday AM meeting. A short second behind my sobriety/recovery from alcoholism is to parent my 3 children (Lucas 14, Casey 12, Adrienne 11) as best as I can from behind bars. Thankfully my husband of 14 years is a strong support to me and our children. As for as I knew I was doing everything right to appear before the board in 2021 as I am serving an indeterminant bid of 4-12 years.

During January of 2019 two things occured which drastically effected me and my family. My first trailer was scheduled for 1/25/19 and Albion had implemented a new Urinalysis machine called the Thermo Fisher Indiko Plus Analyzer. I am prescribed mental health medication which was different from what I took at home, however over a few months of working with OMH I was effectively swiched over to medications which DOCCS finds acceptable (Celexa, Prazosin, Seroquel, Benedryl). On 1/25/19, the first day of my first FRP, before my family arrived, I participated in a fully routine Urinalysis One which I was completely aware I would be required to perform. On 1/26/19 I was called to the officer's station on the FRP site and told I tested positive for AB-Pinaca. Please understand I do not take drugs and I take my sobriety very seriously. My visit was terminated and I was escorted to SHU. My family was informed they had to leave and drive the 8-9 hours home. I did not even get to say good bye.

On 1/28/19, 17 months after arriving in Bedford, I was served my first ever misbehavior report - for drug use. My mental state was fragile. I explained that clearly a mistake had been made, but I was told I must wait till my hearing. So I began research on the situation. With the help of law library

...e requested, for my hearing, a document called An Assay. This is documentation from the urinalysis manufacturer (Thermo Scientific) on their CEDIA AB- Prazea component of the drug testing system. In that Assay on pg 2 Section "limitations" it indicates that "it is possible that substances other than those investigated in the specificity study may interfere with the test and cause false results". The specificity study starts on pg 2 (column 2) and continues to page 5. On that table are all the medications they know DO NOT interfere with the test. Prazosin is NOT on that list. I felt I had finally figured out what happened. When I brought this to the attention of my hearing officer SORC Barhite, she contacted Pharmacy & even after hearing this part of the Assay still insisted I was not on any medications which could cause a positive result. I can not imagine how an educated individual, with documentation from the manufacturer, could without contacting thermo Scientific, could unilaterally reach

This conclusion. I was found guilty and penalized with 60 days keeplock, 15 suspended. I was stunned however it only got worse. When I arrived at keeplock I met inmate Martinez (17G1112) who was another model inmate that was pulled off workrelease and ticketed for Drug Use 6, testing positive for AB-Pinaca. She is also prescribed Seroquel and Prazosin. The day before she was to be released from keeplock she was pulled for urinalysis and the following day was released back to population on Dorm N-2. It is my understanding her test returned positive for AB-Pinaca however she was not ticketed again or locked. I was scheduled to complete my keeplock time on 3/21/19 however, 3/11/19 I was pulled for urinalysis. Knowing I was still on my medication, I assumed it would return positive again; as it had for Martinez, I figured that since I had been confined to shu or keeplock for the ENTIRE time, without taking a single recreation hour, that this would provide further proof that

metabolize, creates a positive result for the CEDIA DA-Pinaca urinalysis test. Boy was I wrong. On Friday 2/8/19 while still in keeplock, I was served with another misbehavior report for drug use. I had another hearing this time by Dep Sutla. I painstakingly explained my situation that ① being in confinement I had no opportunity to obtain any drug. And ② the assay indicates my own medication could cause this result. The pharmacist was called, I questioned her (by way of the hearing officer) about the information in the assay and she said "I can't say one way or the other if the medicine [Prazosin] could cause a false result." I was once again found guilty and sentenced to 60 days SHU time with 15 suspended.

I know DOCCS has to follow procedure but when something like this happens surely the process should be circumvented in the name of justice and fairness. I don't know why the information provided by the manufacturer has not been enough to prove my innocence above and beyond my stellar reputation throughout my time here at Albion. Right now I'm being

to avoid this from perpetuating. Is that what DOCCS wants? I don't know if something political is driving this but today makes 52 days that I haven't spoken to my husband and children. My oldest Lucas suffers from severe depression as a result of my incarceration. Speaking to him daily is part of our routine to help alleviate his symptoms.

I'm asking for help. All the work I have done here has been dismantled, my jobs, schooling, iTRP, Housing... everything. I know I deserve to be in prison but, I do not deserve what is happening to me regarding this situation.

Desperately,

Michelle Bonet

17G0687
Albion Correctional Facility
3595 State School Road
Albion, New York. 14411-9399

# Exhibit J

TO: Superintendent Squires
From: Michelle Bonet   17G16689
Date: 3/31/19
RE: Memo Dated 3/28/19 RE: Tier III Hearing



I was very disappointed to read your memo which acknowleges receipt of my letter dated 3/9/19. You indicated that you reviewed the hearing packet given you by my hearing officer Dep Ciulla and see no procedural issues with that hearing. I am writing because Since I have never taken any unauthorized/illegal drugs or medication and was still found guilty clearly Something did go wrong. Clearly the hearing officer did not arrive impartial. As per directive 4937 ) "Urinalysis Testing" Pg 2 of 10 Section D # 2 ". . . the inmate shall also be asked if he or she has been taking medication in the past month, and the inmates response shall be noted on form # 3082. If the inmate's response is "yes" and the subsequent test results are positive, an inquiry shall be made to medical personnel as to what medications the inmate has received in the past month which may lead to a positive result". Since pharmacy is where the drug testing officer would contact for this information, the statement from the pharmacist is actually what generates the misbehavior report

Since a misbehavior report was written, the pharmacist must have responded that none of the meds I was taking could cause the positive urinalysis. However if you listen to the hearing tape (Tape 19-120), you would hear testimony from the pharmacist stating "she could not say one way or the other" if my meds could cause a false result. When contacted after the test was positive, had she given that same reply, a misbehavior report would not have been written. Despite this admission I was still found guilty. I have documentation (Assay) from the urinalysis manufacturer which indicates that medications not investigated can cause false results. Prozosin and Citalopram are NOT investigated. Logic would dictate that since I have been locked in either SHU or keeplock since 1/26/19 I have neither the access or opportunity to do illegal/unauthorized medications or drugs. Logic would also call into account my history and behavior during my incarceration however instead I have been portrayed as a repeat drug user and penalized with a total of 90 days SHU/keeplock combined.

Your memo does not indicate that you received my letter dated 5/1/19, where I ...

To be put in medical observation (24/7 monitoring) to prove that I am not taking drugs and will still test positive for AB-Pinaca as a false result of my mental health medication. Capt. Batson told me that Dep Chulla denied my request, despite the fact that I was asking you the Superintendent. Not her the Dep of Programs. Why am I being denied an opportunity to prove my innocence? My hope is that you would want to get to the bottom of this facility wide issue.

To date no one has explained what I am to do about continuing Urinalysis. As long as I am taking these meds I will test positive and each time I face increased penalty. Although I have appealed both misbehavior reports and currently am represented by an attorney; what am I to do regarding future urine tests? Unfortunately It took a very long time to identify the best "once approved" medications to alleviate my mental health symptoms. Should I stop taking these much needed medications? To complicate matters even further, every time I was moved, first from SHU to keeplock then from keeplock to SHU; the date scheduled for me to see the psychiatrist was reset. So I have not even been able to ask for guidance on this matter.

COPY

Today is my 64th day of confinement. I have not been able to call my family, have missed both my daughters' birthdays. My son suffers depression and not speaking to me for 60-90 days makes that much more challenging for him. Although my visits have not been taken away, I'm afraid to have them come and to be selected for urinalysis after, leading to the potential (inference) that my family has provided drugs. I also know I'm not the only one in this predicament.) Inmates Martinez (17G1112) and Sequin have also been found guilty. (Note some omni recs). Please stop this before irreperable circumstances emerge. Martinez has a 15 y/o autistic daughter who is a suicide/survivor. The lasting implications of this situation could compound while everyone waits for their appeal or subsequent article 78 proceedings. As Superinterdent you have the power to resolve this before it is too late.

# Exhibit K

TO: OMH
From: michelle Buret   17G0689
Date: 4/15/19
RE: Medication Change

As I'm sure you are aware there has been complications with the meds I take causing false positives for Ab-Pinaca. Upon careful consideration I have decided that a change in medications is in my best interest. Dr Lerner told me to write when I decided how I wanted to handle things. It is imperative that I meet with him to address the changes. Please schedule me asap before my situation becomes complicated with me needing to refuse medication.

Thank You
(M)

# Exhibit L

April 18, 2019

COPY

Dear Superintendent Squires,

I am writing you out of frustration. It has come to my attention that Inmate Martinez 176111? who tested positive for the same drug as me (AB - Pinaca), when tested white in keylock for a second time, was not ticketed a 2nd time and has now had her merit date restored and her work release restored despite her appeal not being completed yet. Whereas when I was tested a 2nd time I was ticketed again and sentenced to another 60 days in my disposition. I fail to understand how 2 situations so similar has turned out so different. You have written that you can not do anything till my appeal is addressed by Albany however as per 7NYCRR Chapter V, Standards Behavior & Allowances, Part 252.7 States "the superintendent may reduce the penalty", or 254.9 Discretionary Review by Superintendent "At Any time during which a penalty imposed pursuant to a Superintendents Hearing is in effect, the Superintendent may reduce the penalty". I can not understand why everyone is so unwilling to help me despite

the fact that I did not take any illegal /unauthorized medication. Spent from 1/26/19 to 4/14/89 confined in either SHU or keeplock plus shown proof that my meds can cause this positive result. I have missed both my daughters' birthdays, my 15 wedding anniversary had my FRP terminated in a departure from procedure which calls for an "orderly, humane (and) dignified procedure for departure"

All I am asking for is the same consideration which was given to Martinez. Klinger V. Dept of Corrections (31 F. 3d 727, 731 8th Cir. 1994) Notes that the equal protection clause requires the state to treat people alike when they are in similar situations. It requires purposeful discrimination. I have lost my housing, College program, FRP and other privileges unjustly. Please help to rectify this situation.

Desperate,                           Enclosed: ④ AB Pinacc Assay
                                        From Thermo Scientific

Michelle Bonet                        ⑤
17G0689   L2-44B                     Pharmacy Record
Albion C.F.                          from Albion
3595 State School Rd
Albion N.Y. 14411

# Exhibit M

MED CNYPC  (7/14)

| | |
|---|---|
| **PSYCHIATRIC PROGRESS NOTE**<br><br>**(OUTPATIENT)** | Patient's Name: Bonet, Michelle          C#: 438139<br><br>Date of Birth: 7/28/73          DIN#: 17G0689<br><br>Unit Name: ALBION CF<br><br>Facility Name: **CENTRAL NEW YORK PSYCHIATRIC CENTER** |

| Instructions: | Indicate date, time, program as appropriate, for each visit.  Sign, title and date. |
|---|---|

| Date&<br>time | Program | |
|---|---|---|
| 5/3/19<br><br>10:55<br>am | VTC | **MED15 DIAGNOSIS:** (primary Diagnosis should be listed with a "P" notation)<br>**Mental Health:**<br>PTSD "P" (OMH 2)<br>Adjustment Disorder with Anxious mood<br>Alcohol use disorder, severe<br><br>**Physical Health:** H/O MVA with injuries. Reports pain from MVA injuries. HPV.<br><br>**ALLERGIES:** NKDA<br><br>**CHIEF COMPLAINT and CURRENT ISSUES:** (Include complaints, preoccupations, worries, issues, etc.):<br><br>Patient reported she has been in and out of KL since January when after a trailer visit urine test was done and she came positive for drugs (AB Pinaca for synthetic opioids). Patient stated she was not using any drugs (there is no know history of drug abuse for this patient she has history of Alcohol use disorder which she acknowledges). Patient stated then she was placed in KL and test was repeated and again she was positive while she continues to deny abusing drugs. Patient stated she has been issued two tickets. She did her own research and found out cases of false positive drug test in her use of Prazosin with Seroquel and reported most of the other inmates were also on Prazosin, so she stopped all her medications except for Seroquel and spoke with another inmate who also had same issues and now on this other inmate is on Thorazine, Cymbalta and Benadryl and her drug screen is negative. Patient stated she would try Cymbalta with Wellbutrin and does not want to take Celexa or Prazosin and unsure about Seroquel as it helps with her sleep.<br><br>Patient noted her mood is "not stable". Patient noted poor sleep, sleeps for 2-3 hours. Patient noted nightmares since stopping Prazosin. Patient noted FB. Patient reported startled response and hypervigilance made worse by current experiences. Patient stated she does not trust the DOCS. Patient reported since all this started her appetite is not good and has lost weight. Patient denied current suicidal and or homicidal ideations, intent or plan. Patient stated all this started after her first trailer visit and since she is not in contact with her children or husband.<br><br>**CHANGES IN MEDICAL STATUS:** (include lab work etc.) Reported body aches due to being in KL.<br><br>**MENTAL STATUS EXAMINATION AND CHANGES:** (Include stable/not stable, response or lack of response to treatment, improving (or not); decompensating)<br><br>Appearance: Appeared stated age.<br>Build: Average<br>Demeanor: Pleasant.<br>Eye contact: Average<br>Activity: Average, no evidence or psychomotor agitation noted.<br>Speech: no evidence of over productive or pressured speech.<br>Thought Content:  Denied delusions, denied current suicidal and or homicidal ideations, intent or plan<br>Perception: Denied |

NOTE:  THIS REPORT IS STRICTLY CONFIDENTIAL AND IS FOR THE INFORMATION ONLY OF THE PERSON/AGENCY TO WHOM IT IS ADDRESSED. NO RESPONSIBILITY CAN BE ACCEPTED BY CENTRAL NEW YORK PSYCHIATRIC CENTER IF IT IS MADE AVAILABLE TO ANY OTHER PERSON, INCLUDING THE PATIENT. DESTRUCTION OF THIS REPORT IS REQUIRED AFTER STATED USE.

| Patient's Name (Last, First, M.I.) | DIN# | C# |
|---|---|---|
| Bonet, Michelle | 17N0689 | 438139 |

**(PSYCHIATRIC PROGRESS NOTE (contd.))**

5/3/18
10:55
A~

Mood: "not stable"
Affect: Constricted
Thought Process: Logical, devoid of formal thought disorder
Behavior: Cooperative
Cognition: Oriented X 3.
Insight: Fair
Judgment:   Fair

SUICIDE RISK ASSESSMENT- (PATIENT ASSESSED FOR WARNING SIGNS OF IMMINENT
SUICIDE RISK (IS PATH WARM):

Risk Factors: Incarceration. First NYS BID, early in her bid.  History of past suicide attempt.
History of alcohol and substance use disorder. History of two MVA's in second MVA she
killed two people while driving intoxicated. FH of substance abuse issues. Witnessed abuse.
Protective Factors: Denied current suicidal and or homicidal ideations, intent or plan.
Religious prohibitions. Supportive family. Ability to verbalize her emotions and needs. Good
compliance with treatment recommendations.
CSRA Reviewed:  __X___ Yes  _____ No  _____ Not in charts.

X_ Warning signs are not present

_ Warning signs are present and are listed below:

In the best of my clinical judgment at the time of this evaluation suicide risk is low,
protective and risk factors described above.

ASSESSMENT/CURENT DIAGNOSTIC IMPRESSION/PLAN: (Include changes to diagnosis
and or treatment options.  Indication for each psychiatric medication must be documented
either here, below in the Medication Section, or in the Physician Orders):

Patient reporting worsening of mood and PTSD since above mentioned issues started she
stopped taking Benadryl, Prazosin and Celexa due to positive drug screen. Discussed with
the patient that it is still unclear which OMH medications can cause these drug tests to
become positive. In the best of my knowledge in case of positive drug tests confirmation is
done by gas Chromatography and I have no knowledge if that confirmatory test was done
or not since it is done by DOCS. Since the test came positive while patient was in KL it is
highly likely that one or more than one of the medications she was on may be causing false
positive tests but without confirmatory test it is hard to say what is the cause of these
positive screens (was told patient is not the only person with this issue but lately there are
a lot of other inmates with same issues). Patient is a reliable historian and as noted above
there is no history of illicit drug abuse. Gas Chromatography test will help to shed further
light on the issues.

NOTE:  THIS REPORT IS STRICTLY CONFIDENTIAL
AND IS FOR THE INFORMATION ONLY OF THE
PERSON OR OTHER PROGRAM IT IS ADDRESSED.
NO RESPONSIBILITY CAN BE ACCEPTED BY
CENTRAL NEW YORK PSYCHIATRIC CENTER IF IT
IS MADE AVAILABLE TO ANY OTHER PERSON.
MATERIALS REQUIRING THE DESTRUCTION OF THIS

Patient rpeorted due to above issues she just can't sleep and it is very
distressing for her.

LIST OF ALL CURENT PAYCHIATRIC AND MEDICAL MEDICATIONS:
(Include all current medications from transferring unit/facility (MED USES and medical meds at
the first visit after transfer.  For Subsequent notes, list all psychiatric meds and any
changes to medical meds since admission to this unit).  Include dose and frequency for
each psychiatric medication listed.

-2-

| Patient's Name (Last, First, M.I.) | DIN# | C# |
|---|---|---|
| Bonet, Michelle | 17/20b59. | 438139. |
| | | **(PSYCHIATRIC PROGRESS NOTE (contd.))** |

5/3/19.
10:55
Am

**Psychiatric Medications:**
DC Citalopram to 30 mg po qpm for mood/PTSD/Anxiety. Patient stopped the medication.

Decrease Seroquel (crush and dissolve in water) from 400 mg to 200 mg po qpm for 3 days then stop.

DC Prazosin 2 mg po qpm for nightmares. Patient stopped the medication.

DC Benadryl Cap 50 mg po qpm. Patient stopped the medication.

Start Cymbalta (patient stated another inmate with same drug testing issues since on Cymbalta came back negative) 30 mg po qpm for 7 days then increase dose to 60 mg po qpm for mood/PTSD/Anxiety.

Start Trazodone 100 mg po qpm for 7 days then increase dose to 200 mg po qpm.

Patient insisted on getting Wellbutrin and patient was informed Cymbalta and Wellbutrin are both anti-depressant medications and there is no indication to put her on two anti-depressants at the same time.

**Medical Medications:** Naproxen. Calcium Carbonate chewable. Thiamine. Triamcinolone. Betamethasone. Cetirizine. Guaifenesin as needed. Ergocalciferol.

**MEDICATION EDUCATION PROVIDED** (check when provided): X

Side effects, risks, benefits and alternatives discussed with the patient. Patient showed understanding of the possible risks of medications and agreed to take medications at free will.
**ADDITIONAL INFORMATION:** Group or individual therapy. CBT. PTSD therapy. AAA.

**FOLLOW UP:** (indicate next appointment): 6 weeks or earlier if needed.

Syed K. Razi, M.D.
PSYCHIATRIST 2    DATE: 5/3/19

NOTE: THIS REPORT IS STRICTLY CONFIDENTIAL AND IS FOR THE INFORMATION ONLY OF THE PERSON/AGENCY TO WHOM IT IS ADDRESSED. NO RESPONSIBILITY CAN BE ACCEPTED BY CENTRAL NEW YORK PSYCHIATRIC CENTER IF IT IS MADE AVAILABLE TO ANY OTHER PERSON, INCLUDING THE PATIENT. DESTRUCTION OF THIS MATERIAL IS REQUIRED AFTER STATED USE.

ALBION PHARMACY  
3/5/2019

Patient Profile  
Active Dates: 11/14/2018 - 3/5/2019

Page 2  
09:03 am

| Rx #<br>Facility<br>Sig | Last Fill<br>Quantity | Drug<br>Doctor | NDC | # of Refills | Start Date<br>DC Date | Exp Date<br>Refill Due |
|---|---|---|---|---|---|---|
| 30MG EVERY EVENING | | | | | | |
| 091P-327236<br>091 | &lt;None&gt;<br>0EA | PRAZOSIN 2MG CAP<br>RAZI, SYED | 00378-2302-01 | 0 | 12/21/18 | 03/21/19<br>12/30/99 |
| 2MG EVERY EVENING | | | | | | |
| 091P-327237<br>091 | &lt;None&gt;<br>0EA | diphenhydrAMINE 50MG CAP<br>RAZI, SYED | 16103-0347-11 | 0 | 12/21/18 | 03/21/19<br>12/30/99 |
| 50MG EVERY EVENING | | | | | | |
| 091P-327238<br>091 | &lt;None&gt;<br>0EA | QUETIAPINE 200MG TAB<br>RAZI, SYED | 67877-0246-01 | 0 | 12/21/18 | 03/21/19<br>12/30/99 |
| 400MG EVERY EVENING (CRUSH AND DISSOLVE IN WATER) | | | | | | |
| 091P-327593<br>091 | 12/31/2018<br>4EA | ERGOCALCIFEROL [VIT D2] 50,000 UNITS<br>NATHAN, SATHIA | 69452-0151-20 | 0 | 12/31/18 | 01/27/19<br>01/28/19 |
| TAKE ONE CAPSULE(S) BY MOUTH EVERY WEEK | | | | | | |
| 091P-329875<br>091 | 01/28/2019<br>4EA | ERGOCALCIFEROL [VIT D2] 50,000 UNITS<br>NATHAN, SATHIA | 69452-0151-20 | 0 | 01/28/19 | 03/28/19<br>02/25/19 |
| TAKE ONE CAPSULE(S) BY MOUTH EVERY WEEK | | | | | | |
| 091P-330398<br>091 | 02/04/2019<br>1EA | SODIUM CHLORIDE NASAL 45ML 0.65%<br>NATHAN, SATHIA | 00904-3865-75 | 0 | 02/04/19 | 05/04/19<br>03/06/19 |
| USE AS DIRECTED TWICE A DAY | | | | | | |
| 091P-330399<br>091 | 02/26/2019<br>10EA | WHITE PETROLATUM TOP 5GM OINT<br>NATHAN, SATHIA | 67777-0211-01 | 1 | 02/04/19 | 05/04/19<br>03/28/19 |
| APPLY TO LIPS ONCE DAILY | | | | | | |
| 091P-330937<br>091 | 02/11/2019<br>90EA | IBUPROFEN 600MG TAB<br>NATHAN, SATHIA | 67877-0320-05 | 0 | 02/11/19 | 08/09/19<br>03/13/19 |
| TAKE ONE TABLET(S) BY MOUTH THREE TIMES A DAY AS NEEDED | | | | | | |

ALBION PHARMACY
3/5/2019

Patient Profile
Active Dates:  11/14/2018 - 3/5/2019

Page 2
09:03 am

| Rx #<br>Facility<br>Sig | Last Fill<br>Quantity | Drug<br>Doctor | NDC | # of Refills | Start Date<br>DC Date | Exp Date<br>Refill Due |
|---|---|---|---|---|---|---|
| 30MG EVERY EVENING | | | | | | |
| 091P-327236<br>091 | <None><br>0EA | PRAZOSIN 2MG CAP<br>RAZI, SYED | 00378-2302-01 | 0 | 12/21/18 | 03/21/19<br>12/30/99 |
| 2MG EVERY EVENING | | | | | | |
| 091P-327237<br>091 | <None><br>0EA | diphenhydrAMINE 50MG CAP<br>RAZI, SYED | 16103-0347-11 | 0 | 12/21/18 | 03/21/19<br>12/30/99 |
| 50MG EVERY EVENING | | | | | | |
| 091P-327238<br>091 | <None><br>0EA | QUETIAPINE 200MG TAB<br>RAZI, SYED | 67877-0246-01 | 0 | 12/21/18 | 03/21/19<br>12/30/99 |
| 400MG EVERY EVENING (CRUSH AND DISSOLVE IN WATER) | | | | | | |
| 091P-327593<br>091 | 12/31/2018<br>4EA | ERGOCALCIFEROL [VIT D2] 50,000 UNITS<br>NATHAN, SATHIA | 69452-0151-20 | 0 | 12/31/18 | 01/27/19<br>01/28/19 |
| TAKE ONE CAPSULE(S) BY MOUTH EVERY WEEK | | | | | | |
| 091P-329875<br>091 | 01/28/2019<br>4EA | ERGOCALCIFEROL [VIT D2] 50,000 UNITS<br>NATHAN, SATHIA | 69452-0151-20 | 0 | 01/28/19 | 03/28/19<br>02/25/19 |
| TAKE ONE CAPSULE(S) BY MOUTH EVERY WEEK | | | | | | |
| 091P-330398<br>091 | 02/04/2019<br>1EA | SODIUM CHLORIDE NASAL 45ML 0.65%<br>NATHAN, SATHIA | 00904-3865-75 | 0 | 02/04/19 | 05/04/19<br>03/06/19 |
| USE AS DIRECTED TWICE A DAY | | | | | | |
| 091P-330399<br>091 | 02/26/2019<br>10EA | WHITE PETROLATUM TOP 5GM OINT<br>NATHAN, SATHIA | 67777-0211-01 | 1 | 02/04/19 | 05/04/19<br>03/28/19 |
| APPLY TO LIPS ONCE DAILY | | | | | | |
| 091P-330937<br>091 | 02/11/2019<br>90EA | IBUPROFEN 600MG TAB<br>NATHAN, SATHIA | 67877-0320-05 | 0 | 02/11/19 | 08/09/19<br>03/13/19 |
| TAKE ONE TABLET(S) BY MOUTH THREE TIMES A DAY AS NEEDED | | | | | | |

| Brand Meds List | Insert Record(s) |

### View & Update Past Psychiatric Medications (180 Days):

| MEDICATION | FREQUENCY | FORM | START DATE | STOP DATE | STATUS | | | |
|---|---|---|---|---|---|---|---|---|
| Duloxetine (Cymbalta) 30 mg PO | Once a day in the PM | Capsule | 05/03/2019 | 05/09/2019 | Expired | Renew | Discontinue | Delete |
| Quetiapine (Seroquel) 200 mg PO | Once a day in the PM | Tablet | 05/03/2019 | 05/06/2019 | Discontinued | Renew | Discontinue | Delete |
| Trazodone (Desyrel) 100 mg PO | Once a day in the PM | Tablet | 05/03/2019 | 05/09/2019 | Expired | Renew | Discontinue | Delete |
| Diphenhydramine (Benadryl) 50 mg PO | Once a day in the PM | Capsule | 03/21/2019 | 05/03/2019 | Discontinued | Renew | Discontinue | Delete |
| Prazosin (Minipress) 2 mg PO | Once a day in the PM | Capsule | 03/21/2019 | 05/03/2019 | Discontinued | Renew | Discontinue | Delete |
| Citalopram Hydrobromide (Celexa) 30 mg PO | Once a day in the PM | Tablet | 03/21/2019 | 05/03/2019 | Discontinued | Renew | Discontinue | Delete |
| Quetiapine (Seroquel) 400 mg PO | Once a day in the PM | Tablet | 03/21/2019 | 05/03/2019 | Discontinued | Renew | Discontinue | Delete |
| Citalopram Hydrobromide (Celexa) 30 mg PO | Once a day in the PM | Tablet | 12/21/2018 | 04/04/2019 | Expired | Renew | Discontinue | Delete |
| Prazosin (Minipress) 2 mg PO | Once a day in the PM | Capsule | 12/21/2018 | 04/04/2019 | Expired | Renew | Discontinue | Delete |
| Diphenhydramine (Benadryl) 50 mg PO | Once a day in the PM | Capsule | 12/21/2018 | 04/04/2019 | Expired | Renew | Discontinue | Delete |
| Quetiapine (Seroquel) 400 mg PO | Once a day in the PM | Tablet | 12/21/2018 | 04/04/2019 | Expired | Renew | Discontinue | Delete |

You are logged in as: Pauline Allen

Your facility is: Albion Satellite Unit

COFACWEB1, Oracle Sessions: 360

ADDITIONAL INFORMATION:  If your symptoms or health problems do not get better or if they become worse, call your doctor. Do not share your drugs with others and do not take anyone else's drugs. Keep a list of all your drugs (prescription, natural products, vitamins, OTC) with you. Give this list to your doctor. Talk with the doctor before starting any new drug, including prescription or OTC, natural products, or vitamins. Some drugs may have another patient information leaflet. Check with your pharmacist. If you have any questions about this drug, please talk with your doctor, nurse, pharmacist, or other health care provider.

Database Edition 19.2 - Expires July 2019

Copyright 2019 CDI, LLC. All rights reserved.

All rights reserved.

ALBION PHARMACY
3/5/2019

Patient Profile
Active Dates: 11/14/2018 - 3/5/2019

Page 1
09:03 am

| Rx #<br>Facility<br>Sig | Last Fill<br>Quantity | Drug<br>Doctor | NDC | # of Refills | Start Date<br>DC Date | Exp Date<br>Refill Due |
|---|---|---|---|---|---|---|
| ALBION PHARMACY ( 091P ) | | BONET, MICHELLE  DIN #: 17G0689 | | | | |
| 3595 STATE SCHOOL RD | | | | | | |
| ALBION, NY 14411 | | | | | | |
| 091P-299434 | 06/22/2018 | WHITE PETROLATUM TOP 5GM  OINT | 67777-0211-01 | | 01/17/18 | 01/16/19 |
| 091 | 15EA | NATHAN, SATHIA | | 1 | | 07/22/18 |
| APPLY THIN FILM TO AFFECTED AREA DAILY AS NEEDED | | | | | | |
| 091P-309875 | 09/19/2018 | TRIAMCINOLONE ACET NASAL16.9ML | 45802-0109-01 | | 05/21/18 | 11/16/18 |
| 091 | 1EA | NATHAN, SATHIA | | 3 | | 10/19/18 |
| USE TWO SPRAY(S)  IN EACH NOSTRIL EVERY DAY | | | | | | |
| 091P-312414 | 12/17/2018 | CETIRIZINE 10MG TAB | 00904-5852-60 | | 06/22/18 | 12/18/19 |
| 091 | 30EA | NATHAN, SATHIA | | 3 | | 01/16/19 |
| TAKE ONE TABLET(S) BY MOUTH EVERY DAY | | | | | | |
| 091P-318832 | 12/05/2018 | ERGOCALCIFEROL [VIT D2] 50,000 UNITS | 69452-0151-20 | | 09/10/18 | 01/07/19 |
| 091 | 4EA | NATHAN, DHANYA | | 3  12/31/2018 | | 01/04/19 |
| TAKE ONE CAPSULE(S) BY MOUTH EVERY WEEK | | | | | | |
| 091P-321055 | <None> | CITALOPRAM 10MG TAB | 13668-0009-01 | | 10/03/18 | 01/01/19 |
| 091 | 0EA | RAZI, SYED | | 0  12/13/2018 | | 12/30/99 |
| 30MG EVERY EVENING | | | | | | |
| 091P-321056 | <None> | PRAZOSIN 2MG CAP | 00378-2302-01 | | 10/03/18 | 01/01/19 |
| 091 | 0EA | RAZI, SYED | | 0  12/13/2018 | | 12/30/99 |
| 2MG EVERY EVENING | | | | | | |
| 091P-321057 | <None> | QUETIAPINE 200MG TAB | 67877-0246-01 | | 10/03/18 | 01/01/19 |
| 091 | 0EA | RAZI, SYED | | 0  12/13/2018 | | 12/30/99 |
| 400MG EVERY EVENING (CRUSH AND DISSOLVE IN WATER) | | | | | | |
| 091P-321058 | <None> | diphenhydrAMINE 50MG CAP | 16103-0347-11 | | 10/03/18 | 01/01/19 |
| 091 | 0EA | RAZI, SYED | | 0  12/13/2018 | | 12/30/99 |
| 50MG EVERY EVENING | | | | | | |
| 091P-321522 | 02/22/2019 | CALCIUM CARBONATE CHEWABLE 420MG | 47682-0802-48 | | 10/12/18 | 04/09/19 |
| 091 | 50EA | NATHAN, SATHIA | | 4 | | 03/11/19 |
| TAKE ONE TABLET(S) BY MOUTH THREE TIMES A DAY AS NEEDED | | | | | | |
| 091P-321750 | 01/28/2019 | NAPROXEN 375MG TAB | 68462-0189-05 | | 10/16/18 | 05/13/19 |
| 091 | 30EA | VIJAY, DHANYA | | 3  2/11/2019 | | 02/27/19 |
| TAKE ONE TABLET(S) BY MOUTH TWICE A DAY AS NEEDED FOR PAIN (PER MD MAX=30 TABS PER MONTH) | | | | | | |
| 091P-324778 | 01/22/2019 | TRIAMCINOLONE ACET NASAL16.9ML | 45802-0109-01 | | 11/21/18 | 05/19/19 |
| 091 | 1EA | NATHAN, SATHIA | | 1 | | 02/21/19 |
| USE TWO SPRAY(S)  IN EACH NOSTRIL EVERY DAY | | | | | | |
| 091P-326432 | <None> | CITALOPRAM 10MG TAB | 13668-0009-01 | | 12/12/18 | 03/12/19 |
| 091 | 0EA | RAZI, SYED | | 0  12/26/2018 | | 12/30/99 |
| 30MG EVERY EVENING | | | | | | |
| 091P-326433 | <None> | PRAZOSIN 2MG CAP | 00378-2302-01 | | 12/12/18 | 03/12/19 |
| 091 | 0EA | RAZI, SYED | | 0  12/26/2018 | | 12/30/99 |
| 2MG EVERY EVENING | | | | | | |
| 091P-326434 | <None> | QUETIAPINE 200MG TAB | 67877-0246-01 | | 12/12/18 | 03/12/19 |
| 091 | 0EA | RAZI, SYED | | 0  12/26/2018 | | 12/30/99 |
| 400MG EVERY EVENING (CRUSH AND DISSOLVE IN WATER) | | | | | | |
| 091P-326435 | <None> | diphenhydrAMINE 50MG CAP | 16103-0347-11 | | 12/12/18 | 03/12/19 |
| 091 | 0EA | RAZI, SYED | | 0  12/26/2018 | | 12/30/99 |
| 50MG EVERY EVENING | | | | | | |
| 091P-326628 | 02/21/2019 | CETIRIZINE 10MG TAB | 00904-6717-60 | | 12/17/18 | 03/16/19 |
| 091 | 30EA | VIJAY, DHANYA | | 2 | | 03/23/19 |
| TAKE ONE TABLET(S) BY MOUTH EVERY DAY | | | | | | |
| 091P-327235 | <None> | CITALOPRAM 10MG TAB | 13668-0009-01 | | 12/21/18 | 03/21/19 |
| 091 | 0EA | RAZI, SYED | | 0 | | 12/30/99 |

# Exhibit

# N



**Corrections and Community Supervision**

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

June 6, 2019

BONET, MICHELLE (17G0689)
L-02-32B

    **Re:**   **FOIL Log No. 19-094**

Dear Mrs. Bonet:

This is in response to your New York State Freedom of Information Law request for: Urinalysis Quarterly Proficiency Reports for the facility per 7NYCRR 1020.7

Per Security, this request has been addressed and no further action is needed.

                           Sincerely,

                           T. Leon, ORC
                           Albion Correctional Facility
                           Guidance Unit

CC:    FOIL Records

*6/6/19 - Capt. Goodman verbally informed me Proficiency Reports are not 1/4 but annually*

*Locations: Chapel*

If you do not agree with any part of this decision, you may appeal by writing the Office of the Counsel & FOIL Appeals Officer, NYS Department of Corrections and Community Supervision, The Harriman State Campus, 1220 Washington Avenue, Albany, New York, 12226-2050.

In appeal correspondence, please clearly note your name, DIN number, facility from which records were requested, and the FOIL Log Number provided.

# Exhibit

# O

# Prisoners' Legal Services of New York

KAREN L. MURTAGH
*Executive Director*

MARIA E. PAGANO
*Managing Attorney*

14 Lafayette Sq., Suite 510 ♦ Buffalo, New York 14203
Tel.: (716) 854-1007 ♦ Fax: (716) 854-1008

DAVID BENTIVEGNA
*Staff Attorney*

ANDREW STECKER
*Staff Attorney*

June 5, 2019



Anthony Annucci, Commissioner
NYS-DOCCS
1220 Washington Avenue
Building 2, State Campus
Albany, New York 12226-2050

Richard C. Finnegan, Assistant Commissioner
Office of Inmate Discipline
NYS-DOCCS
Building #2, State Campus
Albany, New York 12226

Susan Squires, Superintendent
Albion Correctional Facility
3595 State School Road
Albion, New York 14411-9399

  **RE:**  **Urinalysis Testing Equipment at Albion**
      **False Positive Results**

Dear Mr. Annucci, Mr. Finnegan and Ms. Squires,

  I am writing to bring your prompt attention to an urgent matter concerning the urinalysis testing equipment at Albion C.F. Specifically, our office has been contacted by several prisoners housed at Albion C.F., who have reported falsely testing positive for drugs, primarily AB-Pinaca, but also Suboxone. Some of these prisoners noted testing positive on subsequent urinalysis screenings, taken a few weeks after the first. As detailed more completely below, none of the prisoners who've contacted our office have any prior history of drug use in prison or any prior disciplinary history. Given the number of reports we have received as well as the circumstances/history of the individual prisoners, we believe it highly likely the urinalysis equipment at Albion has an operational or technical fault of some kind. If allowed to persist, this will only lead to further inaccurate test results and unnecessary disciplinary sanctions.

  The following prisoners each reported testing false positive for AB-Pinaca:

- &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;   First tested positive on &#9608;&#9608;&#9608;&#9608;&#9608;
  Second positive test on &#9608;&#9608;&#9608;&#9608;&#9608;

- &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;   Tested positive on &#9608;&#9608;&#9608;&#9608;&#9608;

- Ms. Michelle Bonet, 17-G-0689 -  First tested positive on January 26, 2019
  Second positive test on March 07, 20

*Si usted desea, nos podemos comunicar en español.*

Our office was also contacted by another prisoner who reported a false positive test result for Suboxone:

- ███████████████████████ -Tested positive on ███████████

In each of the above cited cases, misbehavior reports were issued for the positive urinalysis results and Tier III hearings were held. Our office has reviewed these proceedings[1] with the exception of ███████████ (to date we only recently requested a copy of that hearing packet and we are still awaiting its receipt). All the above named prisoners were, however, found guilty and received disciplinary sanctions.

Notably, ████████████████, ████████████████, Ms. Bonet (17-G-0689) and ███████ have no prior history of drug use while in DOCCS custody as well as no prior disciplinary violations at all. All were also model prisoners. For instance ████████████████████████ ████████████████████████████████████ Likewise, Ms. Bonet (17-G-0689) had been successfully participating in a college credit program and was maintaining a 3.8 GPA.

Additionally, many of the urinalysis screenings listed above were not the result of random selections but were instead routine aspects of these women's program participation. For example, when Ms. Bonet (17-G-0689) was tested on January 26, 2019, it was conducted as part of the standard screening process for participants concluding a visit in the Family Reunion Program (FRP). ██████████████ Notably, both Ms. Bonet and ██████████ had previously undergone multiple FRP visits, with requisite urinalysis tests, without issue. ████████████████████ Accordingly, we emphasize that many of the tests listed above were conducted at times when the involved women were fully aware of the fact that a urinalysis screening was going to take place, a fact that further heightens the illogical timing and uncharacteristic nature of their alleged drug use.

Viewed individually, these urinalysis results are unusual. Collectively, however, they are more than anomalous, they indicate the urinalysis testing equipment at Albion is materially or operationally defective (at least as it relates to screenings for AB-Pinaca and Suboxone). It is beyond improbable that all of these women, prisoners with no prior history of institutional drug use or misbehavior, would each suddenly elect to take drugs, in some instances multiple times and while participating in programs where they knew drug testing was a regular and known occurrence.

We note the present rash of positive test results is very similar to one that occurred at Attica C.F. in 2012. At that time, our office received an unusually high number of requests for assistance from prisoners who had tested positive for Buprenorphine. There, as here, many of these requests came from prisoners with no history of drug use, many of whom were also participants in the FRP program. Given the abnormally high number of prisoner correspondence we received concerning that matter, we similarly reached out to DOCCS concerning the issue. Following a subsequent investigation by DOCCS, it was determined the machine at Attica had been improperly calibrated for Buprenorphine and was producing false positive results in some instances.

Here, it is our understanding Albion's current urinalysis testing machine, the DRI+ CEDIA system, was only recently installed in January 2019. We do not know if staff unfamiliarity with the machine could have

████████████████████████████████████████████████████████

*Si usted desea, nos podemos comunicar en español.*

caused the above results, or if there is some other fault in the system itself such as a calibration error similar to the one that affected Attica. In either event, we note the increased number of requests for assistance we have received from Albion (concerning urinalysis test results), and the related circumstances of those individuals testing positive, are substantially similar to the Attica Buprenorphine matter.

Finally, many of these women have brought to our attention that they take a number of medications prescribed by Office of Mental Health staff. For some, these included the same combinations of medications. While we understand that cross checking with the facility pharmacist is a standard practice by staff when conducting a urinalysis test, given the number of positive screenings seen here and the similarity of medications being taken, perhaps some combination of psychiatrically prescribed medicines is producing false positives. Indeed, at the Tier III hearing related to Ms. Bonet's March 7, 2019 urinalysis test, it was confirmed by the Albion pharmacist that the medication Prazosin, which Ms. Bonet regularly takes, has not been checked by the DRI+ CEDIA system's manufacturer for cross reactivity with AB-Pinaca testing agents. ████████████. We do not know if this would explain all the anomalous test results presented here, but we are bringing it to your attention as an area of investigation.

As each of you are aware, the defenses a prisoner can raise at a disciplinary hearing resulting from a positive urinalysis result are extremely limited. Character witnesses are not allowed and several of the above women were precluded from presenting evidence concerning their character at the hearings which followed their urinalysis screenings. Furthermore, the consequences of a guilty finding, especially one for a rule 113.24 (Drug Use) violation are severe. Some of the women above may lose FRP privileges, ████████████. Also, there are the lingering effects of a sustained Tier III violation on a prison record, which can impact Good Time Allowance considerations as well as a prisoner's appearance before the Parole Board.

The above women are individuals who have wholeheartedly applied their energies to rehabilitation and taken full advantage of the various therapeutic and educational programs DOCCS has to offer. As such, they are model prisoners, with no prior history of drug abuse or misbehavior. We implore you to review these matters, reverse and expunge the instant hearings and investigate the DRI+ CEDIA testing apparatus for potential flaws.

We thank each of you for your prompt attention to this matter and kindly let us know what action your offices takes to investigate the anomalous urinalysis testing results detailed above. If you have any questions or concerns please do not hesitate to contact me.

Sincerely,

David Bentivegna
Senior Staff Attorney

CC.:   Dr. John Morley, DOCCS Chief Medical Officer

# Exhibit P



**NEW YORK STATE** | **Corrections and Community Supervision**

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

To:        Bonet, Michelle        17G0689        L-02-32B

From:     S. Doolan, Education Supervisor

Subject:   College Program

Date:      September 23, 2019

This memorandum is in response to your letter dated September 9, 2019 in which you inquire about enrolling in the college program. The Albion Correctional Facility College Program offered through Medaille College is a two-year Liberal Arts Degree program.

Your name has been added to the **Summer 2020** list of interested candidates for possible participation in the Albion Correctional Facility College program offered through Medaille; however, this is in no way a guarantee for interview or admittance nor is it a guarantee that you are eligible. The number of open items, applicants and their qualifications vary each semester and candidates must submit a ***letter of interest for each semester***. Prior to the start of the semester the list of interested candidates is evaluated and selected candidates will be placed on a callout for interview. If you are not called for interview, please submit a letter of interest prior to the start of the next semester.

You are encouraged to maintain a positive program and disciplinary record so that you <u>may be</u> considered.

SD
Cc:     P. Muccigrosso, Site Coordinator/Medaille College
        A. Whelan, Education Counselor
        S. Doolan, Education Supervisor
        File

# Exhibit Q

Cheryl L. Kates PC
Attorney at Law
PO Box 734
Fairport, NY 14450
(585) 820-3818

CEO
Marc N. Casper
Thermo Fisher Scientific Inc.
168 Third Avenue
Waltham, Maine 02451

Cc: Anthony Annucci, NYS Department of Corrections

September 13, 2019

Dear Mr. Casper,

As CEO of Thermo Fisher Scientific, you should be advised that your newly supplied Thermo Indiko drug testing machines being used in NYS Department of Corrections, correctional facilities are producing false positives in grove numbers regarding inmates incarcerated in NYS. The Department and your company have failed to research the scientific validity of your testing apparatus, specifically when an inmate is taking prescribed medicines and which medicines cause false positive. Your company representative is testifying at Tier 3 correctional disciplinary hearings, which cause an inmate to be placed in solitary confinement or keep lock, upon a finding of guilt and that employee is testifying that false positives cannot happen in cases where your company has not tested the specific medication which equates to giving false testimony.

Please be advised that several civil rights organizations voiced their concerns to the attention of Anthony Annucci, Acting Commissioner of NYS DOCCS, but NYS DOCCS is continuing to use your faulty machines. This situation can create a legal liability for your company because you are the manufacturer of the machine.

My office alone is receiving 4x the requests for legal assistance for "dirty urines" from false positives since January-now. People's lives are being adversely affected by the unreliability of your machine, far beyond being found guilty of a disciplinary matter and being subjected to being placed in solitary confinement.

In the case of M.B., she was a college student, working in trusted positions in the correctional facility and served as a role model to other female inmates. Her prescribed medication is the reason she tested positive for the drug test. She notified her doctor and he changed the medication she was taking. After this change, she no longer received positive urine tests. The doctor indicated in her chart the medication was most likely the reason for the false positive. This information was given to the NYS DOCCS and they refuse to reverse the disciplinary finding.

This woman was someone who was a shining example of rehabilitation and now is suffering way beyond the disciplinary sanctions. She was removed from her college program, where she was a year shy of graduating. She lost her privilege to participate in family reunion program. She lost the jobs she was

working in. She lost the respect of the correctional officials, as in corrections if you receive a drug test that is positive that is golden. There is no question of false positives. They see things in black and white, a positive test in their eyes means the inmate used drugs, period.

In this case, there is a slew of false positives for female inmates housed at Albion CF. Yet, NYS DOCCS is failing to review these matters and provide a remedy for those who are NOT using drugs and are testing positive. It is really a shame and is causing severe damage to the people being affected by it.

In the case of D.S. housed at Orleans CF. He received 3 positive tests in the last 6 months. The Department reversed 2 of the tickets. We are currently appealing the third positive. This is a man who is incarcerated over 3 decades, and who is elderly and suffering from cancer. He does not have a history of drug infractions in the last ten years (timeframe for disciplinary review). At this time, postponed his parole board appearance for 6 months to allow for appealing positive drug tests. He incurred multiple attorney fee charges to obtain representation. He was confined and forced to relocate to the ASAT dorm (last ticket) and to start taking substance abuse rehabilitative program, even though he does not have a need for it. He lost his privileges to speak to his family, receive packages etc. In both cases, these individuals will most likely be denied parole because of the disciplinary matter. This is a very unfortunate, sad situation these "innocent" people are being punished for your machine's unreliability.

These are only two of the people who have experienced the backlash from these false positive drug tests. As a corporate executive, you certainly have a duty to the public and corrections to remedy this problem. These people are suffering and being penalized as a result of the faulty testing procedures from a machine your company is manufacturing.

Sincerely,

Cheryl L. Kates Esq.

**Thermo Fisher**
S C I E N T I F I C

The world leader
in serving science

October 11, 2019

Via email (cheryl6401@aol.com) and US Mail

Cheryl L. Kates PC
Attorney at Law
PO Box 734
Fairport, NY 14450

Re:    **Letter to Marc Casper dated September 13, 2019**

Dear Ms. Kates:

The above referenced letter was forwarded to me for handling. As I indicated in my emails and voicemail, I am the attorney supporting Microgenics Corporation ("*Microgenics*"), which is a subsidiary of Thermo Fisher Scientific. I apologize for our extended exchanges of voicemails and emails. In order to further aid your understanding of our instrument and related drugs of abuse tests, I thought it would be helpful to provide some additional information.

**Background**

Microgenics does supply the Thermo Scientific™ Indiko™ Clinical and Specialty Chemistry System ("*Indiko Analyzers*") to the New York State Department of Corrections ("*NYS DOCCS*"). According to our records we installed 52 Indiko Analyzers (one for each of the 52 NYS DOCCs sites) between January and March 2019.

The Indiko Analyzer is a fully automated, sample-oriented, random access bench-top clinical and specialty chemistry system for clinical and special chemistries, including enzymes, substrates, electrolytes, specific proteins, and drugs of abuse tests. Many different tests can be run simultaneously from a single sample. The Indiko Analyzer's Food and Drug Administration ("*FDA*") Device Classification Name is "discrete photometric chemistry analyzer for clinical use." The Indiko Analyzer was cleared via the FDA Premarket Clearance process (or "*510(k)*") and received its 501(k) Number K11035 per 21 CFR 862.2160, Classification Product Code JJE on June 28, 2011. As part of obtaining FDA Premarket Clearance, the Indiko Analyzer was subjected to design verification and validation testing to ensure that the design specifications were met.

Microgenics initially provided to NYS DOCCS our CEDIA™ Buprenorphine II Assay ("*BUP II Assay*"). The BUP II Assay is a sensitive assay with a cut-off of 10 ng/ml, and the assay functions by measuring and comparing the cumulative sum of these four analytes against the cut-off. We also sell the CEDIA™ Buprenorphine I Assay ("*BUP I Assay*") which has a cut-off of 5 ng/mL which detects the parent drug and only one of the key metabolites – Buprenorphine-glucuronide. The BUP I Assay and BUP II Assay are classified as Enzyme Immunoassay, Opiates and also go through the 510(k)

**Thermo Fisher**
S C I E N T I F I C

process. The BUP I Assay was cleared via FDA 510(k) K040317 on June 23, 2004 and BUP II Assay was cleared via FDA 510(k) K16301 on April 6, 2017. The BUP II Assay is intended to minimize false positives in the BUP I Assay, detecting the parent drug as well as the three most prevalent metabolites of the drug – Norbuprenorphine, Norbuprenorphine-glucuronide, and Buprenorphine-glucuronide.

Since many tests (or assays) can be run on the Indiko Analyzer, it is necessary that these assays are appropriately validated per the install process specified by Microgenics and the customer pursuant to respective standards, guidelines and regulations. The assays themselves also have FDA clearance to ensure the scientific validity when run on an automated clinical chemistry analyzer such as the Indiko Analyzer. The design and development of these assays takes into account common structurally related and unrelated compounds. Prescribed medication(s) (including medications prescribed to an inmate) may interfere with the drug being screened/tested which could lead to an unconfirmed positive. However, Microgenics' drugs of abuse tests are all preliminary tests, and because of this the Instructions For Use ("*IFU*") expressly require a more specific confirmatory test to be run to obtain a confirmed analytical result. The IFU provides the following instruction: "*The assay provides only a preliminary analytical test result. A more specific alternative chemical method must be used to obtain a confirmed analytical result. Gas chromatography/ mass spectrometry (GC/MS) or Liquid chromatography/tandem mass spectrometry (LC-MS/MS) is the preferred confirmatory method.*" A copy of the IFU is included for your convenience.

### Response to Letter

In regard to our company representative "testifying that false positives cannot happen in cases where your company has not tested the specific medication," it is difficult for me to respond to such a statement without hearing exactly what was said or the context in which an answer may have been given. I could interpret this as someone stating that we cannot confirm an unconfirmed positive if we do not have access to a sample for purposes of retesting. This is true. I can tell you that our technical support colleagues are sometimes asked to provide product information during hearings. Our technical support team is instructed to provide guidance based on the instrument's operator's manual and IFU, which as noted above, includes the instruction for confirmatory testing.

In your letter you indicate, "your newly supplied Thermo Indiko drug testing machines being used in NYS Department of Corrections, correctional facilities are producing false positives in grove numbers regarding inmates incarcerated in NYS." Because we do not believe that we have a large number of alleged unconfirmed positives related to the BUP II Assay, we reviewed our complaint logs for NYS DOCCS as well as other customers. Since 2017, we have received only nine complaints alleging an unconfirmed positive. Four of the nine relate to the NYS DOCCS, but only one in 2019. We have received other complaints for unrelated performance issues or shipping errors. Given the large volume of instruments (52) and thousands of related tests that have been provided to NYS DOCCS, and the fact that no preliminary screening test can ensure that an unconfirmed positive would never occur, we did not conclude that the data supported your statement.

Microgenics does test/evaluate several medications as part of the assay design and development process. For those prescribed medications that we have tested/evaluated, we do include such cross-

**Thermo Fisher**
S C I E N T I F I C

reactivity information in the applicable assay IFU. However, it is not feasible to test/evaluate all prescribed medications and this is why we include the confirmatory testing requirement in our IFU as noted above.

In response to the BUP II Assay unconfirmed positive complaints mentioned above, NYS DOCCS decided to convert all of its sites to the BUP I Assay. The BUP I Assay is less sensitive (since as noted above it only detects one of the key metabolites) and therefore is less likely to exhibit unconfirmed positives. As of the date of this letter, all 52 sites have been converted to the BUP I Assay.

We are equally concerned that people's lives may be adversely affected and that is why we ensure both the BUP I Assay and BUP II Assay IFUs contain adequate information as previously mentioned. We actively collaborated with NYS DOCCS to convert its sites to further mitigate this issue. The Albion CF facility was converted to the BUP I Assay on Sept 25, 2019 and the New Orleans CF facility was converted on Sept 26, 2019.

It is unfortunate that these issues have occurred as we take pride in ensuring our products are safe and effective for their intended use, while adhering to FDA and international regulator Guidelines and Regulations. While we desire and work to design and develop such assays where no unconfirmed positives occur, it is extremely challenging due to the numerous possibilities of medications that a person may take. For this reason, it is important that end users adhere to the labeling/IFU to ensure a confirmation test is performed in the event of an unconfirmed positive.

I hope the above provides useful information to you. I would be glad to further discuss the matter if you like.

Regards,

David C. Hissong
VP & Deputy General Counsel

Encl.

# Exhibit R

| NEW YORK STATE **Corrections and Community Supervision** | GRIEVANCE NO. ALPC-12335-19 | | DATE FILED 3/11/19 |
|---|---|---|---|
| | FACILITY **ALBION** | | POLICY DESIGNATION **INST** |
| **INMATE GRIEVANCE PROGRAM** | TITLE OF GRIEVANCE Faulty Machine | | CLASS CODE 28 |
| **SUPERINTENDENT** | SUPERINTENDENT'S SIGNATURE | | DATE 4/5/19 |
| GRIEVANT  Bonet, M. Martinez, S. | DIN 17G0689 17G1112 | | HOUSING UNIT RHU N2 |

The grievants allege that the Indiko Plus Drug Testing Machine is not working properly and giving false positives due to their medication.

The investigation was completed by a security supervisor. The officer in charge of testing has been certified through Thermo Scientific on 1/16/19 in the use of the Indiko Plus Drug Testing System. The calibrations of the machine are done on a weekly basis as to the manufacturers request. The controls are done every day the drug testing machine is used. All of this is done per Directive #4937. When a positive test result is received the officer consults with Pharmacy to determine if any drugs would test positive. The Pharmacy states that per Thermo Scientific there have been no medications found that give a false positive.

Based on the investigation, the allegations have been found without merit, therefore the grievance appeal is denied.

*Copy sent 4/9/19*

ALBION CF

APR 0 8 2019

RECEIVED
IGRC

*manufacturer provided documentation states there are medications which can cause false results making pharmacy culpable for perpetuating this false perception, Thermo Scientific should be consulted not pharmacy at this point. (SM)*

**APPEAL STATEMENT**

If you wish to refer the above decision of the Superintendent please sign below and return this copy to your Inmate Grievance Clerk. You have seven (7) calendar days from receipt of this notice to file your appeal.* Please state why you are appealing this decision to C.O.R.C.

*I wish to appeal the above finding because when Albion & Docs implemented the use of the Indiko Plus Analyzer they should have checked if any medications used by population or (me) would create a positive result for ex- Anaca. It is not a faulty machine it is faulty procedure & implementa-tion. 4-5-18*

| | |
|---|---|
| GRIEVANT'S SIGNATURE | DATE |

| | |
|---|---|
| GRIEVANCE CLERK'S SIGNATURE | DATE |

* An exception to the time limit may be requested under Directive #4040, section 701.6(g).

8/31/19

TO: IGRC

From: Michelle Boret  17616689

RE: ALPC-12335-19

copy

I am troubled to read that the response
to my grievance is:

Denied the machine is
Calibrated every time it is
used.

The issue is NOT calibration but
the fact that Thermo-Scientific's
CEDIA AB-Pinaca Assay indicates
in pg. 2 Section "limitations" #2

" It is possible that substances other than
those investigated in the specificity study
may interfere with the test and cause
false results"

Prazosin & Citalopram are not in the
Study!! Please address the problem.

The fact that while confined I still tested positive is proof that Prazosin is causing the positive. Furthermore when inmate martinez tested positive the 2nd time (while confined) a misbehaviour report was not written clearly showing that I am being treated differently when taking the same medication and testing positive for the same drug. I have volunteered to go into medical Observation to prove that I am testing positive while taking only prescribed medication but that offer was denied. Something about the way my prescription metabolizes is clearly the problem and thermo scientific or pharmacy clearly does not want to take responsibility

My response Re: ALPC-12369-19 attached to as Appeal Statement

FORM 21312E (REVERSE) (9/12)

**Response of IGRC:** *Hearing Date 3/25/19          (1-28)*

*ALPC-18032 (illegible) Grievant Denied a vacuum cleaner w/*
*                              Martinez 2-176.13 (1)*

*Denied a Machine is Prohibited somtime*
*    if is used)*

Date Returned to Inmate: _____   IGRC Members: _____

Chairperson: _____

Return within 7 calendar days and check appropriate boxes.*

[X] I disagree with IGRC response and wish to appeal to Superintendent.

[ ] I agree with the IGRC response and wish to appeal to the Superintendent.

[ ] I have reviewed deadlocked responses. Pass-Thru to Superintendent.

[ ] I apply to the IGP Supervisor for review of dismissal.

Signed: _____     3/31/19
                Grievant                    Date

\* *Please see attached memo RE: ALPC 12335-19*

_____                    _____
Grievance Clerk's Receipt                    Date

**To be completed by Grievance Clerk.**

Grievance Appealed to the Superintendent: _____
                                            Date

Grievance forwarded to the Superintendent for action: _____
                                                        Date

* An exception to the time limit may be requested under Directive #4040, section 701.6(g).

FORM 21312E (REVERSE) (9/12)
## Response of IGRC:
HEARING DATE: 4/11/19                          (I-22)

ALLC-12369-19      NAME: Bonet, M.   1760689    500

Date Returned to Inmate: _____ IGRC Members: _____

Chairperson: _____

Return within 7 calendar days and check appropriate boxes.*

[x] I disagree with IGRC response and wish to appeal to Superintendent.

[ ] I agree with the IGRC response and wish to appeal to the Superintendent.

[ ] I have reviewed deadlocked responses. Pass-Thru to Superintendent.

[ ] I apply to the IGP Supervisor for review of dismissal.

Signed: _____        4/15/19
         Grievant              Date

_____        _____
Grievance Clerk's Receipt       Date

*To be completed by Grievance Clerk.*

Grievance Appealed to the Superintendent: _____
                                            Date

Grievance forwarded to the Superintendent for action: _____
                                                        Date

*An exception to the time limit may be requested under Directive #4040, section 701.6(g).

| NEW YORK STATE | **Corrections and Community Supervision** | GRIEVANCE NO. ALPC-12369-19 | | DATE FILED 4/5/19 |
|---|---|---|---|---|
| | | FACILITY **ALBION** | | POLICY DESIGNATION **INST** |
| **INMATE GRIEVANCE PROGRAM** | | TITLE OF GRIEVANCE Pharmacy Misrepresents | | CLASS CODE **22** |
| **SUPERINTENDENT** | | SUPERINTENDENT'S SIGNATURE *Susan Sgos* | | DATE 4/18/19 |
| GRIEVANT Bonet, M. | | DIN 17G0689 | | HOUSING UNIT **L2** |

The grievant claims that pharmacy representatives misrepresent the effect of her medicine, Prazosin has on the urinalysis machine during testing. Grievant believes that statements given are false and not accurate per manufacturer.

Investigation was done by the DSA. The Pharmacist went on record stating that according to the assay provided by Thermo Scientific, the drug testing company, they have not found any medications they have tested to cause a false positive. The company was contacted via phone and email and Thermo Scientific representatives stated that they did not believe Prazosin's chemical structure was similar enough to warrant further testing. Pharmacy conveys this message to the urinalysis officer when requested.

Based on the investigation, there is no merits to the claims, therefore the grievance appeal is denied.

**ALBION CF**

APR 1 9 2019

RECEIVED
IGRC

---

**APPEAL STATEMENT**

If you wish to refer the above decision of the Superintendent please sign below and return this copy to your Inmate Grievance Clerk. You have seven (7) calendar days from receipt of this notice to file your appeal.* Please state why you are appealing this decision to C.O.R.C.

_____

_____

_____

| GRIEVANT'S SIGNATURE | DATE |
|---|---|

| GRIEVANCE CLERK'S SIGNATURE | DATE |
|---|---|

* An exception to the time limit may be requested under Directive #4040, section 701.6(g).
FORM 2133 (02/15)

# Exhibit

# S



**NEW YORK STATE** | **Corrections and Community Supervision**

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

## <u>MEMORANDUM</u>

**TO:**   BONET, M.  17G0689   SH-OA-005

**FROM**:  SUSAN SQUIRES, SUPERINTENDENT

**DATE:**  MARCH 28, 2019

**RE:**   **TIER III HEARING**

I am in receipt of your letter dated 3/09/19 regarding your Tier III misbehavior report for drug use with dates of incidents being 3/7/19 and 1/26/19.

I have reviewed the hearing packet and tier III Hearing done by DSP Ciulla.  I see no procedural issues with that hearing.  I do see also for both Hearings you have appeals pending which must be answered by Special Housing before anything further occurs.

SLS/kma
Cc:  Disciplinary
    File



**Corrections and
Community Supervision**

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

## MEMORANDUM

S H-0A-005

**TO**:    BONET, M.   17G0689

**FROM**:  SUSAN SQUIRES, SUPERINTENDENT

**DATE**:  APRIL 3, 2019

**RE**:     **LETTER DATED 3/31/19**

I am in receipt of your letter dated 3/31/19 regarding your Tier III Hearings.

As I stated in my previous letter to you, you have filed appeals to Special Housing regarding both hearings  and there is nothing at the facility level that can be done until those responses are given.

SLS/kma
Cc:  Disciplinary
      File

COPY

Dear Capt. Goodman,                                              4/30/19.

My name is Michelle Bonet (17G0689) and I am writing because on 3/12/19 I wrote for copies of my hearing tapes. To be clear, I initially had Capt. Batson as my hearing officer for a tier III hearing for drug use, as the result of a positive urinalysis. I have explained from the begining of this nightmare, that I did not take any illegal/unauthorized drugs or medications. My initial hearing began on 1/31/19. We sat for 3 sessions (1/31, 2/4, 2/7) before filing what became 3 extensions. On 2/26/19 I was assigned a new hearing officer (SDRC Barbett) and we began the hearing over. Despite the fact that I had been confined the entire time, on 3/7/19 I was randomly selected for an additional urinalysis, which I believed would assist in proving my innocence. However on 3/8/19 I was served with an additional Tier III ticket for drug use as the result of a positive urinalysis and subsequently had yet another hearing which lasted 2 sessions (3/13, 3/k on 4/25/19 I was called to B Block to pick up my hearing tapes for review. After listening to the tapes I identified that I was not furnished 1/31, 2/4 and 2/7 as they were part of the inital hearing with Capt. Batson. I require these



**NEW YORK STATE** | **Corrections and Community Supervision**

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

## MEMORANDUM

**TO:**    BONET, M.  17G0689  L-02-44B

**FROM:** SUSAN SQUIRES, SUPERINTENDENT

**DATE:**  APRIL 24, 2019

**RE:**    **LETTER DATED 4/18/19**

I am in receipt of your letter regarding inmate Martinez 17G1112.

The information is not accurate you wrote regarding inmate Martinez.

You were found guilty on two instances of drug use and have appeals pending on both.  You will get a response from Director Venettozzi in regards to your appeals.

SLS/kma
Cc:  Guidance
     Disciplinary
     File

NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
THE HARRIMAN STATE CAMPUS - BUILDING 2
1220 WASHINGTON AVENUE
ALBANY, N.Y. 12226-2050

ANTHONY J. ANNUCCI                          JAMES O'GORMAN
ACTING COMMISSIONER                         DEPUTY COMMISSIONER
                                            CORRECTIONAL FACILITIES

REVIEW OF SUPERINTENDENT'S HEARING

NAME: BONET, MICHELLE                NO. 17G0689

HEARING FACILITY: ALBION

ON BEHALF OF THE COMMISSIONER AND IN RESPONSE TO YOUR RECENT

LETTER OF APPEAL, PLEASE BE ADVISED THAT YOUR SUPERINTENDENT'S HEARING OF

FEBRUARY 26, 2019, HAS BEEN REVIEWED AND AFFIRMED ON APRIL 26, 2019.

_____ D. VENETTOZZI _____
DIRECTOR, SPECIAL HOUSING/
INMATE DISCIPLINARY PROGRAM

CC: FACILITY SUPERINTENDENT
    CENTRAL OFFICE FILES
    D. BENTIVEGNA/ PLS, BUFFALO

APPEAL DECISION RENDERED PURSUANT TO SECTION 254.8 OF CHAPTER V AND
ELECTRONICALLY PRODUCED UPON THE AUTHORITY OF THE DIRECTOR OF SPECIAL
HOUSING/INMATE DISCIPLINE PROGRAM.

# Prisoners' Legal Services of New York

KAREN L. MURTAGH
*Executive Director*

MARIA E. PAGANO
*Managing Attorney*

14 Lafayette Sq., Suite 510 ◆ Buffalo, New York 14203
Tel.: (716) 854-1007 ◆ Fax: (716) 854-1008

DAVID BENTIVEGNA
*Staff Attorney*

ANDREW STECKER
*Staff Attorney*

May 10, 2019

**LEGAL MAIL**
**CONFIDENTIAL AND PRIVILEGED**

Michelle Bonet
17-G-0689
Albion Correctional Facility
3595 State School Road
Albion, NY  14411

Dear Ms. Bonet:

Enclosed please find a copy of the Administrative Supplemental Appeal/Request for Reconsideration we submitted on your behalf in regards to the February 26, 2019 and March 15, 2019 Tier III hearings.  Be assured that we will contact you as soon as we receive a response from the Director of Special Housing's Office.

We wish you well and please take care.

Sincerely,

David Bentivegna
Senior Staff Attorney

Enc.:   Copy of Supplemental Appeal

*Si usted desea, nos podemos comunicar en español.*



NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
THE HARRIMAN STATE CAMPUS - BUILDING 2
1220 WASHINGTON AVENUE
ALBANY, N.Y.  12226-2050

ANTHONY J. ANNUCCI                                    JAMES O'GORMAN
ACTING COMMISSIONER                                   DEPUTY COMMISSIONER
                                                      CORRECTIONAL FACILITIES

REVIEW OF SUPERINTENDENT'S HEARING

NAME:  BONET, MICHELLE                    NO.  17G0689

HEARING FACILITY:  ALBION

ON BEHALF OF THE COMMISSIONER AND IN RESPONSE TO YOUR RECENT

LETTER OF APPEAL, PLEASE BE ADVISED THAT YOUR SUPERINTENDENT'S HEARING OF

MARCH 15, 2019,    HAS BEEN REVIEWED AND AFFIRMED ON MAY 14, 2019.

_____D. VENETTOZZI_____
DIRECTOR, SPECIAL HOUSING/
INMATE DISCIPLINARY PROGRAM

CC: FACILITY SUPERINTENDENT
    CENTRAL OFFICE FILES
    D. BENTIVEGNA/ PLS, BUFFALO

APPEAL DECISION RENDERED PURSUANT TO SECTION 254.8 OF CHAPTER V AND
ELECTRONICALLY PRODUCED UPON THE AUTHORITY OF THE DIRECTOR OF SPECIAL
HOUSING/INMATE DISCIPLINE PROGRAM.



**Central New York Psychiatric Center**

| ANDREW M. CUOMO | ANN MARIE T. SULLIVAN, M.D. | DEBORAH J. MCCULLOCH |
|---|---|---|
| Governor | Commissioner | Executive Director |

May 23, 2019

RE: CNYPC Outpatient Clinical Record C#435139

Dear Ms. Bonet,

The attached clinical information is made available for your inspection in accordance with Mental Hygiene Law 33.16.

Central New York Psychiatric Center accepts no responsibility if information is re-disclosed to other persons or agencies.

Any questions or concerns you may have should be discussed with the clinical staff reviewing the information with you.

Sincerely,

Unit Chief

OMHPHI
**A FACILITY OF THE OFFICE OF MENTAL HEALTH**

Satellite Unit @ Albion Correctional Facility | 3595 State School Rd | Albion, New York 14411
P  585.589.5511 x1200    F 585.589.5511 x1299



**NEW YORK STATE** | **Corrections and Community Supervision**

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

May 20, 2019

BONET, MICHELLE (17G0689)
L-02-32B

     Re:    **FOIL Log No. 19-094**

Dear Mrs. Bonet:

This is in response to your New York State Freedom of Information Law request for: Urinalysis Quarterly Proficiency Reports for the facility per 7NYCRR 1020.7

We are attempting to determine what, if any, records are available concerning your request. We anticipate a reply should be forwarded to you within 20 days of the date of this letter unless you are notified otherwise in writing.

          Sincerely,

          T. Leon, ORC
          Albion Correctional Facility
          Guidance Unit

CC:    FOIL Records

If you do not receive a response or delay notification by the date specified, you may appeal by writing the Office of the Counsel & FOIL Appeals Officer, NYS Department of Corrections and Community Supervision, The Harriman State Campus, 1220 Washington Avenue, Albany, New York, 12226-2050.

In appeal correspondence, please clearly note your name, DIN number, facility from which records were requested, and the FOIL Log Number provided.



**NEW YORK STATE** | **Corrections and Community Supervision**

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

May 20, 2019

BONET, MICHELLE (17G0689)
L-02-32B

Re:    **FOIL Log No. 19-094**

Dear Mrs. Bonet:

This is in response to your New York State Freedom of Information Law request for: Urinalysis Quarterly Proficiency Reports for the facility per 7NYCRR 1020.7

We are attempting to determine what, if any, records are available concerning your request.  We anticipate a reply should be forwarded to you within 20 days of the date of this letter unless you are notified otherwise in writing.

Sincerely,

T. Leon, ORC
Albion Correctional Facility
Guidance Unit

CC:    FOIL Records

---

If you do not receive a response or delay notification by the date specified, you may appeal by writing the Office of the Counsel & FOIL Appeals Officer, NYS Department of Corrections and Community Supervision, The Harriman State Campus, 1220 Washington Avenue, Albany, New York, 12226-2050.

In appeal correspondence, please clearly note your name, DIN number, facility from which records were requested, and the FOIL Log Number provided.

**NEW YORK STATE** | **Corrections and Community Supervision**

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

COPY

May 21, 2019

RECEIVED

MAY 24 2019

PLSNY - BUFFALO

Mr. David Bentivegna
Staff Attorney
Prisoners' Legal Services of New York
14 Lafayette Square, Suite 510
Buffalo, New York 14203

Re:    Michelle Bonet, 17-G-0689
       Albion Correctional Facility

Dear Mr. Bentivegna:

This is in response to your letter requesting reconsideration of inmate Bonet's appeal regarding her Disciplinary Hearing of February 26, 2019, conducted at Albion Correctional Facility.

I do not believe there are sufficient grounds to reconsider the previous decision on that hearing. No further administrative action will be taken. Also, please note that inmate Bonet was released from confinement on April 14, 2019 as a result of a discretionary review.

Sincerely,

Donald Venettozzi    For
Director, Special Housing/
Inmate Disciplinary Programs

DV/jc
cc:    Superintendent Squires, Albion Correctional Facility
       Central Files

CTIONAL FACILITY
HOOL ROAD
ORK  14411

Law Library
Bonet, Michelle
17G0689
OL-02-32B

ALBION CORRECTIONAL FACILITY
RECEIVED
MAY 2 3 2019
CORRESPONDENCE

# Prisoners' Legal Services of New York

KAREN L. MURTAGH
*Executive Director*

14 Lafayette Sq., Suite 510 ◆ Buffalo, New York 14203
Tel.: (716) 854-1007 ◆ Fax: (716) 854-1008

DAVID BENTIVEGNA
*Staff Attorney*

MARIA E. PAGANO
*Managing Attorney*

ANDREW STECKER
*Staff Attorney*

June 5, 2019

**LEGAL MAIL**
**CONFIDENTIAL AND PRIVILEGED**

Michelle Bonet
17-G-0689
Albion Correctional Facility
3595 State School Road
Albion, NY  14411

Dear Ms. Bonet:

We hope this letter finds you well.  As you know our office submitted a Supplemental Administrative Appeal to the Director of Special Housing's Office in regard to your March 15, 2019 Tier III hearing at Albion C.F.  In addition, we also submitted a Request for Reconsideration concerning the February 26, 2019 Tier III hearing.  At this time we have received copies of his decisions (see enclosed).  Regrettably, the dispositions in your hearings were upheld.  Upon our review we have further determined that we will not be able to provide you with representation in an Article 78 proceeding to challenge these matters further.

If you choose to do so, you could file Article 78 petitions on your own.  If you decide to file an Article 78, you must do so within four months from the date you received a copy of the Director of Special Housing's decision regarding each disposition.  Please note, the Article 78 Memo we enclosed with our letter of March 29, 2019 contains some general advice and form materials that you may find informative.

Although we cannot assist you with an Article 78 petition, please find enclosed a copy of an advocacy letter we submitted to DOCCS concerning the urinalysis testing equipment at Albion.  Please note, because this letter contains personal information relating to other prisoners, we have redacted those portions of the letter that relate to these other individuals.  Be assured, we will advise of any response we receive from DOCCS.

Finally, we are returning the original documents you enclosed with your last letter.  Please take care.

Sincerely,

David Bentivegna
Senior Staff Attorney

Enc.:   Copy of Advocacy Letter
        Appeal Decisions
        Originals

*Si usted desea, nos podemos comunicar en español.*

 **NEW YORK STATE** | **Corrections and Community Supervision**

**ANDREW M. CUOMO**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

August 27, 2019

Ms. Cheryl L. Kates PC
Attorney at Law
PO Box 734
Fairport, NY 14450

Re: Michelle Bonet, 17-G-0689
Albion Correctional Facility

Dear Ms. Kates:

This is in response to your letter requesting reconsideration of inmate Bonet's appeals regarding Disciplinary Hearings of February 26, 2019 and March 15, 2019, conducted at Albion Correctional Facility.

I do not believe there are sufficient grounds to reconsider the previous decisions on these hearings. No further administrative action will be taken.

I encourage you to continue to exhibit positive behavior and avoid any further disciplinary problems.

Sincerely,

Donald Venettozzi    *For*
Director, Special Housing/
Inmate Disciplinary Programs

DV/lr
cc:    Superintendent Squires, Albion Correctional Facility
       Central Files

Cheryl L. Kates PC
Attorney at Law
PO Box 734
Fairport, NY 14450
(585) 820-3818
Cheryl6401@aol.com

Anthony Rodriguez
NYS DOCCS
SHU Appeals
1220 Washington Avenue
Building 9
Albany, Ny 12226

Re: Michelle Bonet, 17G-0689
Tier 3 drug tickets

September 7, 2019

Dear Mr. Rodriguez,

I am in receipt of your letter dated August 27, 2019 denying further relief on this matter. Since our
phone conversation, I was able to speak with my client regarding an issue you brought up stating she
received an additional urine test between the two positives which came up negative. She indicated that
this did not happen. In a letter challenging things written by PLS previously, their correspondence
discussed two additional inmates who also experienced this problem. It was inmate Sequin who
received the negative urine between positives not Bonet.

Bonet indicated she was given a urinalysis as required when preparing for an FRP. She was also given
one February 7th when she was in keep lock status which was positive. After the DR. changed her
medications she was tested in July and this test was negative.

Ms. Bonet was in the college program when this occurred. She missed a semester already and stands to
miss the upcoming semester as well. She only had a year left to obtain her diploma and would graduate
after completing the semester which is set to begin ( had she not been removed a semester ago). This is
very unfair to someone who was actively participating in her rehabilitation and then also serving as a
leader at the correctional facility helping others. I would ask that you look at this specific issue. There
was also an issue in her matters where the document in her file was that of the other inmate so please
check the DIN numbers when you are reviewing this. Thank you for your attention to this matter.

Sincerely,

Cheryl L. Kates Esq.

9/15/19

Dear Superintendent Squires:

My name is Michelle Bone (17G0689) and I am writing you because I have been here at Albion for 5 years and one month hoping to participate in the DWI program, unfortunately I'm 15 months away from my first board appearance with no hope in sight of getting into the class. I also have not been put in a job (yet) probably because I was an FPA) and in college. However since losing all of my privileges as a result of two false positive urinalysis, I am no longer permitted to engage in those activities. Therefore I am currently a porter for two meals a day with no meaningful programming and hoped you may be able to get me into DWI.

Please advise

Thank You,
Michelle Bone
17G0689  C2-30B



STATE OF NEW YORK
COUNTY OF ORLEANS
CHAMBERS OF
COUNTY JUDGE AND SUPREME COURT
JUSTICE
1 SOUTH MAIN STREET, STE 3
ALBION, NEW YORK 14411

JAMIE SUMMERS
Chief Clerk of Surrogate
Court
(585)283-6658
Fax # (585)589-0632

KRISTIN E. NICHOLSON
Chief Clerk of County and
Supreme Courts
(585)283-6657
Fax # (585) 589-0632

September 18, 2019

S. Squires, Superintendent
Albion Correctional Facility
3595 State School Road
Albion, NY 14411

Re:   Bonet vs. Annucci, et al
      Index No. 19-45995

Dear Superintendent:

Enclosed herewith you will find a copy of documents regarding the above-entitled Article 78
proceeding which has been made returnable in Supreme Court, Orleans County on Tuesday,
October 29, 2019 at 1:00 p.m. at the Orleans County Courthouse, Courthouse Square, Albion, New
York. This matter will be heard on papers as submitted.

Very truly yours,

Kristin E. Nicholson
Chief Clerk

cc:   Michelle Bonet, 17G0689 (w/out enc.)
      File

Enc.

**Thermo Fisher**
S C I E N T I F I C

The world leader
in serving science

October 11, 2019

Via email (cheryl6401@aol.com) and US Mail

Cheryl L. Kates PC
Attorney at Law
PO Box 734
Fairport, NY 14450

**Re:    Letter to Marc Casper dated September 13, 2019**

Dear Ms. Kates:

The above referenced letter was forwarded to me for handling. As I indicated in my emails and voicemail, I am the attorney supporting Microgenics Corporation ("*Microgenics*"), which is a subsidiary of Thermo Fisher Scientific. I apologize for our extended exchanges of voicemails and emails. In order to further aid your understanding of our instrument and related drugs of abuse tests, I thought it would be helpful to provide some additional information.

## Background

Microgenics does supply the Thermo Scientific™ Indiko™ Clinical and Specialty Chemistry System ("*Indiko Analyzers*") to the New York State Department of Corrections ("*NYS DOCCS*"). According to our records we installed 52 Indiko Analyzers (one for each of the 52 NYS DOCCs sites) between January and March 2019.

The Indiko Analyzer is a fully automated, sample-oriented, random access bench-top clinical and specialty chemistry system for clinical and special chemistries, including enzymes, substrates, electrolytes, specific proteins, and drugs of abuse tests. Many different tests can be run simultaneously from a single sample. The Indiko Analyzer's Food and Drug Administration ("*FDA*") Device Classification Name is "discrete photometric chemistry analyzer for clinical use." The Indiko Analyzer was cleared via the FDA Premarket Clearance process (or "*510(k)*") and received its 501(k) Number K11035 per 21 CFR 862.2160, Classification Product Code JJE on June 28, 2011. As part of obtaining FDA Premarket Clearance, the Indiko Analyzer was subjected to design verification and validation testing to ensure that the design specifications were met.

Microgenics initially provided to NYS DOCCS our CEDIA™ Buprenorphine II Assay ("*BUP II Assay*"). The BUP II Assay is a sensitive assay with a cut-off of 10 ng/ml, and the assay functions by measuring and comparing the cumulative sum of these four analytes against the cut-off. We also sell the CEDIA™ Buprenorphine I Assay ("*BUP I Assay*") which has a cut-off of 5 ng/mL which detects the parent drug and only one of the key metabolites – Buprenorphine-glucuronide. The BUP I Assay and BUP II Assay are classified as Enzyme Immunoassay, Opiates and also go through the 510(k)

**Thermo Fisher**
S C I E N T I F I C

process. The BUP I Assay was cleared via FDA 510(k) K040317 on June 23, 2004 and BUP II Assay was cleared via FDA 510(k) K16301 on April 6, 2017. The BUP II Assay is intended to minimize false positives in the BUP I Assay, detecting the parent drug as well as the three most prevalent metabolites of the drug – Norbuprenorphine, Norbuprenorphine-glucuronide, and Buprenorphine-glucuronide.

Since many tests (or assays) can be run on the Indiko Analyzer, it is necessary that these assays are appropriately validated per the install process specified by Microgenics and the customer pursuant to respective standards, guidelines and regulations. The assays themselves also have FDA clearance to ensure the scientific validity when run on an automated clinical chemistry analyzer such as the Indiko Analyzer. The design and development of these assays takes into account common structurally related and unrelated compounds. Prescribed medication(s) (including medications prescribed to an inmate) may interfere with the drug being screened/tested which could lead to an unconfirmed positive. However, Microgenics' drugs of abuse tests are all underlined preliminary tests, and because of this the Instructions For Use ("*IFU*") expressly require a more specific confirmatory test to be run to obtain a confirmed analytical result.  The IFU provides the following instruction: "*The assay provides only a preliminary analytical test result. A more specific alternative chemical method must be used to obtain a confirmed analytical result. Gas chromatography/ mass spectrometry (GC/MS) or Liquid chromatography/tandem mass spectrometry (LC-MS/MS) is the preferred confirmatory method.*"  A copy of the IFU is included for your convenience.

### Response to Letter

In regard to our company representative "testifying that false positives cannot happen in cases where your company has not tested the specific medication," it is difficult for me to respond to such a statement without hearing exactly what was said or the context in which an answer may have been given. I could interpret this as someone stating that we cannot confirm an unconfirmed positive if we do not have access to a sample for purposes of retesting. This is true.  I can tell you that our technical support colleagues are sometimes asked to provide product information during hearings.  Our technical support team is instructed to provide guidance based on the instrument's operator's manual and IFU, which as noted above, includes the instruction for confirmatory testing.

In your letter you indicate, "your newly supplied Thermo Indiko drug testing machines being used in NYS Department of Corrections, correctional facilities are producing false positives in grove numbers regarding inmates incarcerated in NYS." Because we do not believe that we have a large number of alleged unconfirmed positives related to the BUP II Assay, we reviewed our complaint logs for NYS DOCCS as well as other customers.  Since 2017, we have received only nine complaints alleging an unconfirmed positive. Four of the nine relate to the NYS DOCCS, but only one in 2019.  We have received other complaints for unrelated performance issues or shipping errors.  Given the large volume of instruments (52) and thousands of related tests that have been provided to NYS DOCCS, and the fact that no preliminary screening test can ensure that an unconfirmed positive would never occur, we did not conclude that the data supported your statement.

Microgenics does test/evaluate several medications as part of the assay design and development process.  For those prescribed medications that we have tested/evaluated, we do include such cross-

NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
THE HARRIMAN STATE CAMPUS - BUILDING 2
1220 WASHINGTON AVENUE
ALBANY, N.Y.  12226-2050

ANTHONY J. ANNUCCI                          JAMES O'GORMAN
ACTING COMMISSIONER                         DEPUTY COMMISSIONER
                                            CORRECTIONAL FACILITIES

REVIEW OF SUPERINTENDENT'S HEARING

NAME:  BONET, MICHELLE                   NO.  17G0689

HEARING FACILITY:  ALBION

ON BEHALF OF THE COMMISSIONER, PLEASE BE ADVISED THAT YOUR

SUPERINTENDENT'S HEARING OF  MARCH 15, 2019,    HAS BEEN REVIEWED AND

ADMINISTRATIVELY REVERSED ON JANUARY 3, 2020.


_____D. VENETTOZZI_____
DIRECTOR, SPECIAL HOUSING/
INMATE DISCIPLINARY PROGRAM


CC: FACILITY SUPERINTENDENT
    CENTRAL OFFICE FILES


APPEAL DECISION RENDERED PURSUANT TO SECTION 254.8 OF CHAPTER V AND
ELECTRONICALLY PRODUCED UPON THE AUTHORITY OF THE DIRECTOR OF SPECIAL
HOUSING/INMATE DISCIPLINE PROGRAM.

NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
THE HARRIMAN STATE CAMPUS - BUILDING 2
1220 WASHINGTON AVENUE
ALBANY, N.Y.  12226-2050

ANTHONY J. ANNUCCI
ACTING COMMISSIONER

JAMES O'GORMAN
DEPUTY COMMISSIONER
CORRECTIONAL FACILITIES

REVIEW OF SUPERINTENDENT'S HEARING

NAME:  BONET, MICHELLE                NO.  17G0689

HEARING FACILITY:  ALBION

ON BEHALF OF THE COMMISSIONER, PLEASE BE ADVISED THAT YOUR

SUPERINTENDENT'S HEARING OF  FEBRUARY 26, 2019,  HAS BEEN REVIEWED AND

ADMINISTRATIVELY REVERSED ON JANUARY 3, 2020.


_____D. VENETTOZZI_____
DIRECTOR, SPECIAL HOUSING/
INMATE DISCIPLINARY PROGRAM


CC: FACILITY SUPERINTENDENT
    CENTRAL OFFICE FILES


APPEAL DECISION RENDERED PURSUANT TO SECTION 254.8 OF CHAPTER V AND
ELECTRONICALLY PRODUCED UPON THE AUTHORITY OF THE DIRECTOR OF SPECIAL
HOUSING/INMATE DISCIPLINE PROGRAM.

MICHELLE BONET
9 STONEWALL CIRCLE
WHITE PLAINS, NY 10607
MICHELLEBONET@GMAIL.COM
(914)260-4162

May 8, 2024

The Honorable John L. Sinatra, Jr.
United States District Judge
Robert H. Jackson United States Courthouse
2 Niagara Square
Buffalo, New York 14202

**Re: 22-CV-300 (JLS)**

To The Honorable John L. Sinatra, Jr.:

Enclosed please find the second amended complaint in the above-mentioned case. These documents represent the culmination of significant effort and dedication to obtaining justice. This litigation has proven to be intricate and time-consuming, requiring meticulous attention to detail.

As a pro-se litigator I have diligently worked to navigate the complexities of the case to the best of my abilities. However, I must respectfully request the court's consideration of my request to engage additional legal counsel to assist in the further proceedings of this case. The challenges presented by this litigation extend beyond my current capacity, necessitating specialized expertise and resources that I am unable to provide single-handedly.

The filings included herewith address various issues pertinent to the case, including violations of due process rights and wrongful solitary confinement. It is my fervent hope that these submissions will aid the court in understanding the gravity of the situation.

Thank you,

Michelle Bonet

Enc:
11 copies of the full submission to i  l  l
Marshall Service Form



Part # 156297 (XS/PAGO/EXP 07/24

SHIP DATE: 16MAY24
ACTWGT: 9.80 LB
CAD: 689395E/SSFE2500

BILL THIRD PARTY

ORIGIN ID:NESA  (000) 000-0000
MICHELLE BONET

9 STONEWALL CIR

WHITE PLAINS, NY 10607
UNITED STATES US

TO  UNITED STATES DISTRICT
    COURT CLERK
    200 U.S COURTHOUSE
    2 NIAGARA SQUARE
    BUFFALO NY 14202
    (716) 551-1600

REF:

DEPT:

FedEx
Express

E

TRK# 2747 6961 1713
0201

XS BUFA

FRI – 17 MAY 5:00P
STANDARD OVERNIGHT
ASR
14202
BUF

NY-US

J24202403Z601 uY

RT418
FZ
6
17:00
17:3
05.17

Box

argo

recyclable.